UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

D-1  EDWIN MILLS,
D-2  CARLO WILSON,

      Defendants.

Case No. 2:16-cr-20460

Hon. Mark A. Goldsmith

---

**JOINT MOTION TO STRIKE THE NOTICE OF INTENT TO SEEK
SENTENCE OF DEATH ON THE GROUNDS THAT THE
FEDERAL DEATH PENALTY ACT IS UNCONSTITUTIONAL BECAUSE
IT FAILS TO REQUIRE A GRAND JURY FINDING ON THE EXISTENCE
OF AGGRAVATING FACTORS AND WHETHER THOSE OUTWEIGH
ANY MITIGATING FACTORS**

Messrs. Edwin Mills and Carlo Wilson, through counsel, respectfully move

this Court, pursuant to the Fifth, Sixth, and Eighth Amendments to the United

States Constitution, to strike the Notice of Intent to Seek a Sentence of Death.

In support of this motion, Messrs. Mills and Wilson state the following:

1.     The grand jury indicted Messrs. Mills and Wilson in a second

superseding indictment filed February 28, 2018. Dkt. 292. Both pled not guilty to

the charges. Dkt. 302. A Notice of Intent to Seek a Sentence of Death was filed on

March 1, 2018. Dkt. 293. Trial is scheduled for April 21, 2020. Dkt. 475.

2.      In this motion, Messrs. Mills and Wilson seek the following relief: (I) an order striking the Notice of Intent (NOI) to seek a sentence of death because the Supreme Court's decisions in *Ring v. Arizona* and *Hurst v. Florida* have rendered the Federal Death Penalty Act of 1994 ("FDPA") unconstitutional; and (II) an order striking the NOI because even if the FDPA can be rendered constitutional by a finding by the grand jury of gateway and statutory aggravating factors, the "notice of special findings" in the superseding indictment and the notice of the non-statutory aggravating factors in the NOI should be stricken because the government has not obtained an indictment consistent with the requirements of the Fifth Amendment.

3.      The government, through its Assistant United States Attorney, does not concur in this motion.

4.      Messrs. Mills and Wilson respectfully move this Court to declare the FDPA unconstitutional.

Respectfully submitted,

s/Gerald J. Gleeson
Gerald J. Gleeson, II (P53568)
Jeffrey Alan Crapko (P78487)
Miller, Canfield, Paddock
and Stone, P.L.C.
840 West Long Lake Road, Suite 150
Troy, Michigan 48098-6358
(248) 879-2000
gleeson@millercanfield.com
Counsel for Edwin Mills

s/ Jacqueline K. Walsh
Jacqueline K. Walsh
Washington State Bar No. 21651
705 2nd Ave., Suite 501
Seattle, WA  98104
(206) 325-7900x5
Jackie@jamlegal.com
Counsel for Carlo Wilson

s/ Jean D. Barrett
Jean D. Barrett
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
(973)744-1000
jeanbarrett@ruhnkeandbarrett.com
Counsel for Edwin Mills

s/ Ashwin Cattamanchi
Ashwin Cattamanchi
Illinois State Bar No. 6289199
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
ashwin_cattamanchi@fd.org
Counsel for Carlo Wilson

DATED:     February 15, 2019

**MEMORANDUM IN SUPPORT OF JOINT MOTION TO STRIKE THE
NOTICE OF INTENT TO SEEK SENTENCE OF DEATH
ON THE GROUNDS THAT THE
FEDERAL DEATH PENALTY ACT IS UNCONSTITUTIONAL
BECAUSE IT FAILS TO REQUIRE A GRAND JURY FINDING ON THE
EXISTENCE OF AGGRAVATING FACTORS AND WHETHER THOSE
OUTWEIGH ANY MITIGATING FACTORS**

## Issue Presented

I.      Whether the Supreme Court's decisions in *Ring v. Arizona* and *Hurst v. Florida* have rendered the Federal Death Penalty Act of 1994 ("FDPA") unconstitutional.

II.      Whether even if the FDPA can be rendered constitutional by a finding by the grand jury of gateway and statutory aggravating factors, the "notice of special findings" in the superseding indictment and the notice of the non-statutory aggravating factors in the NOI should be stricken because the government has not obtained an indictment consistent with the requirements of the Fifth Amendment.

## Controlling Authority for the Relief Sought

The Fifth, Sixth, and Eighth Amendments to the United States Constitution, *Ring v. Arizona*, 536 U.S. 584 (2002), and *Hurst v. Florida*, 136 S. Ct. 616 (2016).

## ARGUMENT

**I.    The Supreme Court's *Ring* and *Hurst* Decisions Have Rendered the Federal Death Penalty Act Unconstitutional, and the Act Cannot Be Saved By a Judicial "Construction" That Creates a New Criminal Offense Whose Elements and Intertwined Procedures Have Neither Been Considered, Nor Enacted Into Law, By Congress.**

### A.    Introduction and Summary of Argument

In enacting the FDPA in 1994, and the predecessor Anti Drug Abuse Act of 1988 (ADAA of 1988), which provided for a potential death sentence for so-called drug kingpins, Congress granted exclusive statutory authority to allege aggravating factors to the prosecutor. If that aspect of the FDPA is not operative, the statute lacks any congressionally-approved method of alleging aggravating factors. But that is exactly the case. In the wake of *Ring v. Arizona*, 536 U.S. 584 (2002), the FDPA lacks any legislatively-selected method of initiating a capital prosecution. While the Constitution requires that the elements of capital murder be presented to a grand jury and charged in an indictment, Congress, in passing the FDPA, had chosen another route and it is up to Congress to make the necessary corrections.

Thus, the FDPA is presently unconstitutional and this Court should resist and reject the government's efforts to invent a "*Ring* fix."

It is fundamental to our system of government that "[i]t is the legislature which is to define a crime and ordain its punishment." *United States v. Wiltberger*, 18 U.S. 76, 93 (1820) (Marshall, C.J.). In *Ring*, the Court held that, with respect to the framework of Arizona's death penalty statute, the "enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense' . . . ." *Ring*, 536 U.S. at 585 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)). That holding, coupled with the Court's earlier holding in *Jones v. United States*, 526 U.S. 227, 251–52 (1999), that all elements of a federal offense "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt[,]"[1] in effect render the FDPA unconstitutional because under *Ring* the statute's aggravating factors are elements of the capital offense. Under the FDPA, for the purposes of this discussion only, the "elements" of capital murder are *at least* murder + intent + one or more statutory aggravating factors.

The FDPA, of course, nowhere provides for presentation of aggravating

---

[1] *Ring* did not discuss the grand jury issue because the case arose in the context of a state statute to which the Fifth Amendment's Indictment Clause does not apply. *See Hurtado v. California*, 110 U.S. 516 (1884).

factors to a grand jury. But neither is the statute silent on the issue of how such factors are to be alleged. On that score, the FDPA explicitly reserves the selection and notice of aggravating factors to the exclusive discretion of the prosecutor. The government has attempted to resolve the problem, as it has here, by adopting a practice of seeking "special findings" from the grand jury as part of the indictment process. The government should not be permitted to re-write the FDPA to save it. Instead, the FDPA must be declared unconstitutional until further congressional action.

In a closely analogous circumstance, the Supreme Court, in *United States v. Jackson*, 390 U.S. 570 (1968), condemned the very practice now at issue, *i.e.*, where a district court was asked to engage in the judicial amendment of a capital statute in order to preserve its constitutionality. In that case, the court declined to do so. The Supreme Court's admonition in *Jackson* is equally appropriate here:

> It is unnecessary to decide here whether this conclusion
> [the Government's proposed "fix" of the death-penalty
> aspects of the federal kidnapping statute] would follow
> from the statutory scheme the Government envisions, for
> it is not the scheme that Congress enacted.

390 U.S. at 573.

The principles which flow logically and inexorably to the conclusion that the FDPA cannot survive *Ring* and *Hurst* will be presented below in the following order:

(1) in *Ring* and *Hurst*, the Supreme Court held that aggravating factors necessary to a capital verdict are essential elements of the capital offense and must  proved to a jury beyond a reasonable doubt; when combined with the indictment requirement for elements in *Jones,* aggravating factors in federal capital cases must be presented to a grand jury and alleged in the indictment;

(2) the FDPA does not provide for presentation of aggravating factors to a grand jury (and thereby inclusion of them in an indictment), but instead vests authority to identify aggravating factors exclusively with the prosecutor;

(3) the FDPA cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury because, as the Supreme Court held in *Jackson*, and consistent with centuries of constitutional jurisprudence and statutory construction, it is for the legislature, not the courts or the prosecutor, to define crimes and punishment and the contours of a statute, and the presentation of aggravating factors to a grand jury is contrary to the unambiguous intent of Congress as expressed in the FDPA; and,

(4) contrary decisions from courts of appeals have been wrongly decided because they have failed either to (a) address *Jackson* and the fundamental separation of powers principles incorporated therein; and/or (b) acknowledge, much less reconcile, the explicit allocation of authority to the prosecutor to determine the propriety of aggravating factors. Nor do severability analysis or the post-*Apprendi* drug cases, or the principle of "constitutional avoidance" save the FDPA; indeed, those doctrines and the cases, as well as post-*Ring* Supreme Court cases, including *United States v. Booker*, 543 U.S. 220 (2005), and *Blakely v. Washington*, 542 U.S. 296 (2004), establish that a judicially imposed solution cannot redefine or reconfigure a federal criminal statute to do what Congress has not intended.

**B.**     **Aggravating factors necessary to a capital verdict are essential elements of the capital offense and must be pleaded in the indictment and proved to a jury beyond a reasonable doubt.**

In *Ring*, in which the Supreme Court overruled *Walton v. Arizona*, 497 U.S.

639 (1990), and in subsequent cases, the Court established beyond dispute that

aggravating factors necessary to imposition of the death penalty under the FDPA

must be charged in the indictment and proved to the satisfaction of a jury beyond a

reasonable doubt. As noted earlier, the Supreme Court explained in *Ring* that facts

which increase the maximum penalty faced by the defendant create new, different,

and "greater offense[s]." Concurring in *Ring*, Justice Scalia observed:

> [All] facts essential to imposition of the level of punishment that the
> defendant receives—whether the statute calls them elements of the offense,
> sentencing factors, or Mary Jane—must be found by the jury beyond a
> reasonable doubt.

*Ring*, 436 U.S. at 610 (Scalia, J., concurring).

Similarly, in *Apprendi*, the Court had observed that "[t]he judge's role in

sentencing is constrained at its outer limits by the facts alleged in the indictment

and found by the jury. Put simply, facts that expose a defendant to a punishment

greater than that otherwise legally prescribed [are] by definition 'elements' of a

separate legal offense." 530 U.S. at 483 n.10.

In *Jones*, the Court had presaged what has since occurred by holding that all

elements of a federal offense "must be charged in the indictment, submitted to a

jury, and proven by the Government beyond a reasonable doubt." 526 U.S. at 227.

*See also United States v. Cotton*, 535 U.S. 625 (2002) (in federal prosecutions, any

fact increasing the maximum punishment "must also be charged in the

indictment").

Thus, *Ring* and *Jones* have established beyond dispute that the facts alleged in the "Special Findings" section of the superseding indictment and the statutory and nonstatutory aggravating factors alleged in the NOI in this case constitute elements of an offense, because they "are facts that expose [this] defendant to a punishment greater than that otherwise legally prescribed . . . ," *i.e.*, the death penalty. That conclusion is further confirmed by the Supreme Court's subsequent decisions in *Blakely* and *Booker*, in which first state and then federal sentencing guidelines factors, respectively, were held to constitute the functional equivalent of elements that required proof to a jury beyond a reasonable doubt. 542 U.S. at 303; 543 U.S. at 244.

Capital cases since *Ring* have continued in the same vein. For example, in *Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003), the Court considered whether double jeopardy was a bar to the second prosecution of a capital penalty trial after a divided jury at the first trial had spared the defendant's life and the defendant's underlying conviction was reversed on appeal. There, the Court ruled 5-4 that double jeopardy did not bar a second sentencing trial. Justice Scalia—joined by the Chief Justice and Justice Thomas—discussed the implications of the Court's decision in *Ring*:

> In *Ring v. Arizona*, 536 U.S. 584 (2002), we held that aggravating circumstances that make a defendant eligible for the death penalty "operate as 'the functional equivalent of an element of a *greater offense*.'" *Id.* at

> [609] (emphasis added). That is to say, for purposes of
> the Sixth Amendment's jury-trial guarantee, the
> underlying offense of "murder" is a distinct, lesser
> included offense of "murder plus one or more
> aggravating circumstances": Whereas the former exposes
> a defendant to a maximum penalty of life imprisonment,
> the latter increases the maximum permissible sentence to
> death.

537 U.S. at 111.

The three justices who joined that portion (Part III) of the main opinion

concluded that there could be no principled reason to distinguish between what

constitutes an offense for purposes of the Sixth Amendment and an "offence" for

purposes of the Double Jeopardy Clause of the Fifth Amendment. *Id.*

Yet even the four dissenting justices agreed with Justice Scalia's proposition

with respect to capital murder constituting a *greater* offense based on the

additional elements—the aggravating factors—needed to prove that offense:

> This Court has determined . . . that for the purposes of
> the Double Jeopardy Clause, capital sentencing
> proceedings involving proof of one or more aggravating
> factors are to be treated as trials of separate *offenses*, not
> mere sentencing proceedings. *See, ante*, at [537 U.S. at
> 736-738, 739-740]; *Ring v. Arizona*, 536 U.S. 584
> (2002); *Bullington v. Missouri*, 451 U.S. 430 (1981).

537 U.S. at 126 n.6 (emphasis in original) (Ginsburg, J., dissenting).

Thus, at least seven justices agreed that, under the principles set forth in

*Ring*, capital sentencing schemes that employ aggravating factors create, from a

constitutional perspective, new offenses, greater than ordinary willful homicide,

11

that are distinguished by the additional *elements* those aggravating factors represent. Pursuant to *Jones* and *Cotton*, when those greater offenses are prosecuted under federal law in federal court, it is beyond question that they must not only be proved to a jury beyond a reasonable doubt, but that they must first be presented to a grand jury and included within the indictment.

And finally, in the Supreme Court's recent decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016), the Court held that, under *Apprendi*, 530 U.S. at 466, and *Ring*, 536 U.S. at 584, sentencing procedures that Florida had used for more than 40 years violated the Sixth Amendment right to jury trial. In *Hurst*, the Supreme Court reversed a death sentence under Florida's sentencing scheme and declared that scheme unconstitutional. Under pre-*Hurst* Florida law, after an evidentiary hearing, a jury made a "recommendation" of life or death. But the judge was still required to hold a separate hearing and determine "whether sufficient aggravating circumstances existed to justify imposing the death penalty"—the jury's recommended sentence was merely "advisory." This, the Supreme Court held, is forbidden, because "[t]he Sixth Amendment requires a jury, not a judge, to find each *fact* necessary to impose a sentence of death." 136 S. Ct. at 619–21 (emphasis added):

> Florida concedes that *Ring* required a jury to find every fact necessary to render Hurst eligible for the death penalty. . . . [Yet t]he State fails to appreciate the central and singular role the judge plays under Florida law. . . .

> [T]he Florida sentencing statute does not make a defendant eligible for death until "*findings by the court* that such person shall be punished by death." Fla. Stat. § 775.082(1) (emphasis added). The trial court alone must find "the facts ... [t]hat sufficient aggravating circumstances exist" and "[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances." § 921.141(3); *see Steele*, 921 So.2d, at 546. . . . The State cannot now treat the advisory recommendation by the jury as the necessary factual finding that *Ring* requires.

*Id.* at 622 (emphasis added). Thus, the Court viewed the trial judge's weighing determination as a finding of a fact for purposes of *Apprendi*. The Fifth and Sixth Amendments require that such finding be made beyond a reasonable doubt. *See Alleyne v. United States*, 570 U.S. 99, 108 (2013); *Ring*, 536 U.S. at 610 (Scalia, J., concurring) ("[A]ll facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by the jury beyond a reasonable doubt.").[2]

The structure of the FDPA conforms with that conclusion. As with the Arizona scheme at issue in *Ring*, and the Florida scheme at issue in *Hurst*, a jury's

---

[2] *Hurst* has already led one jurisdiction to reexamine and declare unconstitutional its sentencing procedures in capital cases. The Delaware Supreme Court, which had previously held that "*Ring* does not extend to the weighing phase" of capital sentencing, *Brice v. State*, 815 A. 2d 314, 322 (Del. 2003), relying on *Hurst v. Florida*, held that the "weighing" of aggravating factors against mitigating factors is a factual determination that only the jury, and not the judge, could determine, and that determination must be unanimous and found by proof beyond a reasonable doubt. *See Rauf v. State of Delaware*, 145 A.3d 430 (Del. 2016).

verdict finding a federal defendant guilty of murder cannot support a sentence of death without additional fact-finding. For example, although a guilty verdict is a potential death sentence, a defendant is not actually exposed to a death sentence unless and until the jury (or the judge, where a jury has been waived) makes determinations, unanimously and beyond a reasonable doubt, that the existence of one of the four "intent" factors listed at 18 U.S.C. § 3591(a)(2)(A–D) and at least one statutory aggravating factor set forth at 18 U.S.C. § 3592(c) or (d) has been found. Thus, it follows that the aggravating factors alleged by the government in the superseding indictment (Dkt. 292) and in the NOI (Dkt. 293) are elements of a greater offense that require the proof of those elements before a death sentence can be imposed.

### C. The FDPA does not provide for presentation of aggravating factors to a grand jury (and thereby including them in an indictment), but instead vests authority to identify aggravating factors exclusively with the prosecutor.

With respect to federal capital offenses prosecuted in federal court, *Ring* and the Fifth Amendment's indictment clause require that aggravating factors necessary to a death sentence be presented to a grand jury and included in the indictment.[3] The FDPA neither contemplates affording, nor permits, the grand jury

---

[3] The Fifth Amendment provides in pertinent part that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury[,]" including those accused of felony offenses. *See Stirone v. United States*, 361 U.S. 212, 215 (1960) ("[t]he crime charged here is a

any role in determining which aggravating factors are to be alleged in a federal capital prosecution. Pursuant to the FDPA scheme chosen by Congress, a sentence of death may not be sought unless, as set forth in the statute itself, "the attorney for the Government believes that the circumstances of the offense are such that a sentence of death is justified." 18 U.S.C. § 3593(a). If the "attorney for the government" believes death is warranted, the next step in the legislatively-selected process is for that attorney to serve and file a notice, signed by the attorney for the Government, stating, *inter alia*, that "the Government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified . . . and that the Government will seek a sentence of death." 18 U.S.C. § 3593(a)(1).

Although not in and of themselves aggravating factors, the pre-*Ring* FDPA also required proof—and allegation in the notice by government attorneys—of one or more of four "gateway" state-of-mind factors. 18 U.S.C. § 3591(2). The notice, in addition, is required to set forth the aggravating factors—statutory and non-statutory—the government proposes to prove if the defendant is convicted which may include victim-impact evidence. 18 U.S.C. § 3593(a). The ADAA scheme was similar. *See* 21 U.S.C. § 848(h) (Repealed). Consequently, the unambiguous language of the FDPA statutes themselves establishes that Congress, rightly or

---

felony and the Fifth Amendment requires that prosecution be begun by indictment").

wrongly, elected to enact a scheme where the decision to set the machinery of death in motion would be reserved to the government's attorneys and no one else, not grand juries, not the court, and not any other individual or entity. Nonetheless, the government seeks to establish a substitute method for introducing aggravating factors now that *Ring* has rendered the exclusive statutorily prescribed mechanism selected by Congress constitutionally invalid. Fidelity to the fundamental principle of separation of powers, embedded deeply in the constitutional form of government our nation has adopted, and detailed below, is even more important when applied to the government's efforts to execute one of its citizens, thereby imposing "the most irremediable and unfathomable of penalties." *Ford*, *supra*, 477 U.S. at 411.

> **D.** ***Jackson* and the Separation of Powers Doctrine demonstrate that the FDPA cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury because presentation of aggravating factors to a grand jury is contrary to the unambiguous intent of Congress as expressed in the FDPA.**

As noted, this is not an instance in which congressional silence permits flexibility in rescuing an otherwise unconstitutional statute from invalidation. Indeed, given the express and unambiguous language and structure of the FDPA, if, prior to *Ring*, a defendant had argued that the aggravating factors could not be applied unless they were presented to and charged by a grand jury in the indictment, the government's response undoubtedly, and correctly, would have

been that the statute does not ascribe any such role to the grand jury, and that the statute plainly reserves that authority solely to the prosecutor.

1.  Congress, not the courts or prosecutors, is vested with legislative authority to define federal criminal offenses and the punishment for such conduct.

This view conforms with centuries of federal criminal jurisprudence. Since at least as early as *United States v. Hudson*, 11 U.S. 32 (1812) (Marshall, C.J.), it has been clear that the Constitution affords Congress the sole power to define and create all offenses against the United States, and the punishment therefor. *See also United States v. Worrall*, 2 U.S. (2 Dall.) 384, 393–94 (1798); *United States v. Wiltberger*, 18 U.S. 76, 93 (1820), ("[i]t is the legislature, not the court, which is to define a crime and ordain its punishment"); *Hudson*, 11 U.S. at 34 ("[t]he legislative authority of the Union must first make an act a crime, fix a punishment to it, and declare the Court that shall have jurisdiction of the offense" and "[t]he power of punishment is vested in the legislative, not in the judicial department"). *See also Bousley v. United States*, 523 U.S. 614, 620–21 (1998) ("under our federal system it is only Congress, and not the courts, which can make conduct criminal"); *Staples v. United States*, 511 U.S. 600, 604 (1994) ("[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes which are solely creatures of statute") (citation omitted).

17

As a result, "[o]ne may be subjected to punishment for crime in the federal courts only for the commission or omission of an act defined by statute, or by regulation having legislative authority, and then only if punishment is authorized by Congress." *Viereck v. United States*, 318 U.S. 236, 241 (1943) (citations omitted); *see also United States v. Lanier*, 520 U.S. 259, 267–68 n.6 (1997) ("[f]ederal crimes are defined by Congress, not the courts, . . . ."); *Logan v. United States*, 144 U.S. 263, 283 (1982) ("[a]lthough the constitution contains no grant, general or specific, to congress of the power to provide for the punishment of crimes, [with certain exceptions] . . . no one doubts the power of congress to provide for the punishment of all crimes and offenses against the United States"). Applying these principles in *Bouie v. City of Columbia*, 387 U.S. 347 (1964), in which the state courts of South Carolina, in an obvious effort to prosecute civil rights protesters, had construed an existing statute in a manner that created a new crime, the Supreme Court intervened and set aside the statute, as interpreted, as contrary to *Wiltberger*. *See also Crandon v. United States*, 494 U.S. 152, 158 (1990) ("legislatures, not courts, define criminal liability").

2.   <u>*Jackson* provides a direct and "all fours" precedent to the circumstances present herein, and compels invalidation of the FDPA</u>

It is in that context that the Supreme Court's decision in *United States v. Jackson*, 390 U.S. 570 (1968), provides precedent applicable to capital statutes,

and to improper attempts to cure them by judicial fiat rather than by legislative action. As stated earlier, this is not the first time that the government has attempted to enlist the judiciary in an effort to rescue, through ersatz construction, a constitutionally flawed federal death penalty.

In *Jackson*, the Court held that when a federal sentencing statute is unconstitutional, a court lacks authority to devise its own procedure, unauthorized by statute or rule to pass constitutional muster. In *Jackson*, the Court considered the federal kidnapping statute, which contained a mandatory death penalty when a jury recommended it—thereby making the death penalty possible only for those defendants who exercised their right to trial by jury.

In an effort to salvage the death penalty provision, the government proposed a number of alternative "constructions" of the statute and cited *ad hoc* procedures developed by other district courts as "cures" for the constitutional problems. However, the Court, after finding the statute unconstitutional, rejected the government's proposal, because it represented judicial, rather than *legislative* action. *Id.* at 572–81.[4]

---

[4] For example, the government proposed a "construction" of the statute under which "even if the trial judge accepts a guilty plea or approves a jury waiver, the judge remains free . . . to convene a special jury for the limited purpose of deciding whether to recommend the death penalty." *Id.* at 572. The Government also suggested that the court might save the statute by reading it to make imposition of the death penalty discretionary on the part of the sentencing judge. *Id*. at 575. The

In analyzing and explicating the limits of judicial authority to construe legislation, even when such construction would "save" the legislation from a declaration of unconstitutionality, the *Jackson* Court pointed out that the kidnapping statute "sets forth no procedure for imposing the death penalty upon a defendant who waives the right to jury trial or one who pleads guilty." *Id.* at 571. The Court declined to read into the statute congressional authority for the courts to develop such a procedure. According to the Court, "it would hardly be the province of the courts to fashion [such] a remedy," *id.* at 579, absent "the slightest indication that Congress contemplated any such scheme." *Id.* at 578.

Applying *Jackson*'s analysis to this case, it is manifest that once the provision allocating to the prosecutor the power to charge aggravating factors is declared unconstitutional, the FDPA "sets forth no procedure" for alleging aggravating factors. Indeed, as the *Jackson* opinion explained, "[t]o accept the Government's suggestion that the jury's sentencing role be treated as merely advisory would return to the judge the ultimate duty that Congress deliberately placed in other hands." *Id.* at 576.

Here, as in *Jackson*, Congress has "deliberately placed in [the prosecution's] hands" the responsibility for alleging aggravating factors under the FDPA. "Construing" the FDPA to allow the grand jury to assume that responsibility would

---

Court rejected these proposed reconstructions and adhered, instead, to the plain language of the statute as the best evidence of Congress' intent.

violate the FDPA and contravene Congressional intent without "the slightest indication that Congress contemplated" according the grand jury such a role. Presented with the option, Congress, in light of the change of law from *Walton* to *Ring*, might very well enact a comprehensive death penalty scheme that allocates a role to the grand jury. Congress might also choose to enact a wholly new and different scheme, one which fully defined the new offense of "capital murder," specified its elements, and set forth comprehensive procedures for trial of those offenses.[5]

 *Jackson*, however, proscribes a court from implementing what Congress *might* do, or what the prosecutor proposes as a "fix" for a constitutionally deficient statute. Instead, *Jackson* requires that courts, under such circumstances, invalidate, and not legislate: "[i]t is unnecessary to decide here whether this conclusion would follow from the statutory scheme the Government envisions, *for it is not the scheme that Congress enacted*." *Id.* at 573 (emphasis added).

 The very same type of judicial and prosecutorial restructuring of a statute to conform with constitutional imperatives was rejected by the Court in *United States*

---

[5] Indeed, the dangers of judicial legislation are patently evident from the divergent attempts, following *Ring*, to salvage the FDPA despite the obvious defect in the method of alleging aggravating factors. For example, in *United States v. Jackson*, 327 F.3d 273, 284–87 (4th Cir. 2003), the court held that the presentation of but one statutory aggravating factor to the grand jury (and inclusion in the indictment) was sufficient to permit the government to seek death on the basis of several statutory aggravating factors not so included.

*v. Booker*, 543 U.S. 220 (2005). In the course of invalidating the mandatory nature of the federal sentencing guidelines because they permitted a judge to find, by a preponderance of the evidence, facts necessary to an enhanced punishment, the Court did not create a hybrid system, inconsistent with the Sentencing Reform Act (hereinafter "SRA"), under which those sentencing factors would be incorporated in indictments and presented to a jury. Rather, a separate majority in *Booker* (in what has generally been denominated the "remedy opinion," *id*. at 245–46, severed the offending section—that which made the guidelines mandatory—but retained the essential character of the remainder of the SRA. Indeed, in *Blakely v. Washington*, *Booker*'s predecessor, Justice Breyer, who wrote the remedial opinion in *Booker*, recognized the practical and due process concerns attendant to charging sentencing enhancement facts and submitting them to a jury. 542 U.S. 296, 334–35 (2004) (Breyer, J., dissenting).

Here, the government has fashioned its own remedy independent of both Congress' intent and clear and limiting legislative language. This view is similar to that taken by the government, and rejected by the Supreme Court, in *Booker*:

> Severing the requirement that judges, not juries, apply
> the Guidelines would require courts to make the legal and
> policy decisions necessary to resolve all of those
> questions. There is no indication that Congress delegated
> that role to the courts. It is one thing to recharacterize a
> single factor that increases a statutory maximum and treat
> it as an element of the crime. It is quite another to take an
> entire system expressly designed to channel sentencing

discretion and treat it as if Congress was attempting to
rewrite the criminal code.

*Id.* at 363.

*Jackson* is precisely on point and controls this case. In enacting the FDPA,

Congress, relying on *Walton*, created a scheme in which the prosecutor was

granted the exclusive authority to pursue death and determine which aggravating

factors to allege. *Ring* has rendered that unconstitutional. As a result, if the

FDPA's treatment of aggravating factors is unconstitutional after *Ring*, then it is

undeniable, under *Jackson* and the doctrine of Separation of Powers, that only

Congress can cure the problem, and only by enacting—should it choose to do so—

a new death penalty scheme.

   3.   The Non-Delegation Doctrine provides further support for the
        conclusion that the FDPA's defects cannot be cured by judicial action.

In addition to the Separation of Powers problems posed by the prosecution's

supposed unilateral *Ring* fix for the FDPA is the non-delegation doctrine's[6]

preclusion of Congress from delegating its legislative power to another branch of

government. As Justice Scalia stated in his dissent in *Mistretta v. United States*,

488 U.S. 361 (1989):

   It is difficult to imagine a principle more essential to
   democratic Government than that upon which the

---

[6] "The non-delegation doctrine originated in the principle of separation of powers
that underlies our tripartite system of Government." *Mistretta v. United States*, 488
U.S. 361, 371 (1989); U.S. CONST. art. 1, § 1.

> doctrine of unconstitutional delegation is founded:
> Except in a few areas constitutionally committed to the
> Executive Branch, the basic policy decisions governing
> society are to be made by the Legislature.
> * * *
> That Congress cannot delegate legislative power to the
> President is a principle universally recognized as vital to
> the integrity and maintenance of the system of
> Government ordained by the Constitution.

488 U.S. at 415 (Scalia, J., dissenting).

The majority in *Mistretta* ultimately found that the non-delegation doctrine had not been violated by creation of the United States Sentencing Commission and the guidelines it promulgated because, in constituting the Commission, Congress had "[laid] down by legislative act an intelligible principle to which the [Sentencing Commission] is directed to conform." 488 U.S. at 372 (quoting *N.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). Nevertheless, the Court reaffirmed the principle that "'the integrity and maintenance of the system of Government ordained by the Constitution's mandate that Congress generally cannot delegate its legislative power to another Branch." *Id.* at 371–72 (quoting *Field v. Clark*, 143 U.S. 649, 692 (1892)).

Thus, *Mistretta* involved the delegation only of authority to determine sentencing factors within the limits of a legislatively determined "intelligible principle." It did not include the authority to determine the very elements of an offense, as would be the case under a hypothetical post-*Ring* FDPA.

24

Because Congress could not delegate to the Executive Branch the power to rewrite the FDPA to its post-*Ring* liking, *a fortiori* the Executive Branch cannot simply assume that power by attempting to substitute new procedures and elements for those originally provided by Congress, but rendered constitutionally infirm by *Ring,* and *Jones*.

4.    The grand jury lacks any authority to issue "special findings"

In this case, the second superseding indictment contains a section labeled, "Notice of Special Findings." Dkt. 292 at 37–41. Grand juries are not, however, permitted to return anything denominated as "Special Findings." The Federal Rules of Criminal Procedure provide that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). In 1979, Rule 7 was amended specifically to allow notice of criminal forfeitures to be alleged by indictment. Obviously, nothing in the text of the Rule, and nothing in the Indictment Clause of the Fifth Amendment, contemplates or permits a grand jury to make "Special Findings" that serve the function of the triggering requirements of the FDPA that are now invalid in light of *Ring*.

In addition, while the Supreme Court's decision in *Schriro v. Summerlin*, 542 U.S. 348, 354–55 (2004), held that, for purposes of collateral review, *Ring* involved issues of procedure rather than substantive criminal law, that does not

place the method of alleging the FDPA's aggravating factors within the purview of the government's authority or role in a three-branch form of government. Rather, the principles established in *Jackson* continue to apply, and the express language of the statute remains controlling and dispositive. Consequently, the prosecutor's attempt to rescue the FDPA via the grand jury's "Special Findings" is void.

> **E.    Courts of appeals' decisions to the contrary have been wrongly decided, and not severability analysis, nor the post-*Apprendi* drug cases, nor the doctrine of "constitutional avoidance" can save the FDPA.**

> > 1.    <u>The decisions by the courts of appeals have been wrongly decided</u>

While various courts of appeals have considered the issue herein and concluded that there is no constitutional or statutory impediment to presenting the FDPA's aggravating factors to a grand jury in order to avoid unconstitutionality under *Ring*, the reasoning in each case is flawed for two principal reasons:

> (a)    the decisions all fail to address *Jackson*, and/or to distinguish its clearly applicable holding and principles; and

> (b)    the decisions ignore the plain language of the FDPA with respect to whether the grand jury is authorized to allege aggravating factors.

For example, in *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006), the Eleventh Circuit not only failed to mention *Jackson* at all, but also joined other circuits in claiming that while "'nothing in the FDPA requires prosecutors to charge aggravating factors in an indictment . . . there is nothing in that law

inhibiting such a charge.'" *Id.* at 1367 (quoting *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004)). *See also United States v. LeCroy*, 441 F.3d 914 (11th Cir. 2006) ("[t]he major flaw in LeCroy's argument is that nothing in the [FDPA] forbids, or is inconsistent with, prosecutors' taking the additional step of including the statutory aggravating factors in the indictment and submitting same to the grand jury. Indeed, a statute will seldom expressly provide for submitting elements of an offense to the grand jury"); *United States v. Allen*, 406 F.3d 940, 949 (8th Cir. 2005) ("[w]hile it is true that the FDPA directs the government to charge these factors in a notice of intent to seek the death penalty, nothing in the Act precludes the government from also submitting them to the grand jury for inclusion in the indictment"); *United States v. Barnette*, 390 F.3d 775, 789 (4th Cir. 2004) ("[a] review of the statute itself reveals no language that restricts the government from submitting aggravating factors to the grand jury. Neither does the legislative history indicate any such intent"). The First Circuit's attempt to distinguish *Jackson* is likewise flawed in that the reasoning requires that the plain language of the statute, which ordains a procedure completely at odds with presentment to a grand jury, be ignored. *See United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007).

That contention is wrong on two counts: (1) the FDPA not only does not "require" prosecutors to present aggravating factors to the grand jury, it prescribes

a precise and exclusive method for alleging aggravating factors: the prosecutor's exclusive discretion and judgment; and (2) the assertion that "nothing in the [FDPA] inhibit[s]" presentation of aggravating factors to the grand jury ignores the explicit and exclusive statutory delegation to the prosecutor, the rules of statutory construction and the clear and controlling precedent provided by *Jackson*.

Again, this is not an instance in which a statute simply does not "expressly provide for submitting elements of an offense to the grand jury"; rather, the FDPA expressly provides for another, exclusive method for alleging aggravating factors. Thus, the decisions upholding the validity of the FDPA were wrongly decided, and this Court should, consistent with *Jackson* and the clear language of the FDPA, declare the statute unconstitutional.

> ### 2. The post-*Apprendi* drug-quantity cases do not authorize presenting the FDPA's aggravating factors to a grand jury

Nor is there refuge to be found in post-*Apprendi* cases that required drug quantity in federal prosecutions under 21 U.S.C. § 841, previously deemed a sentencing factor to be determined by a judge by a preponderance of evidence, to be pleaded in an indictment and proved to a jury beyond a reasonable doubt. *See, e.g.*, *United States v. Thomas*, 274 F.3d 655 (2d Cir. 2001) (*en banc*); *see also United States v. Cotton*, 535 U.S. 625 (2002) (government concedes that it was error not to include drug quantity in all post-*Apprendi* federal drug indictments, but

conviction affirmed because the defendant failed to object, and omission constituted harmless error).

In fact, the difference between Title 21's treatment of drug quantity and the FDPA's handling of aggravating factors is striking and dispositive. Regarding drug quantity, Congress enacted statutes in which the penalty ranges increase directly with the quantity of the specified drug.[7] For those statutes, though, Congress was silent on whether drug quantities were elements of the offense or sentencing factors. Thus, requiring drug quantities to be alleged by indictment did not alter the structure of the drug laws, or offend Congressional intent.[8]

In fundamental contrast, however, Congress clearly never intended the aggravating factors in the FDPA to be presented to the grand jury as elements of the offense. Rather, Congress, relying on *Walton*, which permitted such aggravating factors to be treated as sentencing factors, patently described them as such, and directed that they be determined and identified in each case *not* by a grand jury (or any other body or institution), but by the prosecutor *alone*.

---

[7] *See, e.g.*, 21 U.S.C. § 841(b)(1)(A) (possession of one kilogram or more of heroin exposes a defendant to a sentence of 10 years to life; possession of less than 50 grams of heroin exposes a defendant to a sentence of 0–20 years, 21 U.S.C. § 841(b)(1)(c)).

[8] The same is true of the federal carjacking statute at issue in *Jones*, 526 U.S. at 239, 251–252. The statute, 18 U.S.C. § 2119, did not make any distinction with respect to whether serious bodily injury was an element or a sentencing factor. Thus, including that factor in an indictment did not involve effectively redrafting a statute as happened in this case with respect to the FDPA's aggravating factors.

Moreover, when the Supreme Court has been required to determine whether a statute sets forth elements-of-an-offense, as distinct from sentencing factors, it has looked to Congressional intent. Accordingly, in *Castillo v. United States*, 530 U.S. 120 (2000), the Court explained that "[t]he question before us is *whether Congress intended* the statutory references . . . to define a separate crime or simply to authorize an enhanced penalty." *Id.* at 123 (emphasis added). *Accord Jones*, 526 U.S. at 232–39; *see also Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998).

In *Almendarez-Torres*, the Court found the aspects at issue to be sentencing factors; in *Castillo* and *Jones*, they were found to be elements of the offense. In both sets of cases, the Court proceeded by the same exhaustive statutory, not constitutional, analysis, because the Constitution, though it places limits upon Congress' ability to designate certain facts as sentencing factors, does *not* afford the courts authority to recast statutes to fit within those limits.

Here, Congress's intent is plain and unmistakable. Consistent with the state of the law pre-*Ring* (and governed by *Walton*), Congress structured the FDPA so that aggravating factors were sentencing considerations that were within the exclusive province of the prosecutor. As a result, the government is not empowered to override Congressional intent and, in effect, create by prosecutorial fiat, a brand new criminal statute.

3.    <u>Severability analysis cannot save the FDPA from unconstitutionality</u>

Additionally, the severability cases also undercut any analogy to the drug cases discussed earlier. Under those cases, the critical question is whether the statute at issue, upon removal of its unconstitutional portion, can function independently.[9] For example, in *Booker*, as noted, rather than cobble together a hybrid system that would permit presentation of sentencing factors to both grand and petit juries, the Supreme Court severed the portion of the SRA which made the sentencing guidelines mandatory because that *preserved* the character of the SRA, and Congress's intent in enacting it, as opposed to creating a new system inconsistent with Congressional intent, and which raised more procedural issues and questions than it resolved.

The structure of the FDPA plainly requires that the government's notice of aggravating factors, and only that mechanism, triggers the entire operation of the FDPA. Absent that enabling act by the prosecutor, the statute cannot function as a capital statute, since without aggravating factors, the government cannot seek the death penalty. The same conclusion was reached in *Jackson*, in which the Court found that severing the unconstitutional death penalty provision of the Kidnapping

---

[9] *See, e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999); *Leavitt v. Jane*, 518 U.S. 137 (1990); *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987).

Act left an otherwise fully functional criminal statute, albeit one that could not carry with it a potential sentence of death.

Here, deciding what Congress intended with regard to the FDPA is an easy task—it is obvious from the FDPA that Congress, relying on *Walton*, believed it was creating sentencing factors. It is equally clear that, after *Ring,* aggravating factors constitute elements of an offense. Accordingly, the statute may not be construed; it must be voided.

4.     The doctrine of "constitutional avoidance" is inapplicable

When "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter," applying the doctrine of constitutional avoidance. *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909). Here, since the FDPA is, for the reasons set forth *supra*, plainly not "susceptible of two constructions," the doctrine of constitutional avoidance does not apply.

In *Walton,* 497 U.S. at 649, the Court had permitted a judge to decide sentencing factors in capital cases. Congress relied on *Walton,* which was the state of the law existing at the time it enacted the FDPA, and manifested that reliance in reserving for the prosecutor the exclusive authority to allege aggravating factors. Reconstructing the FDPA based on *Ring*'s precedence over *Walton* would

constitute the type of "dynamic" statutory interpretation that would vitiate

Congress's clear intent. As the Court has noted:

> This canon is followed out of respect for Congress,
> which we assume legislates in the light of constitutional
> limitations. *FTC* v. *American Tobacco Co.*, 264 U.S. 298,
> 305-307, 68 L. Ed. 696, 44 S. Ct. 336 (1924). It is
> qualified by the proposition that "avoidance of a
> difficulty will not be pressed to the point of disingenuous
> evasion." *George Moore Ice Cream Co.* v. *Rose*, 289
> U.S. 373, 379, 77 L. Ed. 1265, 53 S. Ct. 620 (1933).

*Rust v. Sullivan*, 500 U.S. 173, 191 (1991).

Consequently, the doctrine of constitutional avoidance is as inapplicable

here as it was in *Rust.* As with the statute there, with the FDPA there is no

ambiguity about Congress's choice. As stated in *Miller v. French*, 530 U.S. 327,

341 (2000) (quotations omitted), "[w]here Congress has made its intent clear, we

must give effect to that intent."

Similarly, in *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833

(1986), the Court stated:

> Federal statutes are to be so construed as to avoid serious
> doubt of their constitutionality. Where such serious
> doubts arise, a court should determine whether a
> construction of the statute is fairly possible by which the
> constitutional question can be avoided. *It is equally true,
> however, that this canon of construction does not give a
> court the prerogative to ignore the legislative will in
> order to avoid constitutional adjudication; although this
> Court will often strain to construe legislation so as to
> save it against constitutional attack, it must not and will
> not carry this to the point of perverting the purpose of a*

*statute . . . or judicially rewriting it.*

*Id.* at 841 (citations and internal quotations omitted) (emphasis added).

Here, Congress made its intent clear in the FDPA—the allegation of aggravating factors is the province solely of government attorneys. The *Jones-Apprendi-Ring* trilogy has now altered the status of the law, and aggravating factors (and other aspects of the FDPA) are now properly, and constitutionally, elements of an offense not yet enacted by Congress and beyond the authority of the courts (or the prosecutor) to create via "construction" that amounts to judicial and executive legislation.

Accordingly, it is respectfully submitted that the FDPA cannot be rewritten to permit presentation of aggravating factors to the grand jury, and that, because those aggravating factors are elements pursuant to *Ring*, the FDPA is unconstitutional. The capital aspects of this case should be dismissed.

II.   **Even if the FDPA can be rendered constitutional by a finding by the grand jury of gateway and statutory aggravating factors, the "notice of special findings" in the second superseding indictment and the notice of the non-statutory aggravating factors in the NOI should be stricken because the government has not obtained an indictment consistent with the requirements of the Fifth Amendment.**

A.   **Introduction**

As outlined above, the second superseding indictment does not allege any non-statutory aggravating factors. Nor does the second superseding indictment

allege that the "special findings" should subject Messrs. Mills and Wilson to the death penalty or otherwise indicate that the grand jury intended to return an indictment charging a capital offense. Nor does the superseding indictment allege that the aggravating factors present in this case outweigh the mitigating factors and do so to an extent that is sufficient to justify imposition of a sentence of death. Under these circumstances, the superseding indictment does not comport with the Grand Jury Clause of the Fifth Amendment and does not charge a capital offense.

> **B.    The grand jury was not given the choice of holding Messrs. Mills and Wilson to answer for a capital crime because it was (presumably) unaware of the consequences of its "Special Findings"**

The Fifth Amendment provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. CONST. amend. V. As the Supreme Court has explained:

> [T]he grand jury is a central component of the criminal justice process. The Fifth Amendment requires the Federal Government to use a grand jury to initiate a prosecution. . . . The grand jury, like the petit jury, 'acts as a vital check against the wrongful exercise of power by the State and its prosecutors.' It controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, *including the important decision to charge a capital crime.*

*Campbell v. Louisiana*, 523 U.S. 392, 398 (1998) (emphasis supplied); *see also*

*Vasquez v .Hillary*, 474 U.S. 254, 263 (1986) (power to charge capital or

noncapital offense lies in the hands of the grand jury); Fed. R. Crim. P. 7(a).

When Congress adopted the Bill of Rights, only the indicting grand jury, by choosing the offense to charge, could make an offense punishable by death. In 1789, Congress sought to ratify the Fifth Amendment and also passed the first federal criminal laws. Laws that authorized the death penalty mandated it; they left no other sentencing option. *See generally* Rory Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 361–63 (1999). This practice was consistent with that of the states, which at the time the Bill of Rights was adopted in 1791, "followed the common law practice of making death the exclusive and mandatory sentence for certain specified offenses." *Woodson v. North Carolina*, 428 U.S. 280, 289 (1976). Thus, the intent of the framers of the Fifth Amendment was that the grand jury retain the power to choose which defendants would receive a sentence of death upon conviction. The Supreme Court has acknowledged this historical role, writing in *Vasquez* that "the Grand Jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. *In the hands of a grand jury lies the power to charge* a greater or lesser offense; numerous counts or a single count; and perhaps the most significant of all, *a capital offense or a noncapital offense*." 474 U.S. at 263 (emphasis added).

36

In this case, the government presented to the grand jury some of the elements of capital murder so as to make Messrs. Mills and Wilson "death-eligible" for Eighth Amendment purposes—the intent requirements under 18 U.S.C. § 3591(a)(2) and the alleged statutory aggravating factors under 18 U.S.C. § 3592(c). No known evidence supports that the government informed the grand jury of the consequences of those special findings, *i.e.*, that by returning the indictment, Messrs. Mills and Wilson would be held to answer to an offense punishable by death. Certainly nothing on the face of the indictment shows that the grand jury was aware that it was being asked to determine if Messrs. Mills and Wilson should be held to answer for a capital offense. Nothing in the model grand jury charge of the Administrative Office of the United States Courts indicates that the jury would not have been told that either Mr. Mills or Mr. Wilson would face the death penalty upon conviction. Indeed, that charge expressly instructs the jury to do the opposite: "When deciding whether or not to indict, you should not be concerned about punishment in the event of conviction. Judges alone determine punishment." *See United States v. Caruto*, 663 F.3d 394, 399 (9th Cir. 2011) (citing model grand jury charge). Presumably, the grand jury that returned the indictment against Messrs. Mills and Wilson was given the same instruction. By not informing the jury that it was returning an indictment charging a capital offense, and misinforming the grand jury about who determines punishment in a

federal capital case, the government turned the proceeding into one that gave only

the appearance of complying with the Fifth Amendment, but that deprived Messrs.

Mills and Wilson of their constitutional and statutory rights.

The Supreme Court, in a related context, has refused to countenance such

disregard for the Fifth Amendment. In *Smith v. United States*, 360 U.S. 1, 9 (1959),

the Court reversed a kidnapping conviction initiated by information even though it

was a capital offense. The Court stated:

> [t]he Fifth Amendment made the [grand jury indictment]
> rule mandatory in federal prosecutions in recognition of
> the fact that the intervention of a grand jury was a
> substantial safeguard against oppressive and arbitrary
> proceedings . . . . [T]o permit the use of informations
> where . . . the charge states a capital offense, would . . .
> make vulnerable to summary treatment those accused of
> . . . our most serious crimes.

*Id.* (citations omitted). Similarly, to permit the government to obtain from a grand

jury an indictment alleging the elements of a capital offense, but not informing the

grand jury that by finding those elements it was holding the defendant to answer to

a capital crime, makes vulnerable those accused of the most serious crimes. If the

grand jury is not informed of the capital nature of the offense, it cannot express the

conscience of the community or perform its constitutionally assigned role as a

"Our law has therefore wisely placed this strong and two-fold barrier, of a

presentment and a trial by jury, between the liberties of the people and the

prerogative of the [government])." *Duncan v. Louisiana*, 391 U.S. 145, 151 (1968)

(quoting W. Blackstone, Commentaries on the Laws of England 349 (T. Cooley ed. 1899)).

The grand jury's constitutional and historical role in deciding whether a defendant should face the death penalty is perhaps more critical now than ever. Few checks exist on the federal government's power to pursue the ultimate punishment against one of its citizens and fewer opportunities exist for the local community to express its desires about the appropriateness of the death penalty in any given case. Prosecutorial decision making in capital cases is centralized at the Department of Justice in Washington, D.C. Nor is the petit jury in a capital case a meaningful barrier between "the liberties of the people and the prerogative of the [government])." *Duncan, supra*. This is because petit jurors, to-date, have been "death-qualified." Individuals with disqualifying scruples against the death penalty, no matter how many exist in a given community, have not been permitted to sit in judgment in a capital case. Instead, capital juries consist exclusively of individuals who believe that the death penalty is an appropriate punishment and who express a willingness to impose it.[10] The net effect of death qualification is

---

[10] *See* Jesse Nason, *Mandatory Voir Dire Questions in Capital Cases: A Potential Solution to the Biases of Death Qualification*, 10 Roger Williams U. L. Rev. 211, 219 (2004) (summarizing research on how death-qualified jurors may presume guilt, resolve ambiguities against the defendant, more readily accept the government's version of events, distrust defense witnesses, fill evidentiary gaps with their beliefs that defendant committed the crime, and were more likely to infer premeditation). *See also United States v. Green*, 324 F. Supp. 2d 311, 329 (D.

that capital jurors do not represent the conscience of the local community or its rich diversity; at best, they represent only those members of the community who share similar views on the death penalty. Jurors that represent such a small segment of the community are ill-equipped to act as a barrier between the "liberties of the people" and the power of a government, particularly a government so centralized that it can force local prosecutors to take a capital case to trial against their will.[11]

Thus, the Constitution and the Bill of Rights sets up a carefully crafted system of checks and balance. Under the Fifth Amendment, the grand jury, like the petit jury, is supposed to "act[] as a vital check against the wrongful exercise of power by the State and its prosecutors." *Campbell*, 523 U.S. at 398 (citations omitted). Unless the grand jury is aware of its capital charging power and the consequences of returning an indictment with "special findings" like those in this case, it cannot perform its constitutionally assigned function and make "*the*

---

Mass. 2004) (citing studies that note death-qualified juries are more conviction-prone).

[11] Public opinion polls "consistently show that opposition to capital punishment runs around 45% to 55% for black Americans, while for whites it is much lower, ranging from 17% in 1992 to 24% in 2000. That is, opposition to the death penalty is about twice as high among black Americans as among white, and a much larger majority of whites than blacks support the death penalty." Rory Little, *What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh*, 53 DePaul L. Rev. 1591, 1596 (2004).

*important decision to charge a capital crime*." *Id.* (emphasis added) Because the grand jury did not perform its constitutionally assigned role of deciding whether Messrs. Mills and Wilson should be held to answer for a capital crime, the death notice should be dismissed and the indictment's "special findings" stricken.

### C.    The government did not obtain an indictment alleging all elements of a capital crime

Even if the grand jury had been aware that it its "special findings" would hold Messrs. Mills and Wilson to answer for a capital crime, the notices should be dismissed because the government did not present further elements necessary for the grand jury to make the decision as to whether either Mr. Mills or Mr. Wilson should be subject to the death penalty; that is, whether (1) the aggravating factors outweigh the mitigating factors and (2), whether they outweighed the mitigating factors *sufficiently* to justify a sentence of death. The failure of the grand jury to examine all relevant factors to determine if the death penalty was justified conflicts with the framers' intent, discussed above, that the grand jury retain the power to decide which defendants should receive a sentence of death upon conviction. Moreover, as argued earlier, the process that was followed violated Messrs. Mills' and Wilson's Fifth and Sixth Amendment rights to have all elements of the crime submitted to the grand jury for its consideration. *See Jones*, 526 U.S. at 251–52.

The elements of capital murder include decisions reached by the jury right up to the point where it makes a fact-finding that the aggravating circumstances

actually outweigh the mitigating circumstances to a sufficient degree that a sentence of death is justified. In truth, then, the "selection" decision is not made until the jury reaches the final decision-point of determining "whether all the aggravating factors found to exist *sufficiently* outweigh all the mitigating factors found to exist to justify a sentence of death." 18 U.S.C. § 3593(e) (emphasis added). A simple "outweighing" is not enough. As a matter of human experience, one can imagine a conscientious juror reaching the conclusion that, although the aggravating circumstances do barely tip the balance in favor of death, the degree to which that balance tips is not sufficient to justify imposition of a sentence of death. It is not until the moment that the finding of sufficient outweighing is made that the defendant's potential punishment increases to death. Recall Justice Scalia's point: "[All] facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by the jury beyond a reasonable doubt." *Ring*, 436 U.S. at 610 (Scalia, J., concurring).

Obviously, there are enormous practical difficulties in devising a system where a grand jury can consider and weigh both aggravating and mitigating factors. That is precisely why, as argued in these motions, the legislature needs to amend this statute. It is not the role of courts and prosecutors to "fix" a statute that no longer reflects what Congress intended. The grand jury's failure to indict on all

elements of capital murder—even assuming the viability of a "*Ring* fix"—means the notice must be dismissed.

### D. The non-statutory aggravating factors alleged in the death notice must be dismissed because they are not supported by the indictment

In *United States v. Green*, 372 F. Supp. 2d 168 (D. Mass. 2005), Judge Gertner examined the issue of whether a non-statutory aggravating factor of unadjudicated criminal activity alleged in a death notice should be stricken under the Fifth Amendment because the factor had not been previously found by the grand jury. Holding that the factor must be stricken, she relied primarily on *Blakely*'s mandate that "every defendant [has] . . . the right to insist that the prosecutor prove to a jury *all facts legally essential to the punishment*." *Id.* (emphasis added). She reasoned that "any aggravating factor is 'legally essential to punishment' because, while not linearly triggering a higher sentence within the statutory maximum, as Federal Sentencing Guidelines factors do, it may effectively tip the scale from life to death in combination with the other factors at play." *Id.* at 177–78. She continued:

> The FDPA makes the death penalty jury a sentencing jury, not only conducting fact-finding, as any jury does, but also weighing aggravating and mitigating facts for the purpose of determining punishment, as judges typically do. The penalty jury's unique role muddies the distinction between offense facts, traditionally screened by grand juries, and sentencing facts, which traditionally went unscreened.

The trilogy of *Apprendi*, *Ring*, and *Blakely* further conflates the line between sentencing facts and offense facts. *Blakely* explicitly rejected methodical distinctions between formal offense elements and sentencing factors, holding that all facts "essential" to punishment must be treated to the formalities of grand jury presentment and a jury trial. The Supreme Court specifically deemed it an "absurd result" that "the jury need only find whatever facts the legislature chooses to label elements of the crime, and that those it labels sentencing factors—no matter how much they may increase the punishment—may be found by the judge." *Blakely*, 124 S. Ct. at 2539. Even the government agrees that certain "sentencing facts"—here the listed statutory aggravating factor—must be screened by a grand jury.

Moreover, once a defendant is deemed death-eligible, the FDPA requires that the penalty jury impose the death penalty only if the aggravating factors "sufficiently outweigh" the mitigating factor or factors. 18 U.S.C. § 3593(e). This burden is not optional. Even if the defendant presents no mitigating factors, to return a sentence of death after the first two death-eligibility burdens have been met, the jury must find that the aggravating factors "alone are sufficient to justify a sentence of death." *Id.* Because we will never know exactly how each factor influences the jurors' ultimate punishment determination, logic dictates that all aggravating factors – together – be considered legally essential to the punishment. Indeed, the government's argument that non-statutory factors are not essential is disingenuous; if the government does not require additional evidence to convince the jury to vote for death, why is it invoking non-statutory factors at all?

*Id.* at 177.

Judge Gertner limited her holding to unadjudicated criminal activity, finding

on the basis of Supreme Court precedent that unadjudicated criminal activity, in particular, required the procedural protection of grand jury screening. *Id*. at 180 182. However, the court's logic is obviously applicable to all non-statutory aggravating factors, as is made clear in *United States v. Mills*, 446 F. Supp. 2d 1115 (C.D. Cal. 2006).

In *Mills*, Judge Carter considered whether the Confrontation Clause was applicable to evidence offered to prove non-statutory aggravating factors. He concluded that the Confrontation Clause was applicable based on his analysis that non-statutory aggravating factors were elements under *Apprendi*, *Ring*, and *Blakely*. He began by noting that "[w]hile the Court finds the reasoning in *Green* persuasive, *Green* fails to consider *Booker's* lesson that there are some facts—those which are not binding on the court—that do not rise to the level of constitutional significance. From the Court's perspective, *Booker* and *Blakely* appear to present three potential applications to the issue of confrontation during the selection portion of the penalty phase: (1) pure factfinding; (2) pure sentencing discretion; and (3) constitutionally significant fact-finding." *Id*. at 1133.

Judge Carter acknowledged that if, as *Green* held, *Booker* and *Blakely* applied to pure fact-finding, then the implication was that non-statutory aggravating factors, as well as the ultimate weighing decision on penalty, were elements under the *Ring* line of cases, as argued above:

In *Blakely*, the Court relied on *Apprendi* in striking down Washington's sentencing guideline scheme that permitted the judge to impose a sentence higher than the standard range if he found certain aggravating factors justifying a departure. 542 U.S. at 299, 304–05, 124 S. Ct. 2531. The Court held: Our precedents make clear . . . that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. . . ." In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," . . . and the judge exceeds his proper authority. *Id*. at 303–04, 124 S. Ct. 2531 (internal citations omitted).

As to pure fact finding, one could take *Blakely* literally, to mean that the judge may impose the death penalty "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303, 124 S. Ct. at 2531; *see* 18 U.S.C. § 3594 (requiring court to impose sentence on recommendation of jury). Thus, the Sixth Amendment's protections would no longer stop once the jury has found a statutory aggravating factor and a statutory intent factor. Even if these facts have been found, the judge still cannot impose a death sentence under the FDPA until the jury has found that "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death." *See* 18 U.S.C. §§ 3593(e), 3594. Thus, if steps three through six are fact finding, placement of the weighing after the jury has already engaged in the eligibility determination is not dispositive.

*Id*. at 1131–33.[12]

Instead of reaching this issue, he focused instead on non-statutory aggravating factors, which he reasoned were elements because they involved "constitutionally significant fact finding":

> Under the Act, the jury is required to find these facts unanimously and beyond a reasonable doubt. 18 U.S.C. §3593(c). The jury may consider only the factors upon which it has rendered such a finding when it weighs the factors in aggravation and mitigation. 18 U.S.C. § 3593(d). Further, a jury renders these findings after a contested adversarial hearing that bears many of the features of a trial. *See* 18 U.S.C. § 3593(b)–(e). The Court finds that these features of the Act render steps three and four significantly different than the judicially found facts that inform a court's calculation of the now non-binding Guidelines. In essence, the FDPA completely limits the jury's discretion until it has rendered its findings on the aggravating factors (whether statutory or non-statutory). Only upon finding these facts is the jury permitted to move on to the more discretionary task of finding the mitigating factors, and the broadly discretionary task of weighing aggravation against mitigation. 18 U.S.C. § 3593(c)–(e). Because of these fundamental structural differences, findings on the aggravating factors bear many of the hallmarks of

---

[12] In a footnote, the court noted that "[s]everal state supreme courts have determined that 'weighing' is a factual determination" *id*. (citing *State v. Whitfield*, 107 S.W.3d 253, 261 (Mo. 2003); *Woldt v. People*, 64 P.3d 256, 265–66 (Colo. 2003); *Johnson v. State*, 59 P.3d 450 (2002). And in the case of *Rauf v. Delaware*, 145 A.3d 430 (Del. 2016), the Delaware Supreme Court, relying on *Hurst v. Florida*, 136 S. Ct. 616 (2016), held that the "weighing" of aggravating factors against mitigating factors is a factual determination that only the jury, and not the judge, could determine, and that determination must be found by proof beyond a reasonable doubt.

> constitutionally significant facts falling under the ambit
> of *Blakely*.
>
> It is possible that the jury could return a verdict of death
> without finding any additional aggravating facts,
> provided the proven aggravator alone is sufficient to
> outweigh whatever mitigation has been found. *See* 18
> U.S.C. § 3593(e). However, given the allocation of fact-
> finding and discretionary tasks under the FDPA, the
> Court finds that this possibility alone is not sufficient to
> render these facts constitutionally insignificant for the
> purposes of confrontation.

*Id*. at 1134–35.

The reasoning of *Green* and *Mills* is persuasive and should be followed here.

Although *Green* only addressed one particular class of non-statutory aggravating

factors and *Mills* addressed the Sixth Amendment Confrontation Clause, *Green*

correctly points out that "[t]he FDPA already complies with *Ring's* holding in the

sense that it requires a jury to find both statutory and non-statutory aggravating

factors. Although *Ring* does not address the Fifth Amendment, other Supreme

Court and circuit court opinions have paired Fifth and Sixth Amendment

protections. And, as *Ring* and some state courts following it have suggested, these

procedural protections apply to more than one aggravating factor when the

government presents multiple aggravating factors." 372 F. Supp.2d at 179. *See also*

*United States v. Barrett*, 496 F. 3d 1079, 1107 (10th Cir. 2007) ("The Court's

*Apprendi* line of cases reveals that the reasonable doubt standard is appurtenant to

the right to jury trial.").

In this case, as indicated above, the death notice alleges multiple non-statutory aggravating factors. None are alleged in the indictment. Because Messrs. Mills and Wilson were entitled under the Fifth Amendment Indictment Clause to grand jury screening of these factors, the non-statutory aggravating factors alleged in the Notice of Intent must be stricken. Similarly, to permit the government to obtain from a grand jury an indictment alleging the elements of a capital offense, but not informing the grand jury that by finding those elements it was holding the defendant to answer to a capital crime, makes vulnerable those accused of the most serious crimes. If the grand jury is not informed of the capital nature of the offense, it cannot express the conscience of the community or perform its constitutionally assigned role as a "barrier . . . between the liberties of the people and the prerogative of the [government])." *Duncan v. Louisiana*, 391 U.S. at 151 (grand and petit juries "form a 'strong and two-fold barrier'").

For all of the foregoing reasons, the Court should strike the "notice of special findings" in the second superseding indictment and the notice of the non-statutory aggravating factors in the NOI.

## III.    Conclusion

For the reasons set forth above, this Motion should be granted in all respects together with any and all such other relief as the Court deems just and proper. An evidentiary hearing is requested on all disputed facts.

Respectfully submitted,

s/Gerald J. Gleeson
Gerald J. Gleeson, II (P53568)
Jeffrey Alan Crapko (P78487)
Miller, Canfield, Paddock
and Stone, P.L.C.
840 West Long Lake Road, Suite 150
Troy, Michigan 48098-6358
(248) 879-2000
gleeson@millercanfield.com
Counsel for Edwin Mills

s/ Jacqueline K. Walsh
Jacqueline K. Walsh
Washington State Bar No. 21651
705 2nd Ave., Suite 501
Seattle, WA  98104
(206) 325-7900x5
Jackie@jamlegal.com
Counsel for Carlo Wilson

s/ Jean D. Barrett
Jean D. Barrett
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
(973)744-1000
jeanbarrett@ruhnkeandbarrett.com
Counsel for Edwin Mills

s/ Ashwin Cattamanchi
Ashwin Cattamanchi
Illinois State Bar No. 6289199
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
ashwin_cattamanchi@fd.org
Counsel for Carlo Wilson

DATED:  February 15, 2019

## CERTIFICATE OF SERVICE

I, Gerald J. Gleeson, II, hereby certify that on March 4, 2019, I electronically served the forgoing document with the Clerk of the Court using the ECF system which will send notification to all parties.

s/ Gerald J. Gleeson, II
Gerald J. Gleeson, II (P53568)