UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                      Case No. 16-cr-20460

v.

                                      HON. MARK A. GOLDSMITH

EDWIN MILLS, et al.,

      Defendants.

_____/

**ORDER OVERRULING DEFENDANT CARLO WILSON'S OBJECTIONS (Dkt. 860) TO THE GOVERNMENT'S PROPOSED NEUROPSYCHOLOGICAL TESTING (Dkt. 849), AND DENYING THE PARTIES' TESTING-RELATED REQUESTS**

On December 12, 2018, the Court amended the Group Two Defendants' scheduling order and set a briefing schedule for any motion seeking relief under Atkins v. Virginia, 536 U.S. 304 (2002), and its progeny. See 12/12/2018 Order (Dkt. 652). As part of the new schedule, if one or both of the Group Two Defendants filed a notice of an Atkins claim by March 15, 2019, the Government was directed to file a memorandum by March 27, 2019, which would identify the neuropsychological experts upon whom it intends to rely in opposition to any Atkins motions, include those experts' curricula vitae, and give notice of the type and scope of the proposed neuropsychological testing. See 12/12/2018 Order at 1-2. Defendants were then afforded an opportunity to file objections to the Government's proposed neuropsychological testing by April 3, 2019, and the Government could respond to those objections by April 10, 2019. Id. at 2.

In accordance with this schedule, after Defendant Carlo Wilson filed a notice of an Atkins claim (Dkt. 814), the Government filed its memorandum (Dkt. 849), setting forth numerous tests that its expert—Dr. Robert L. Denney, Psy.D., ABPP—proposes to conduct. Included among those tests are the Minnesota Multiphasic Personality Inventory-2-RF, the Adaptive Behavior

1

Assessment System-3 Self-Report, and Performance Validity Testing. The Government also requests that Wilson disclose the results and raw data of the testing his experts performed.

Wilson filed objections to those three tests, as well as opposing the Government's disclosure request (Dkt. 860). Wilson also requested that defense counsel be present during all or some of the Government's neuropsychological testing, and that the Government's testing be video recorded. The Government then responded (Dkt. 870), and Wilson replied (Dkt. 876). At the Court's direction, the Government filed a supplemental brief with the scholarly literature alluded to by Dr. Denney regarding third-party observers and their effects on testing validity (Dkt. 892), to which Wilson replied (Dkt. 908).[1]

Accordingly, there are three issues raised in the parties' filings that require the Court's resolution: (i) the Government's request for the disclosure of testing results and raw data; (ii) Wilson's objections to the Minnesota Multiphasic Personality Inventory-2-RF, the Adaptive Behavior Assessment System-3 Self-Report, and Performance Validity Testing; and (iii) Wilson's requests for a third-party observer during the Government's testing (both defense counsel and video recording). The Court will address each issue in turn, denying the Government's request, overruling Wilson's objections, and denying Wilson's requests.

**A. The Government's Request for Disclosure of Testing Results and Raw Data**

In its memorandum, the Government first claims that it cannot identify all potentially necessary neuropsychological testing without Wilson disclosing the results and raw data of tests that have been conducted thus far. Gov't Mem. at 9. Because he filed a notice of an intellectual disability, the Government claims that Wilson has put his mental health "in issue" and, therefore,

---

[1] Wilson also filed an ex parte motion for leave to file excess pages for his supplemental reply brief (Dkt. 907), which the Court grants.

he has waived any privilege he had to his medical and psychological records as it relates to the Atkins claim. Id. at 10. Thus, the Government requests that Wilson be compelled to disclose the test results and raw data. Id. at 11. The Government emphasizes that it is not seeking expert reports that may have been prepared based on the testing results and raw data. Id.

In his objections, Wilson recognizes that the "timing surrounding disclosure of the requested material was already argued by the parties and contemplated by the Court when the Court issued its Scheduling Order." Def. Objs. at 20. According to Wilson, the Government's "request is nothing more than an attempt to circumvent the Court's Order and obtain material prior to the date on which it is due." Id. Thus, Wilson requests that the Court "reject the Government's invitation to relitigate issues already decided." Id.

Wilson's point is well founded; the Government should have addressed the disclosure of testing results and raw data earlier during the numerous conferences held concerning the parties' Atkins litigation. Therefore, the Government's belated request for this material is denied.

### B. Wilson's Testing Objections

#### 1. Minnesota Multiphasic Personality Inventory-2-RF

In its list of proposed neuropsychological testing, the Government includes the Minnesota Multiphasic Personality Inventory-2-RF ("MMPI-2-RF"). Gov't Mem. at 6.[2] Wilson objects to the Government's use of this test, which consists of true-false questions, claiming that MMPI-2-RF "is an actuarial tool which is commonly used to assess personality disorders and malingering." Def. Objs. at 4. But whether a person has a personality disorder is "irrelevant to the determination

---

[2] Although the Government's memorandum identified the test as MMPI-2, Wilson notes that the Government is likely seeking to conduct the MMPI-2-RF test, which has supposedly replaced the MMPI-2 test in forensic practice. Def. Objs. at 5. The Government clarifies in its response to Wilson's objections that it intends to conduct the MMPI-2-RF test. See Gov't Resp. at 2.

3

of whether he is a person with [an intellectual disability]." Id. Nor is the MMPI-2-RF appropriate to assess malingering for people with an intellectual disability. Id. This is especially problematic, says Wilson, because the test requires "at least a 6th grade reading level and a level of literacy which most people with [intellectual disability] have not achieved." Id. at 6. Although alternative administrations of the test are available, such as a computerized version with audio that reads the questions aloud to the examinee, Wilson claims that "this version has not been validated for use by people with [intellectual disability]." Id. Wilson further states that test is biased with discriminatory results because the "MMPI-2 over-pathologizes African American men, identifying them as more antisocial, more likely to malinger and fake, more deviant, having more anger and more bizarre thinking, compared to white men." Id. 8.

In its response to Wilson's objections, the Government states that the MMPI-2-RF tests "emotional functioning," which "can interfere with the testing, and measurement, of the subject's intellectual functioning." Gov't Resp. at 2. Accordingly, the Government claims that Dr. Denney "believes that this test will be useful, that it is an important element in conducting a broad-based assessment, and will assist him in reaching a professional opinion as to intellectual functioning." Id. The Government further posits that MMPI-2-RF can be used for individuals of low intellectual functioning because "it has an auditory administration potential for low reading ability, and it has internal consistency-related validity indices which would demonstrate whether or not the examinee understood the items." Id. at 3. As for Wilson's claim of bias, the Government claims that "[t]hree relatively recent MMPI-2-RF studies found very limited evidence of very limited bias, most of which involved under-prediction of psychopathology in minority groups." Id.

The Court overrules Wilson's objection to the Government's administration of the MMPI-2-RF. Because Wilson has failed to articulate any specific prejudice or tangible harm of the

administration of the test itself, the Court finds that the test is not unnecessarily burdensome on Wilson.  It is true that the MMPI-2-RF test has received criticism when assessing malingering in individuals with intellectual disability, e.g. Karen L. Salekin & Bridget M. Doane, "Malingering Intellectual Disability: The Value of Available Measures and Methods," Applied Neuropsychology, Vol. 16, at (2009) ("Across the board, all of the measures that were identified as either 'recommended' or 'acceptable' [for the assessment of malingering], have now been found to be [ ] unacceptable for use when assessing individuals with ID," including MMPI-2.).  However, the ultimate issue of admissibility and weight of any such testing results can, and should, be addressed in the parties' Atkins briefing and argued at the Atkins hearing.  See United States v. Roland, No. 12-298, 2017 WL 752831, at *3-4 (D.N.J. Feb. 27, 2017) (overruling the defendant's objection to the administration of the MMPI-2-RF, and noting that admissibility and weight will be argued at the parties' Atkins hearing).

### 2. Adaptive Behavior Assessment System-3 Self-Report

In its list of proposed neuropsychological testing, the Government also includes the Adaptive Behavior Assessment System-3 Self-Report ("ABAS-3").  Gov't Mem. at 6.  Wilson objects to the use of this test for three reasons.

First, Wilson argues that self-reporting by an individual with intellectual disability of his or her own adaptive behavioral capabilities is disfavored by the American Association of Intellectual and Developmental Disabilities ("AAIDD"), especially when the individual has mild intellectual disability and may exaggerate adaptive abilities to appear more competent.  Id. at 9.  Because it "may contain a certain degree of bias," self-reporting should be interpreted with caution when determining an individual's level of adaptive behavior.  Id. at 10.  Here, Wilson claims that he has mild intellectual disability and, therefore, self-reporting should not be permitted.  Id.

5

Second, although the AAIDD does not recommend a complete ban on self-reporting for the diagnosis of intellectual disability, Wilson contends that, "before any instrument is used to measure adaptive behavior, it must be established that it has been appropriately normed for the relevant population." Id. at 11-12. According to Wilson, the ABAS-3 Self-Report does not satisfy the norming requirements because the test under-sampled Midwestern states, it over-sampled Southern states, and the reliability of the test relied on only thirty-seven people. Id. at 12-13.

Third, Wilson argues that the Government should not be permitted to administer the ABAS-3 because he has been incarcerated for nearly three years and "[a]ssessing deficits in adaptive functioning among prisoners is . . . complicated because no measures of adaptive functioning have been designed or normed for use with prisoners." Id. at 13.

In its response to Wilson's objections, the Government claims that an "adaptive behavior assessment is a valid tool for addressing the question of whether the subject has any significant limitations in adaptive functioning," and it emphasizes that the AAIDD's standards do not preclude the use of self-reports. Gov't Resp. at 5.

For the same reasons stated above regarding the MMPI-2-RF, the Court overrules Wilson's objection, permits the Government to administer the ABAS-3 Self-Report, and allows the parties to address the admissibility and weight of any results gleaned from this testing in their Atkins briefing. See United States v. Northington, No. 07-550-05, 2012 WL 4024944, at *5 (E.D. Pa. Sept. 12, 2012) (overruling the defendant's objection to the administration of the ABAS-II, but noting that the court's decision "does not necessarily mean that expert testimony or conclusions based upon these tests will be admitted, considered, or accepted by the Court at the Atkins hearing").

### 3. Performance Validity Testing

Last, in its list of proposed neuropsychological testing, the Government seeks to administer "Performance Validity Testing." Gov't Mem. at 6. Wilson objects to this sort of testing because it is not sufficiently specific. Def. Objs. at 19. Although performance validity tests assess effort and feigning and are often used to assert that a person is malingering, Wilson argues that the Government's listing of "performance validity testing" is neither a test or is it notice. Id. Moreover, there are many tests for malingering, says Wilson, but "almost none of them are established for use with people with ID and all have poor sensitivity and specificity." Id.

In its response, the Government claims that it is appropriate to designate the validity testing in its notice, "but not identify by name, the specific tests," because these tests can be easily defeated. Gov't Resp. at 6.

As the district court did in United States v. Northington, this Court overrules Wilson's objection, but it orders the Government "to give notice to defense counsel when testing has been completed, and to provide to defense counsel the names of the malingering tests administered to Defendant." 2012 WL 4024944, at *5. Defense counsel may then raise objections, if any, to the Government's performance validity testing at the time of the Atkins hearing. Id.

**C. Wilson's Requests for Presence of Counsel and Video Recording**

Finally, Wilson makes the following two requests in his objections: (i) permit defense counsel to be present in the room during the Government's expert's interviewing and/or testing of Wilson, and (ii) authorize the video recording of any testing performed. The Court will address and deny each request in turn.

**1. Right to Counsel During the Government's Neuropsychological Testing**

Regarding his first request, Wilson acknowledges that his Atkins claim has resulted in a limited waiver of his Fifth Amendment rights, but only with respect to matters relevant to his

7

supposed intellectual disability. Def. Objs. at 22. Wilson claims that he has a right to have counsel present during any examination "to advise him and to interpose appropriate objections," thereby protecting "his Fifth Amendment right to remain silent as to matters beyond the scope of the [Atkins] hearing, and to effectuate his Sixth Amendment rights." Id. (citing Gibbs v. Frank, 387 F.3d 268, 274 (3d Cir. 2004)). Insofar as Wilson's counsel is not permitted to be physically present during the formal test examination itself, Wilson requests that his counsel be present during any interview portion, and then be afforded a "nearby venue in which to sit and monitor proceedings, with an audio feed, so that counsel has an opportunity to object, albeit not simultaneously, if necessary." Id. at 23. At the very least, counsel should be provided a nearby venue to sit, observe, and listen to both the interviewing and the testing of Wilson. Id. at 23. The Court disagrees with Wilson that any of these procedures are necessary to protect his Fifth and Sixth Amendment rights.

First, courts have held that defense counsel's presence during a mental health examination is not necessary to protect a defendant's Fifth Amendment rights because Federal Rule of Criminal Procedure 12.2 provides that "'[n]o statement made by a defendant in the course of any examination conducted under this rule . . . and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition' on which the defendant has introduced expert evidence pursuant to rule 12.2." United States v. Sampson, 335 F. Supp. 2d 166, 247 (D. Mass. 2004) (quoting Fed. R. Crim. P. 12.2(c)(4)); United States v. Moore, No. 07-161, 2008 WL 1944810, at *3 (E.D. Ark. May 2, 2008) ("The Court agrees with the Sampson court's well-reasoned analysis and concludes that, having placed his mental health in issue, defendant does not have a Fifth Amendment right to have counsel present during the government's corresponding evaluation."); cf. United States v. Johnson, 362 F. Supp. 2d 1043, 1088 (N.D. Iowa 2005) (recognizing that "Rule 12.2 does not . . . contain any

provisions specifying the manner in which a defendant's Sixth Amendment right to counsel is to be protected in the context of a mental examination" (emphasis added)). And once Wilson put his mental condition at issue, he waived his right to raise a Fifth Amendment challenge to the Government's use of evidence obtained through a court-ordered examination to rebut his intellectual disability claim. Johnson, 362 F. Supp. 2d at 1088 (citing Powell v. Texas, 492 U.S. 680, 684 (1989) (per curiam)). To the extent any interview or examination poses a risk to Wilson's Fifth Amendment rights beyond the purposes of rebutting his intellectual disability claim, this can be easily addressed through post-examination motions. United States v. Wilson, 920 F. Supp. 2d 287, 303-304 (E.D.N.Y. 2012).

Second, a criminal defendant has a Sixth Amendment right to the assistance of counsel before submitting to any neuropsychological testing that represents a "critical stage" of that defendant's prosecution. Estelle v. Smith, 451 U.S. 454, 468-470 (1981). However, if advance notice of the scope and nature of the testing is provided so that counsel can discuss with the defendant the advisability of undergoing the testing and how the results of that testing may be used in the future, "there would be no Sixth Amendment violation." Johnson, 362 F. Supp. 2d at 1091 ("[F]or effective exercise of [the defendant's] Sixth Amendment rights, defense counsel must be informed of the 'nature and scope' of the 'mental health' proceedings[.]" (quoting Buchanan v. Kentucky, 483 U.S. 402, 424-425 (1987))); see also Wilson, 920 F. Supp. 2d at 305 ("[T]he Sixth Amendment does not require that a defendant be permitted to have counsel present at a mental examination conducted to rebut a psychiatric defense he has initiated; the Supreme Court has held only that counsel must be 'notified in advance' of the examination so that counsel may advise the defendant regarding 'the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed.'" (quoting Estelle, 451 U.S. at 471) (emphasis

9

omitted)). Here, the Government has provided defense counsel with sufficient notice of the nature and scope of the proposed neuropsychological testing such that Wilson can anticipate the Government's use of any neuropsychological evidence in rebuttal.

Moreover, as the Government notes its response to Wilson's objections, Gov't Resp. at 7, several courts have held that the physical presence of a third party, like defense counsel, during mental health examinations "can be disruptive and have adverse effects on the performance and outcome of the evaluation." Wilson, 920 F. Supp. 2d at 305 (collecting cases); see also Estelle, 451 U.S. at 470 n.14 ("[A]n attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination."); United States v. Baird, 414 F.2d 700, 711 (2d Cir. 1969) ("[T]he presence of a third party, such as counsel or a stenographer, at such an examination tends to destroy the effectiveness of the interview."); United States v. Fell, No. 5:01-cr-12-01, 2015 WL 13781291, at *2 (D. Vt. Oct. 9, 2015) ("The court is mindful that the physical presence of defense counsel at a mental health evaluation might impair the evaluation itself." (citing Baird, 414 F.2d at 711; Wilson, 920 F. Supp. 2d at 305)); accord Giddens v. City of Suisun, No. 2:14-cv-0943, 2017 WL 3009189, at *3 (E.D. Cal. July 14, 2017) ("Since the presence of third party observers may, regardless of their good intentions, contaminate a mental examination, they are usually not allowed in the exam room." (citation and quotation marks omitted)). These concerns are present even when counsel sits out of the defendant's sight and remains silent except when imposing an objection, Wilson, 920 F. Supp. 2d at 305, as Wilson requests in his objections, see Def. Objs. at 22 ("To avoid any possible distracting effect on Mr. Wilson during Government testing or interviewing, counsel will sit out of his sight and remain silent except when imposing an

objection.").³  Although he argues that Baird and Wilson are not persuasive for their Sixth Amendment holdings, see Wilson Supp. Reply at 4, Wilson offers no contrary case law to suggest that there is no impact on either testing validity or examinee performance when third-party observers are physically present during the administration of mental health examinations.

Based on the reasoning of Sampson, Johnson, and Wilson, Wilson has waived his right to raise a Fifth Amendment challenge to the Government's use of evidence to rebut his Atkins claim, and defense counsel has been provided advance notice of the Government's proposed neuropsychological testing to protect Wilson's Sixth Amendment right to counsel. Therefore, Wilson's request to have counsel present during the any portion of the Government's testing is denied.

### 2. Video Recording of Examination

Regarding his second request, Wilson claims that numerous courts have authorized the videotaping of the Government's mental condition examinations. Def. Objs. at 22. He is correct on this point. See, e.g., United States v. O'Reilly, No. 05-80025, 2010 WL 653188, at *5 (E.D. Mich. Feb. 19, 2010) ("Defense counsel may arrange for any rebuttal examination to be audio and/or videotaped."); Johnson, 362 F. Supp. 2d at 1091 (ordering all tests and interviews conducted by the government's mental health expert be audio recorded and provided to defense counsel by same-day or next-day delivery upon conclusion of each interview or testing session); United States v. Fell, 372 F. Supp. 2d 753, 761 (D. Vt. 2005) (permitting the tape recording of the mental health testing and interviews); Sampson, 335 F. Supp. 2d at 247-248 (exercising court's discretion to order mental health testing be video recorded). Wilson further requests that the Government

---

³ Wilson now appears to have walked back his request slightly, claiming that defense counsel would "be present at the examination not to interrupt the testing to state objections, but simply to observe and gather information for cross-examination." Def. Supp. Reply at 5.

provide a copy of the videotape to defense counsel no later than one day after the examination, and that the Government be precluded from using the videotape for any purpose other than addressing Wilson's claim of an intellectual disability at the Atkins hearing. Def. Objs. at 23-24.

In its response to Wilson's objections, the Government states that "[e]xperts are better equipped to determine the optimal testing environment and the effects that certain aspects of that environment could have on the integrity of the examination," and that Dr. Denney has "taken the position that videotaping, or the hidden recording of testing, raises ethical concerns." Gov't Resp. at 6-7. In support of the its position, the Government attached a December 23, 2013 declaration from Dr. Denney, in which he states that he is "very strongly opposed to secretive recording of [a] defendant" based, in part, on the "ethical concern" of such recording. 12/23/2013 Denney Decl. ¶ 8 (Dkt. 870-1) (declaration from United States v. Sablan, No. 1:08-cr-00259-PMP (E.D. Cal. Dec. 13, 2013)) (emphasis added). Dr. Denney also states in his declaration that he is "opposed to recording of the neuropsychological test administration on empirical grounds." Id. ¶ 5 (emphasis added). According to Dr. Denney, the "available empirical research demonstrates that third party observers (including presence of audio and/or video recording) alters the testing session in such a manner that test results may no longer reflect the valid performance of the examinee." Id.[4] Thus, Dr. Denney's declaration seems to advance two reasons against the video recording of Wilson's neuropsychological testing—the ethical concerns of secretive recording, and the effect of recording on testing results based on empirical research.

There are undoubtedly ethical concerns about the surreptitious or deceptive recording of mental health examinations, see, e.g., Gohl v. Livonia Pub. Schs., No. 12-cv-15199, 2015 WL

---

[4] The Government provided the Court with the scientific papers Dr. Denney relied on for his assertion (Dkt. 892).

1469749, at *4 (E.D. Mich. Mar. 30, 2015) (recognizing that American Psychological Association's Ethical Principles of Psychologists and Code of Conduct "expressly condemn as unethical only surreptitious or deceptive recording, thereby suggesting that recording of an examination for which informed consent has been obtained beforehand is not ethically problematic"). However, there is no suggestion that Dr. Denney perform any hidden or secretive recording. This ethical concern is, therefore, nonexistent in this case.

Regarding Dr. Denney's assertion that video recording "alters the testing session in such a manner that test results may no longer reflect the valid performance of the examinee," some courts, like the district court in Wilson, have recognized that recording examinations "are disfavored by courts for the same reasons that attorney presence is disfavored." Wilson, 920 F. Supp. 2d at 306. According to the Wilson court, "most courts analyze a request for recording in the same way that they evaluate a motion to permit the presence of an attorney, because, while recording is less intrusive than permitting a third-party to be present, it would still impede one-on-one communication between the patient and the examiner and tend to undermine the examiner's evaluator technique." Id. Because there were no specialized circumstances to justify a recording, the court rejected the defendant's request to have the examination videotaped. Id.

The Court has also reviewed the scholarly literature the Government provided in its supplemental brief, which suggests that video recording may affect an examinee's performance on certain types of neuropsychological testing. See, e.g., Angela D. Eastvold, et al., "Does a Third Party Observer Affect Neuropsychological Test Performance? It Depends," The Clinical Neuropsychological, Vol. 26, No. 3, at 520 (2012) ("Interestingly, a nonhuman observer (audio or video recorder) had a negative impact on performance that was of a medium effect size. . . . However, this finding is based on only four studies, two of which were by the same investigator.

13

Therefore replicability of these findings and confirmation of the magnitude is needed.") (PageID.8365, Dkt. 892-5); Marios Constantinou, et al., "Effects of a Third Party Observer During Neuropsychological Assessment: When the Observer Is a Video Camera," <u>Journal of Forensic Neuropsychology</u>, Vol. 4(2), at 40 (2005) (recognizing that "there is some evidence in the social psychology literature that social facilitation effects occur when the individual believes that his/her performance is being videotaped for observation," and finding that "the presence of a video camera as the third party observer resulted in adverse performance on memory testing" but "did not influence any of the motor measures" of the testing group) (PageID.8326, 8332, Dkt. 892-3); A. John McSweeny, et al., "Ethical Issues Related to the Presence of Third Party Observers in Clinical Neuropsychological Evaluations," <u>The Ethical Neuropsychologist</u>, Vol. 12, No. 4, at 559 (1998) (suggesting, as an alternative to physical presence of third-party observer, "to record the testing session with audio or audiovisual devices," but cautioning that "the presumed relative lack of observer effects with [this alternative] awaits empirical confirmation and test security may be at risk") (PageID.8324, Dkt. 892-2); Robert J. McCaffrey, et al., "Presence of Third Parties During Neuropsychological Evaluations: Who Is Evaluating Whom?" <u>The Clinical Neuropsychologist</u>, Vol. 10, No. 1, at (1996) ("A potential compromise that has been suggested to deal with the issue of a third party observer is to use a one-way mirror or video-camera; however, the social facilitation[5] literature contains some evidence that even an unobtrusive observer can influence task performance.") (PageID.8344, Dkt. 892-4).

---

[5] The "social facilitation" phenomenon has been described as "a situation in where the mere presence of another alters one's behavior, either positively or negatively." Angela D. Eastvold, et al., "Does a Third Party Observer Affect Neuropsychological Test Performance? It Depends," <u>The Clinical Neuropsychological</u>, Vol. 26, No. 3, at 520 (2012) (PageID.8351, Dkt. 892-5).

Although the authors of these articles recommend that additional empirical studies should be conducted to further assess the magnitude of the social facilitation phenomenon's impact on examinee performance regarding nonhuman observers, none of them definitively found that video recording has no impact on an examinee's performance during a neuropsychological testing. Nor has Wilson directed this Court to any such finding.

Therefore, based on the current state of the scientific community's view regarding the potential influence video recording may have on an examinee's performance on neuropsychological tasks, as well as the fact that Wilson's Fifth and Sixth Amendment rights will not be violated by the absence of defense counsel during the neuropsychological testing, the Court denies this request.

SO ORDERED.

Dated: May 6, 2019  
    Detroit, Michigan

s/Mark A. Goldsmith  
MARK A. GOLDSMITH  
United States District Judge