UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

D-2 CARLO WILSON,

    Defendant.

Case No. 2:16-cr-20460

Hon. Mark A. Goldsmith

_____/

**REPLY TO GOVERNMENT'S RESPONSE [DKT. 971] TO MR. WILSON'S *ATKINS* MOTION [DKT. 930]**

Carlo Wilson, through counsel, replies to the Government's response (Dkt. 971) to his motion for a pretrial determination under *Atkins v. Virginia*, 536 U.S. 304 (2002), and its progeny, as set forth in Dkt. 930.

## ARGUMENT

In its effort to rebut Mr. Wilson's evidence, the Government, and its experts, ignore the clinical and medical community standards on the assessment and diagnosis of intellectual disability (ID), offering rebuttal of the same type which has repeatedly been rejected by the Supreme Court. *See, e.g.*, *Moore v. Texas (Moore II)*, 139 S. Ct. 666, 669 (2019) ("'[A] court's intellectual disability determination 'must be informed by the medical community's diagnostic framework.'"). *See also*,

*William v. Mitchell*, 792 F.3d 606, 621 (6th Cir. 2015); *Van Tran v. Colson*, 764 F.3d 594, 605 (6th Cir. 2014)("The reliable and professionally vetted methods presented by Van Tran's experts, from which the legal standards draw their substance, must guide the court's inquiry. The postconviction trial and appellate courts' *ad hoc*, ostensibly commonsense reasoning, by itself, is not sufficient to reject the experts' conclusions….:"). However, when current clinical and medical standards are applied to the tests administered by the Government's expert, Mr. Wilson still meets the criteria for a diagnosis of ID with an adjusted full-scale IQ of 69 and significant deficits in the conceptual domain of adaptive functioning, with onset during the developmental period.

**Criterion One-Significantly Sub-average Intellectual Functioning**. The Government seeks to generate a dispute over IQ scores in order to maintain its position that Mr. Wilson is not a person with ID. Dr. Hunter administered the gold-standard IQ test, the WAIS-IV, demonstrating Mr. Wilson has a Flynn-adjusted full-scale IQ of 46 when considering the core subtests (95% confidence interval [CI]: 43-51), and 53 when considering all the subtests (95% CI: 50-58). Dkt. 930-3 (Exh. B at 9-10). Using the same IQ test, the Government's expert, Dr. Denney, obtained a full-scale IQ of 80 (95% CI: 76-84). The score obtained by Dr. Denney failed to account for two adjustments which must be made to interpret the test result: Flynn effect and practice effects.

"In simple terms, psychologists and psychological measurement experts typically describe the Flynn effect as the result of a 'softening' of IQ tests norms with the passage of time." K. McGrew, *Norm obsolescence: The Flynn Effect*, in The death penalty and intellectual disability 155–169, 156 (E. Polloway ed. 2015). "That is, individuals tested today on an IQ test normed many years earlier will obtain artificially inflated IQ test scores, because the older test norms reflect a level of overall performance that is lower than that of individuals in contemporary society." *Id.* "This is one of the primary reasons why authors and publishers of IQ tests make every effort to periodically provide 'freshened' norms by collecting new nationally representative sample data for IQ test batteries." *Id.*

The Flynn Effect is a phenomenon discussed in widely-cited papers by Professor James R. Flynn. *See, e.g.*, James R. Flynn, *Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect*, 12 Pysch. Pub. Policy, & L. 170 (2006). Through comparative studies, Professor Flynn found that aggregate IQ scores have increased steadily over many decades, at a rate of "approximately three points per decade, or 0.33 points per year." *United States v. Hardy*, 762 F. Supp. 2d 849, 858 (E.D. La. 2010). The district court in *Hardy* explained the practical consequence of the Flynn effect:

> When a new IQ test is developed, it is standardized through a *current* population sample, creating a "new" average of 100. Since this new test is normed with a population that has steadily done better ("is smarter") than the prior generation, the "new" average of 100 is actually "higher"

3

than the old 100. For example, if the old test—normed as it was before the population "got smarter"—were given today, the average score would not be 100, but something closer to perhaps 103. But when the new test is standardized, that "old 103" must be redefined as the "new 100," because the average score of the test is defined to be 100. What this means in practical terms is that someone who receives a score of 80 on a test that was normed a decade ago could be expected, on average, to score a 77 on a newly normed test—without any actual change in his intelligence.

*United States v. Hardy*, 762 F. Supp. 2d 849, 858 (E.D. La. 2010) (emphasis in original).

The consensus among the professional and clinical organizations is that "Flynn adjustments" are necessary and best practices. "Not only is there a scientific consensus that the Flynn effect is a valid and real phenomenon, there is also a consensus that individually obtained IQ test scores derived from tests with outdated norms must be adjusted to account for the Flynn effect, particularly in *Atkins* cases." McGrew, *Norm obsolescence: The Flynn Effect*, in <u>The Death Penalty and Intellectual Disability</u> at 160. The consensus includes the AAIDD, the DSM-5, and courts.[1] Dr. Denney rejects the Flynn effect, despite the scientific consensus, citing

---

[1] In a habeas case, the Sixth Circuit has held that under Tennessee law, a Tennessee state court must allow a party to present Flynn effect evidence and then at least consider that evidence, and not summarily reject such evidence, in assessing a defendant's functional IQ. *Black v. Bell*, 664 F.3d 81, 96 (6th Cir.2011). Accord, *Ledford v. Warden, Georgia Diagnostic & Classification Prison*, 818 F.3d 600, 640 (11th Cir. 2016) ("[A] district court should consider all of the expert medical testimony, including evidence about the Flynn effect, and make its own fact findings." In a subsequent habeas case, the Sixth Circuit indicated that "it …makes little sense to use *Flynn*-adjusted IQ scores to determine whether a criminal is

an article from 2008 and a more recent article co-authored by himself. Dkt. 971-1 at 30 n.4. But the medical community's consensus, which Dr. Denney determinedly continues to ignore, recognizes and accounts for the Flynn effect.

The WAIS-IV mid-year norming was 2007, meaning that, for a test administered in 2019, a twelve-year period must be accounted for using a Flynn correction of 0.33 points per year. Even crediting Dr. Denney's full-scale IQ of 80 for Mr. Wilson, applying the Flynn effect, the score is 3.96 points reduced, giving Mr. Wilson a full scale IQ of 76 (95% CI: 72-81). This is within the range for a

---

sufficiently intellectually disabled to be exempt from the death penalty." *Black v. Carpenter*, 866 F.3d 734, 749 (6th Cir. 2017). The Ninth Circuit made a similar observation in the habeas case of *Pizzuto v. Blades*, 729 F.3d 1211, 1223 (9th Cir.2013), but that did not prevent the district court in *United States v. Williams*, 1 F.Supp.3d 1124, 1143 (D. Hawaii 2014) from taking into account both the Flynn effect and practice effects in a federal death penalty case: "*Pizzuto* stated that "the Flynn Effect is not uniformly accepted as scientifically valid." *Pizzuto*, 729 F.3d at 1223 (citing *Maldonado v. Thaler*, 625 F.3d 229, 238 (5th Cir.2010)). But it is important to view this statement in context—the Ninth Circuit was reviewing a state court proceeding under a § 2254 standard of review (i.e., whether the state court's application of clearly established law was reasonable). That is, *Pizzuto* was not deciding whether a federal court can or should consider a Flynn Effect, but rather it was deciding whether the state court's application of the theory—as matter of state law on the particular evidentiary record before it—was "unreasonable" and violated "clearly established" law. *Pizzuto* reasoned that "[w]ithout more evidence in the record on the need to include an adjustment such as the Flynn Effect in considering the relationship between past IQ tests and a person's true IQ, the Idaho Supreme Court's refusal to apply it is not grounds for reversal here." *Id*. at 1223–24. In apparent contrast to *Pizzuto*, the record before this court after nine days of testimony—with much evidence on factors such as a Flynn effect and potential practice effects—is much different." *United States v. Williams*, 1. F.Supp.3d at 1143, n.19.

finding of significantly subaverage intellectual functioning, qualifying Mr. Wilson for a diagnosis of ID when considering his substantial adaptive deficits.

Additionally, because Dr. Denney administered the same test previously given by Dr. Hunter, practice effects must be taken into accounted. Practice effects are a commonly-observed phenomenon which "refers to gains in IQ scores on tests of intelligence that result from a person being retested on the same instrument." AAIDD Manual at 38. The practice effect "will often lead to an overestimate of the examinee's true intelligence." *Id.* As a result, courts have considered the practice effect as a factor in determining the validity of an individual's IQ score. *See Roland*, 281 F. Supp. 3d at 508 (considering "a possible practice effect as a factor, among others, in assessing the reliability or uncertainty of Roland's scores on particular IQ tests or subtests"); *United States v. Wilson*, 170 F. Supp. 3d 347, 373 (E.D.N.Y. 2016)(same); *United States v. Williams*, 1 F. Supp. 3d 1124, 1145 (D. Haw. 2014)(same).

When successive tests are administered within a short while, "the effect is more pronounced." *Green v. Johnson*, 2006 WL 3746138, at *44 (E.D. Va. Dec. 16, 2006). *See also, Smith v. Schiro*, 813 F.3d 1175, 1183 (9th Cir. 2016) (finding that prior IQ score was more reliable because the higher subsequent score was inflated by the practice effect); *Frazier v. Bobby*, 2011 WL 5086443, at *27 (N.D. Ohio Oct. 25, 2011)(crediting an expert's testimony that the WAIS was the "gold standard"

6

test to assess intelligence, but that "it should not have been administered to Frazier twice within a twelve-month period to avoid 'practice effects.'").

Here, Dr. Denney used the same IQ test, the WAIS-IV, in June 2019 that Dr. Hunter had administered in October 2018. Practice effects on IQ tests are large and are reported to last many years. J.D. Matarazo and D.O. Herman, *Relationship of education and IQ in the WAIS-R standardization sample*, Vol. 52(4), Journal of Consulting and Clinical Psychology, 631-634 (1984); Waber et al., *Four-Year Longitudinal Performance of a Population-Based Sample of Healthy Children on a Neuropsychological Battery: The NIH MRI Study of Normal Brain Development*, Vol. 18(2), Journal of the International Neuropsychological Society, 179-190 (2012); Siders et al., *Do practice effects on Wechsler's performance subtests relate to children's general ability, memory, learning ability, or attention?*, Vol. 13(4), Applied Neuropsychology, 242-250 (2006).

Practice effect gains for full scale IQ on the WAIS instruments have been conservatively estimated to be between 7 and 15 points. Matarazzo et al., *Test-retest reliability and stability of the WAIS: A literature review with implications for clinical practice*, Vol. 2(2), *Journal of Clinical Neuropsychology*, 89-105 (1980). More recent studies have found significant score improvement because of practice effects on the WAIS-IV as well, with full scale IQ improvement of 7 points after a six-month interval for a well educated, above mean at baseline, sample group. Estevis

et al., *Effects of practice on the Wechsler Adult Intelligence Scale-IV across 3- and 6-month intervals*, Vol. 26(2), The Clinical Neuropsychologist, 239-254 (2012).

Conservatively, practice effects are likely to have increased the full-scale IQ score obtained by Dr. Denney by at least 7 points. Correcting for this inflation, the full-scale score is in fact 73, a score which must then be Flynn corrected to 69 (95% confidence interval: 66-74). Mr. Wilson meets Criterion One for a diagnosis of ID based on Dr. Denney's testing as well as Dr. Hunter's testing.

**Criterion Two-Significant Deficits in Adaptive Functioning**. Just as the Texas Court of Criminal Appeals did in *Moore II*, 139 S. Ct. at 668–69 (2019) (citing *Moore I*, 137 S. Ct. 1039, 1050 (2017)), the Government here "'overemphasize[s] [Mr. Wilson's] perceived adaptive strengths'" instead of "'focus[ing] the adaptive-functioning inquiry on adaptive deficits.'" *See*, *Van Tran v. Colson*, 764 F.3d 594 at 609 ("[T]he overemphasis on certain perceived strengths, inferred from anecdotal evidence, is inconsistent with the expert testimony and accepted professional analyses."); *Jackson v. Kelley*, 898 F.3d 859, 865 (8th Cir. 2018)(same).

To dispute that Mr. Wilson has any adaptive deficits, the Government makes several factually inaccurate claims. Based on undated data from a State of Michigan public data portal, the Government claims that "[t]he Detroit Public School (DPS) System has a vibrant mechanism in place to identify and help students with special education needs and intellectual disability." Dkt. 971 at 9. Contrary to this assertion,

the current DPS Superintendent Nikolai Vitti has stated that the school district for far too long failed students with special education needs. Jennifer Chambers, *Detroit Schools Target Special Ed Failures*, The Detroit News, July 10, 2018, attached as Exh. G. Two audits found that the district:

> 1. "Lacks an effective system for identifying and evaluating children who may be eligible for special education services under a federal law called Child Find";
>
> 2. "Often fails to respond to parent requests within 10 days — as required by law — to evaluate their child";
>
> 3. "Uses referrals to the districts Resource Coordinating Team, a school-based problem-solving group, as a way to delay or deny a requested evaluation"; and
>
> 4. "Fails to review records of new students that may need services."

*Id*. These failures occurred during the time that Mr. Wilson attended DPS.

Two of Mr. Wilson's school teachers confirmed that Mr. Wilson in fact received special education services. Dkt. 930-2 at 20. Mr. Wilson's teachers explained that the school he attended from 6th through 8th grade, did not have self-contained classes for students with special needs, and that the resource room was the only service provided. Dr. Patton administered the *Adaptive Behavior Diagnostic Scale (ABDS)* to one teacher, Ms. Murray, and the results confirmed that in all three domains (conceptual, social, and practical), Mr. Wilson's adaptive behavior was "significantly deficient from that of his age peers." Dkt. 930-2 at 24–25.

To assess Mr. Wilson's adaptive deficits, Dr. Denney administered the ABAS-3 to Delores Kimbrough. The results of the ABAS-3 confirm that Mr. Wilson meets the criteria for adaptive deficits as defined by the AAIDD and DSM-5. Ms. Kimbrough reported significant adaptive deficits in the conceptual domain with score 66 (95% CI: 61-71) and a Composite score of 73 (95% CI: 70-76), either of which qualifies Mr. Wilson for a diagnosis of ID. While significant deficits are only needed in one domain, the Defense established that Mr. Wilson suffers from significant adaptive deficits in all three domains.

**Criterion Three-Onset During the Developmental Period** Through Dr. Denney, the Government offers undated and inaccurate information based on brief interviews with currently employed DPS special education administrators. Contrary to the wealth of information regarding the substantially underfunded and poor quality of DPS, and specifically the lack of services for students with ID, Dr. Denney obtained vague assurances that Mr. Wilson's transcript does not specifically state he obtained an IEP (Dkt. 971-1 at 12).

The ineptitude of the school system to identify and provide supports for students with ID is unquestionable. *See, supra*, Exh. G. In addition to the audits described above, the Defense offered evidence from two teachers who taught Mr. Wilson and have first hand knowledge of him, the schools he attended and how those specific schools handled children and adolescents in need of supports, which wholly

undermines the Government's misrepresentations. This Court should reject the Government's and Dr. Denney's baseless conclusion that Mr. Wilson did not require special education services and endorse the evidence that Mr. Wilson manifested significant adaptive deficits during his developmental years.

Relying on a social security disability case, the Government claims that Mr. Wilson "has no reliable evidence that his claimed intellectual functioning deficits and claimed adaptive behavior deficits manifested during the developmental years," as is required under Criterion Three for a finding of ID. Dkt. 971 at 24. For a multitude of reasons, *Daniels v. Commissioner of Social Security*, 70 F.App'x 868 (6th Cir. 2003), is easily distinguishable. The claimant there had graduated from high school, obtained a cosmetology license, worked several jobs in high school sometimes filling in as the supervisor, and managed money. The Court noted that her "educational background and work experience demonstrate an ability to perform relatively complicated tasks." *Id*. at 873 (internal quotes and citations omitted). More importantly, no expert opined that she suffered from "significantly subaverage general intellectual function" or "deficits in adaptive functioning" prior to age 22. *Id*. Here, defense experts opine that Mr. Wilson has both significant subaverage intellectual function and deficits in adaptive functioning during the developmental period.

The school records and teacher interviews document Mr. Wilson was placed in a "resource room," a form of special education services during the developmental period; and additional, knowledgeable people who knew Mr. Wilson during his developmental period described significant adaptive deficits. Dr. Denney's ABAS-3 results also demonstrate significant deficits during the developmental period. Mr. Wilson clearly meets Criterion 3 for a diagnosis of ID.

The Government's experts, contrary to guidance of the AAIDD and DSM-5, proffer irrelevant details about Mr. Wilson's purported strengths in order to assert that he does not have adaptive deficits. The Government spends much ink writing about the fact that Mr. Wilson obtained a driver's license, used social media, and interacted with various law enforcement officers, writing that Mr. Wilson's "use of cutting edge technology is inconsistent with a claim of intellectual disability." Dkt. 971 at 16. It is not at all clear what "cutting edge technology" Mr. Wilson ever used, though the Government appears to be referring to "[c]ell phones, with copious contacts on social media." These are technologies that are far from cutting-edge and which people with ID have repeatedly been found to be able to regularly use. *See e.g*, Allison C. Carey, Mark G. Friedman, and Diane Nelson Bryen, *Use of Electronic Technologies by People With Intellectual Disabilities*, 43 Mental Retardation 332 (2005)(survey study of people with intellectual disability finding that 89.2 percent of the participants regularly used telephones and 41 percent used

computers). *See also, United States v. Smith*, 790 F. Supp. 2d 482, 536 (E.D. La. 2011)(capital defendant found intellectually disabled even though three respondents " all gave Smith the highest rating ('Usually') to 'Makes telephone calls to others, using standard or cellphone' on the VABS–II."); *United States v. Lewis*, 2010 WL 5418901, at *30 (N.D. Ohio Dec. 23, 2010)(" The evidence indicates that Defendant could count money, owned several cell phones, and drove cars for transportation. But a determination of intellectual disability must focus on Defendant's deficits, not his abilities.").

Rather than offering science-based, or fact-based, conclusions based on the clinical and medical standards for assessing ID, the Government relies on inaccurate stereotypes about people with ID. The AAIDD expressly cautions against reliance on misconceptions that interfere with clinical diagnosis of ID, such as expectations that the ID persons cannot get driver's licenses or drive cars. Dkt. 930 at 14 (quoting AAIDD User's Guide at 93, 95–96); *see also Moore II*, 139 S. Ct. at 668–69 (citing *Moore I*, 137 S. Ct. at 1050) ("'But the medical community,' we said, 'focuses the adaptive-functioning inquiry on adaptive deficits.'"). The Government insists on using false stereotypes which are explicitly rejected by the clinical and medical standards which the United States Supreme Court has endorsed. "[S]omeone might be mentally retarded but still be able to carry out any of a number of everyday activities, such as maintaining a simple job or driving a car. Thus, …[a] full,

independent review of whether [the petitioner] show[s] ... that he displayed adaptive deficits ... must therefore look at his weaknesses instead of at his strengths." *See*, *Van Tran v. Colson*, 764 F.3d 594 at 609 (internal quotation omitted.).

Instead of assessing Mr. Wilson's adaptive behavior "within the context of community environments typical of the individual's age peers and culture," Dr. Denney focuses on Mr. Wilson's alleged criminal behavior, including a custodial interrogation that this Court suppressed, noting that the police officer's explanation of the *Miranda* waiver was "unquestionably misleading," that Mr. Wilson "lack[ed] . . . awareness" that he was abandoning his Fifth Amendment rights when signing the *Miranda* waiver form, and that he was not consenting to be interrogated. *See* Dkt. 958 at 11–12. Dr. Denney concluded the opposite: "Mr. Wilson read his Miranda rights form aloud and consented to answering questions." Dkt. 971-1 at 16. This Court wrote "the very purpose of the *Edwards* rule"—"'to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights'"—"is precisely what happened here," Dkt. 958 at 11, and that "the purpose of [Mr. Wilson's] unequivocal invocation was to have counsel present because he did not understand the circumstances surrounding his custodial interrogation." *Id*. at 8. Dr. Denney concluded that Mr. Wilson "does not appear confused," "demonstrated no apparent trouble comprehending what the officers said," and "was not a gullible pushover, susceptible to the officer's attempt to get him to explain his involvement."

14

Dkt. 971-1 at 16. This Court should take Dr. Denney's "assessment" of Mr. Wilson's behavior during the illegal custodial interrogation as indicative of his approach to the assessment of Mr. Wilson's ID.

## CONCLUSION

Despite the Government's best effort to explain the obtained scores as something other than what they are, Mr. Wilson has demonstrated that he has significant subaverage intellectual function and significant adaptive deficits with onset during the developmental period establishing the criteria for ID. As such, the Government should be barred from seeking the death penalty against him.

Respectfully submitted,

By: s/Michael Burt  
    Michael Burt  
    California State Bar No. 83377  
    1000 Brannan St., Suite 400  
    San Francisco, CA 94103  
    (415) 522-1508  
    mb@michaelburtlaw.com  

s/ Jacqueline K. Walsh  
Jacqueline K. Walsh  
Washington State Bar #21651  
705 2nd Ave., Suite 501  
Seattle, WA 98104  
206-325-7900x5  
jackie@jamlegal.com  

    s/ Ashwin Cattamanchi  
    Ashwin Cattamanchi  
    Illinois State Bar No. 6289199  
    Federal Defenders of San Diego, Inc.  
    225 Broadway, Suite 900  
    San Diego, CA 92101  
    (619) 234-8467  
    ashwin_cattamanchi@fd.org  

DATED: July 9, 2019

**CERTIFICATE OF SERVICE**

I, Jacqueline Walsh, hereby certify that on July 9, 2019, I electronically served the forgoing document with the Clerk of the Court using the ECF system which will send notification to all parties.

s/Jacqueline Walsh
Jacqueline Walsh
