UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

EDWIN MILLS, et al.,

    Defendants.
_____/

Case No. 16-cr-20460

HON. MARK A. GOLDSMITH

**OPINION & ORDER
DENYING DEFENDANT CARLO WILSON'S MOTION TO COMPEL DISCOVERY
REGARDING SELECTIVE ENFORCEMENT CLAIM (Dkt. 941)**

This matter is before the Court on Defendant Carlo Wilson's motion to compel discovery in anticipation of filing a motion to strike the notice of intent to seek the death penalty based on a racially selective law enforcement claim (Dkt. 941).[1] The Government filed a response in opposition to the motion (Dkt. 946), to which Wilson replied (Dkt. 949).[2] For the reasons stated below, the Court denies the motion.

## I. BACKGROUND

Because the Court has previously described the factual and procedural background of this case in greater detail in other opinions, it need not do so again for purposes of the present motion. See, e.g., United States v. Mills, 378 F. Supp. 3d 563 (E.D. Mich. 2019) (denying motions to dismiss); United States v. Mills, No. 16-cr-20460, 2019 WL 1915762 (E.D. Mich. Apr. 30, 2019)

---

[1] Defendant Edwin Mills filed a notice of joinder concurring in the relief sought in this motion. See Notice of Joinder (Dkt. 943).

[2] Because oral argument will not aid the Court's decisional process, Wilson's motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2).

1

(denying motions for bills of particulars); United States v. Mills, 367 F. Supp. 3d 664 (E.D. Mich. 2019) (granting in part and denying in part motion to preclude rap lyrics and videos).

## II. DISCUSSION

In his motion, Wilson contends that the Detroit Field Office of the FBI "engages in racially selective investigations of murders committed in relation to criminal enterprises under 18 U.S.C. §§ 1962 and 1959 and 21 U.S.C. § 848, and criminal groups of more than one person under 18 U.S.C. § 924(j) or any other criminal statute with a penalty of death," which supposedly includes its investigation of his case. Def. Mot. at 9; see also Def. Reply at 2 ("[T]he FBI's Detroit field office engaged in a racially selective investigation of Mr. Wilson—part of a pattern of racially selective investigations of murders involving criminal groups of two or more persons—in violation of Mr. Wilson's Fifth Amendment rights."). To demonstrate that his selective enforcement claim has merit, Wilson requests a court order compelling the Government to produce the following discovery:

> (1) A list by case name, number, and race of each defendant charged in any offense under 18 U.S.C. § 1962 in which an overt act of murder was alleged brought by any U.S. Attorney's Office in the State of Michigan from 2008 to the present.
>
> (2) A list by case name, number, and race of each defendant charged in any offense under 18 U.S.C. § 1959(a)(1) or 21 U.S.C. § 848(e) brought by any U.S. Attorney's Office in the State of Michigan from 2008 to the present.
>
> (3) A list by case name, number, and race of each defendant charged in any multi-defendant case for any offenses under federal law for which there is a possible penalty of death.
>
> (4) For each case listed in (1), (2), and (3), a statement of prior criminal contact that the federal agency responsible for the investigation had with each defendant.
>
> (5) All national and Detroit field office FBI manuals, circulars, field notes, correspondence or any other material which discuss

"enterprise," as that term is defined in 18 U.S.C. § 1961(4), or "continuing criminal enterprise," as that term is defined in 21 U.S.C. § 848(c); and which discuss "gangs"; and which discuss any criminal group which the FBI chooses to not categorize as an "enterprise," "continuing criminal enterprise," or "gang"; including directions to agents regarding how to pursue investigations of "enterprises," "continuing criminal enterprises," "gangs," and other uncategorized criminal groups and how to determine which "enterprises," "continuing criminal enterprises," "gangs," and other criminal groups to pursue.

(6) Data from 2008 to the present outlining the number of "enterprises," "continuing criminal enterprises," "gangs," and other criminal groups that the FBI's Detroit field office is investigating or has investigated for violations of 18 U.S.C. § 1962 wherein murder is involved, violations of 18 U.S.C. § 1959(a)(1), violations of 21 U.S.C. § 848(e), violations of 18 U.S.C. § 924(j), or violations of any other federal criminal law in which a penalty of death may apply.

(7) Data from 2008 to the present identifying the racial composition of each "enterprise," "continuing criminal enterprise," "gang," and other criminal group described in (6) above.

(8) All documents that contain information on how supervisors and managers of the FBI's Detroit field office were to ensure and/or did ensure or check to decide that its agents were not targeting persons on the basis of their race, color, ancestry, or national origin for investigations of murders committed by individuals associated with "enterprises," "gangs," or other criminal groups and what actions the FBI's Detroit field office took to determine whether agents were not targeting persons for such investigations on the basis of their race, color, ancestry, or national origin.

(9) The factual basis in each case produced in response to (1), (2), and (3) regarding decisions made to pursue or initiate an investigation against any of the individuals listed as defendants in these cases.

(10) From 2008 to the present, all documents containing instructions given about the responsibilities of Assistant United States Attorneys to ensure that defendants in cases brought by the Office of the United States Attorney for both the western and eastern districts of Michigan have not been targeted due to their race, color, ancestry, or national origin and that such prosecutions have not been brought

> with any discriminatory intent on the basis of the defendant's race, color, ancestry, or national origin.
>
> (11) From 2008 to the present, all documents that contain information about all actions taken about the responsibilities of Assistant United States Attorneys to ensure that defendants in cases brought by the Office of the United States Attorney for both the western and eastern districts of Michigan have not been targeted due to their race, color, ancestry, or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant's race, color, ancestry, or national origin.

Def Mot. at 18-20. To the extent he is not entitled to all of the broad discovery he has requested, Wilson alternatively requests that the Court conduct an evidentiary hearing to determine the scope of discovery to be produced. Id. at 1, 20. For the reasons discussed below, the Court denies Wilson's requests.

The "Constitution prohibits selective enforcement of the law based on considerations such as race." Whren v. United States, 517 U.S. 806, 813 (1996); see also Wayte v. United States, 470 U.S. 598, 608 & n.9 (1985) (ban on discriminatory law enforcement applies to the federal government under the Fifth Amendment). In contrast to a selective prosecution claim, in which a defendant asserts that "the prosecutor has brought the charge for reasons forbidden by the Constitution," United States v. Armstrong, 517 U.S. 456, 463 (1996), a selective enforcement claim is directed at the "actions of law enforcement and those affiliated with law-enforcement personnel," United States v. Washington, 869 F.3d 193, 214 (3d Cir. 2017), cert. denied, 138 S. Ct. 713 (2018). Nevertheless, substantive claims of selective enforcement are evaluated under the same two-part test as selective prosecution claims, which requires a defendant to present "clear evidence" of both a discriminatory purpose and a discriminatory effect. See Armstrong, 517 U.S. at 465; Gardenhire v. Schubert, 205 F.3d 303, 318 (6th Cir. 2000) (citing Futernick v. Sumpter Twp., 78 F.3d 1051, 1056 (6th Cir. 1996)); see also Bennett v. City of Eastpointe, 410 F.3d 810,

4

818 (6th Cir. 2005) (citing Wayte, 470 U.S. at 608); United States v. Jones, 159 F.3d 969, 976-977 (6th Cir. 1998); accord Washington, 869 F.3d at 214.

In Armstrong, the Supreme Court held that a defendant seeking to obtain discovery on a selective prosecution claim need not establish a prima facie case, but he or she must still satisfy a "rigorous standard" by producing "some evidence" of both discriminatory purpose and discriminatory effect. 517 U.S. at 468-470; accord United States v. Bass, 536 U.S. 862, 863 (2002) (per curiam) ("[A] defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent."). The phrase "some evidence," when used in this context, must include a showing that "similarly situated defendants of other races could have been prosecuted, but were not." Armstrong, 517 U.S. at 469; Bass, 536 U.S. at 864 ("Under Armstrong, therefore, because respondent failed to submit relevant evidence that similarly situated persons were treated differently, he was not entitled to discovery."). Here, Wilson complains of selective enforcement, not selective prosecution. Thus, the threshold question is whether the same rigorous discovery standard for selective prosecution claims in Armstrong applies to selective enforcement claims.

Because selective enforcement claims are judged according to the same "ordinary Equal Protection standards" as selective prosecution claims, Gardenhire, 205 F.3d at 318, some courts have held that the standard for discovery is the same, too, see, e.g., United States v. Alcaraz-Arellano, 441 F.3d 1252, 1264 (10th Cir. 2006); United States v. Barlow, 310 F.3d 1007, 1010 (7th Cir. 2002); Hubbard v. Holmes, No. 3:16-cv-00018, 2018 WL 1902376, at *4 (W.D. Va. Apr. 20, 2018); United States v. AT & T Inc., 290 F. Supp. 3d 1, 3-4 (D.D.C. 2018); United States v. Lamar, No. 14 Cr. 726, 2015 WL 4720282, at *5-6 (S.D.N.Y. Aug. 7, 2015); United States v. Alexander, No. 1:14 CR 341, 2015 WL 1523910, at *6 n.4 (N.D. Ohio Apr. 3, 2015); United States

5

v. Dixon, 486 F. Supp. 2d 40, 45 (D.D.C. 2007); see also United States v. Wallace, 389 F. Supp. 2d 799, 801-802 (E.D. Mich. 2005) (applying Armstrong discovery standard to the defendant's claim that a disproportionate number of African-Americans with firearms cases originating in the state criminal system are referred for federal prosecution under "Project Safe Neighborhoods," a national initiative aimed at controlling gun violence).

Other courts, however, have held that the considerations about prosecutorial discretion underlying the Supreme Court's decision in Armstrong are not present in the context of law enforcement agencies. E.g., United States v. Davis, 793 F.3d 712, 720-721 (7th Cir. 2015) (en banc) (distinguishing between prosecutors, who are "protected by a powerful privilege or covered by a presumption of constitutional behavior" recognized by Armstrong, and FBI/ATF agents, who "regularly testify in criminal cases" and whose "credibility may be relentlessly attacked by defense counsel," and deciding that "the sort of considerations that led to the outcome in Armstrong do not apply to a contention that agents of the FBI or ATF engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution."); accord United States v. Sellers, 906 F.3d 848, 853-855 (9th Cir. 2018); Washington, 869 F.3d at 218-220. Accordingly, these courts have endorsed a more relaxed discovery standard for selective enforcement claims, at least in the context of "stash house reverse-sting operations." Sellers, 906 F.3d at 855; Washington, 869 F.3d at 220-221; Davis, 793 F.3d at 722-723; cf. United States v. Hare, 820 F.3d 93, 101 (4th Cir. 2016) (assuming without deciding that a lower evidentiary showing is sufficient to warrant discovery into selective enforcement, but holding that the appellants were not entitled to discovery beyond what the Government had already produced).[3]

---

[3] As the Third Circuit has aptly noted, the Seventh Circuit's en banc decision in Davis never mentions its "earlier decision in Barlow at all—not to harmonize it, distinguish it, or explicitly overrule it." Washington, 869 F.3d at 218; accord Lamar, 2015 WL 4720282, at *5 n.3 ("The

6

For example, the Ninth Circuit has held that a defendant is not required to "proffer evidence that similarly-situated individuals of a different race were not investigated or arrested." Sellers, 906 F.3d at 855. Rather, the defendant need only "have something more than mere speculation to be entitled to discovery." Id. Of course, what that "something" actually looks like will ultimately depend on the nature of the claim and the circumstances of the case. See id.

The Third Circuit has adopted a similar approach. When a claim of selective enforcement is raised, a defendant must proffer "some evidence" of discriminatory effect, which "must contain reliable statistical evidence, or its equivalent, and may be based in part on patterns of prosecutorial decisions . . . even if the underlying challenge is to law enforcement decisions." Washington, 869 F.3d at 220-221 (emphasis omitted). Importantly, a defendant does not have to show that "similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement." Id. at 221. And although a defendant does not have to provide "some evidence" of discriminatory intent, "the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement." Id. When contemplating a motion for discovery on a selective enforcement claim, however, the Third Circuit cautioned that district courts should "still be guided by the spirit of Armstrong/Bass." Id. at 220; see also United States v. Brooks, No. 14-382, 2019 WL 258694, at *4 (D.N.J. Jan. 18, 2019) ("[T]he Third Circuit was clear that the District Court need not grant discovery—even limited discovery—even if the above showing has been met.").

---

Seventh Circuit did not set forth a separate standard for obtaining discovery concerning a selective enforcement claim [in Davis], however, nor did it address—much less explicitly overrule—its holding in Barlow that a defendant seeking discovery on a selective enforcement claim must meet the same 'ordinary equal protection standards' that Armstrong outlines for selective prosecution claims." (quotation marks omitted)). Moreover, unlike Sellers, Washington, and Davis, this case does not involve a stash house reverse-sting operation, calling into question whether the relaxed discovery standard should apply in this case. See Gov't Resp. at 2, 16-21.

7

Although the Sixth Circuit has not yet squarely addressed this precise issue, this Court need not try and resolve it today because Wilson has failed to demonstrate that he is entitled to discovery even under a more relaxed discovery standard.

Wilson relies on three pieces of evidence to support his contention that he has proffered sufficient evidence of a plausible discriminatory effect to satisfy a relaxed standard for discovery. First, Wilson claims that the U.S. Attorney's Office for the Eastern District of Michigan has four pending cases, including this matter, all of which involve "allegations of murder" and "one or more defendants facing a possible death sentence." Def. Mot. at 10 (referring to United States v. Arnold, No. 15-cr-20652 (Steeh, J.); United States v. Griffin, No. 17-cr-20639 (Berg, J.); and United States v. Williams, No. 18-cr-20085 (Borman, J.)). Of the thirty-nine defendants in these four cases, thirty-eight are African-American and one is Latino. Id. According to Wilson, "the key to unlocking why the FBI's Detroit field office investigates primarily—or even exclusively—African-American suspects for crimes of murder involving two or more individuals is its racially selective investigation of criminal groups." Id.

Second, Wilson claims that a review of murder statistics in Michigan compiled by the Michigan State Police from 2008 to 2017 further demonstrates that there is "some evidence" that the Detroit Field Office of the FBI "investigates and refers for federal prosecution murders involving criminal groups comprised of minority members in a manner that violates" the Fifth Amendment. Id. at 11. Specifically, of the 648 adult white suspects who were arrested for murder in Michigan during this ten-year span, Wilson posits that some of those murders must have "involved criminal groups that could be investigated by the FBI and referred for prosecution in federal court," id. at 13, but, "as far as the Defense knows," were not, id. at 16.

8

Third, Wilson avers that three similarly situated adult white murder suspects who committed a triple homicide in the Upper Peninsula of Michigan in 2015 were not investigated by the FBI and referred for federal prosecution. See id. at 13. According to Wilson, one of the defendants had fled to Illinois after the murders, changed the tires of his vehicle, and lied when he was later questioned by a state police detective. Id. at 13-14 (citing People v. Brunke, Nos. 341160 & 341161, 2019 WL 488797 (Mich. Ct. App. Feb. 7, 2019)). These murders were also related to the distribution of controlled substances, says Wilson, because one of the defendants "was noted to be operating a narcotics ring that supplied local residents with cocaine and morphine," including one of the homicide victims. Id. at 15 (quotation marks omitted). Two of the suspects confessed to the murders, claiming that "the motive was to punish [one of the victims] for the theft of the cocaine." Id. (quotation marks omitted). According to Wilson, "[t]his is stark evidence of a similarly-situated criminal group that the FBI's Detroit field office did not investigate and refer for federal prosecution." Id. at 16.

The Court finds that Wilson's proffered evidence, when viewed in its totality, amounts to nothing more than mere speculation about the FBI's alleged racially selective investigation of his case. Sellers, 906 F.3d at 855. More importantly, he fails to provide evidence "strong enough to support a reasonable inference of discriminatory intent and non-enforcement." Washington, 869 F.3d at 221.

To begin, Wilson's suggestion that the FBI was solely responsible for the investigation of his case is inaccurate. As the Government notes in its response, Wilson's arrest came after an investigation conducted by the "Detroit One" initiative, which is a collaboration of local, state, and federal law enforcement formed to track down violent gang activity. Gov't Resp. at 4; see also

9

Ex. A to Gov't Resp. (Dkt. 946-1).[4] This certainly undermines Wilson's selective enforcement claim that the FBI engaged in racially motivated conduct.

Further, the Government is correct that none of the defendants in two of the four cases—Griffin and Williams—is facing a possible death sentence. See Gov't Resp. at 12. In the third case—Arnold—the Government has filed a notice of intent to seek the death penalty against Arnold only, while four death-eligible defendants are not facing the death penalty. Id. Thus, insofar as Wilson's selective enforcement claim is premised on the FBI purportedly engaging in racially selective investigations of murders involving two or more defendants where at least one defendant is facing a possible death sentence, see Def. Mot. at 9 ("criminal groups of more than one person under 18 U.S.C. § 924(j) or any other criminal statute with a penalty of death" (emphasis added)); see also id. at 10 ("one or more defendants facing a possible death sentence." (emphasis added)), these cases hardly rise to the level of plausible discriminatory effect.

Next, Wilson's suggestion that, of the 648 murders committed in Michigan between 2008 and 2017 where an adult white suspect was arrested, "[t]here certainly existed a class of suspects" involving "criminal groups" that "the FBI's Detroit field office could have investigated and referred for federal prosecution," Def. Mot at 13, is mere speculation. There is no suggestion that any of those 648 murders involved more than one defendant, implicated federal jurisdiction, or that federal law enforcement officials were aware of those cases. See Gov't Resp. at 12. As the Ninth Circuit cogently stated in Sellers, a defendant must "have something more than mere speculation to be entitled to discovery." 906 F.3d at 855.

Finally, the Court finds that Wilson is not similarly situated to the three white murder suspects involved in the 2015 triple homicide tried in state court. Wilson believes that a "similarly

---

[4] Wilson does not dispute this fact in this reply brief.

10

situated defendant is a defendant in a murder case involving two or more conspirators that implicates federal jurisdiction in Michigan." Def. Reply at 7. This sort of similarity is simply too broad. For purposes of a selective enforcement claim, a "similarly situated" individual is someone of another race or ethnicity who could have been arrested for the same offense as the defendant but was not. See Dixon, 486 F. Supp. 2d at 46 (citing Johnson v. Crooks, 326 F.3d 995, 1000 (8th Cir. 2003); United States v. Barlow, 310 F.3d 1007, 1010 (7th Cir. 2002)); cf. Armstrong, 517 U.S. at 469 (explaining that for selective prosecution claim, the defendant must produce some evidence that similarly situated defendant of a different race could have been prosecuted for the offense for which the defendant was charged, but were not so prosecuted).

Wilson's charges stem generally from his alleged membership in a criminal enterprise engaged in racketeering activity—the 6 Mile Chedda Grove street gang—and his murder charges in particular were supposedly committed for the purpose of gaining entrance to or maintaining or increasing position in that enterprise. See generally 2d Superseding Indictment. Although the triple homicide in the Upper Peninsula was reportedly related to the distribution of controlled substances, Wilson provides no indication that the three white suspects were members of an enterprise engaged in racketeering, let alone that the murders were committed to maintain or increase their position in that enterprise. See Def. Mot. at 15 (the motive for the triple homicide "was to punish [one of the victims] for the theft of the cocaine.").

Therefore, guided by the spirit of Armstrong and Bass, this Court concludes that Wilson is not entitled to discovery on his selective enforcement claim and, therefore, denies his motion.

### III. CONCLUSION

For the reasons stated above, Wilson's motion to compel discovery in anticipation of filing a motion to strike the notice of intent to seek the death penalty based on a racially selective law enforcement claim (Dkt. 941) is denied.

SO ORDERED.

Dated: July 12, 2019  
   Detroit, Michigan

s/Mark A. Goldsmith  
MARK A. GOLDSMITH  
United States District Judge