**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

CASE NO. 16-20460
HON. DENISE PAGE HOOD

v.

EDWIN MILLS & CARLO WILSON,

Defendants.
_______________________________________/

UNITED STATES OF AMERICA,

Plaintiff,

CASE NO. 15-20652
HON. DENISE PAGE HOOD

v.

BILLY ARNOLD,

Defendant.
_______________________________________/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT EDWIN MILLS' SECOND MOTION FOR ACCESS TO JURY SELECTION RECORDS AND MATERIALS [#912]**

## I. BACKGROUND

A federal grand jury returned a second superseding indictment on February 28, 2018, charging the eleven defendants in this case with various crimes, including violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq*. (Dkt. 292) This case was randomly assigned to Judge Mark

Goldsmith. That indictment claims that Defendants were members and associates of a criminal enterprise—the "6 Mile Chedda Grove" street gang in Detroit, Michigan—one of whose purposes was to "preserv[e] and protect[] the power, territory, reputation, and profits of the enterprise through murder, robberies, intimidation, violence, and threats of violence." (*Id.* at 2, 6.) The enterprise purportedly operated on the east side of Detroit within an area bordered roughly by East McNichols Road to the north, Kelly Road to the east, Houston-Whittier Street to the south, and Chalmers Street to the west. (*Id.* at 2.) The "Chedda Grove" part of the enterprise's name is partially derived from one of the main streets in this territory—Cedargrove Street. (*Id.*)

The indictment further alleges that the enterprise's profits derived primarily from the sale and distribution of controlled substances, including crack cocaine, heroin, and morphine. (*Id.* at 5.) The drug sales and distribution alleged were not limited to Michigan; gang members and associates purportedly sold and distributed controlled substances in Ohio, Kentucky, Tennessee, Alabama, and West Virginia. (*Id.*)

Eight of the eleven defendants have since pleaded guilty.[1] The three remaining defendants have been separated into two groups with separate trial dates.

[1] These eight defendants include Mario Jackson, Michael Richardson, Corey Mills, Devontae Russell, Phillip Peaks, Patrick Johnson, Lomnil Jackson, and Donell Thompson.

(Dkt. 425) Group One is currently composed of one defendant, Robert Baytops, who is not subject to the death penalty upon conviction. His trial will be scheduled at a future date. (Dkt. 846) Group Two, composed of two defendants who are death-penalty eligible, has a trial date of April 21, 2020. (Dkt. 475)

Defendants Edwin Mills ("Mills" or "Defendant") and Carlo Wilson ("Wilson") belong to Group Two and have each been charged with one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d); two counts of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1); two counts of using and carrying a firearm during and in relation to a crime of violence causing death in violation of 18 U.S.C. §§ 924(c) and 924(j); two counts of assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. § 1959(a)(3); and one count of using, carrying, and discharging a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c). (Dkt. 292) On March 1, 2018, the Government filed its notice of intent to seek a sentence of death against Mills and Wilson. (Dkt. 293)

On February 15, 2019, Defendant filed a Motion for Access to Jury Selection Records and Materials. (Dkt. 768) Wilson filed a notice of joinder concurring in the relief sought in that Motion on February 15, 2019. (Dkt. 769) On March 25,

2019, the Court[2] denied Defendant's Motion without prejudice for failure to comply with the Court's deadline for making such requests pursuant to the date set forth in the Court's Stipulated Order (Dkt. 758). (Dkt. 844) On April 3, 2019, Defendant moved for an extension of time to file any challenges to the jury cross-section pursuant to Federal Rule of Criminal Procedure 45. (Dkt. 858) The Court granted Defendant's request on April 30, 2019. (Dkt. 898)

Defendant filed his Second Motion for Access to Jury Selection Records and Materials on May 6, 2019. (Dkt. 912) Wilson filed a notice of joinder concurring in the relief sought in that Motion on May 8, 2019. (Dkt. 917) In another case that is currently pending in front of Judge George Caram Steeh, *United States of America v. Arnold*, et al. (15-cr-20652), Defendant Billy Arnold ("Arnold") sought to join the instant Motion on June 4, 2019.[3] Judge Steeh granted Arnold's request on June 10, 2019.[4] Any rulings made in regard to the instant Motion will therefore apply to Mills, Wilson, and Arnold. On May 16, 2019, the Government filed its Response

[2] When discussing past judicial decisions, the "Court" refers to decisions made by Judge Goldsmith because the underlying case, *United States of America v. Mills*, et al. (16-cr-20460), has been assigned to him. Any determinations regarding the instant Motion using the term the "Court" will be in reference to findings made by Chief Judge Denise Page Hood.

[3] Arnold also seeks additional juror selection records and materials that are beyond the limited scope of discovery contemplated in Administrative Order No. 00-AO-060.

[4] The Court notes that Arnold seeks information from the same jury wheels (2015 for grand jury information and 2019 for the petit jury information) that Mills and Wilson request information from.

(Dkt. 922) and Defendant filed his Reply on May 21, 2019 (Dkt. 924). This Motion is currently before the Court and a hearing was held on May 22, 2019.

In his Motion, Defendant argues that he has an "unqualified right" to inspect and copy "records or papers used by the jury commission or clerk in connection with the jury selection process." (Dkt. 912, Pgs. 6-7) Defendant contends that courts have found that capital cases require extra precautions to protect the defendant's right to an impartial and representative jury because of the "broad discretion given the jury at the death penalty hearing" and "the special seriousness of the risk of improper sentencing." *Turner v. Murray*, 476 U.S. 28, 37 (1986); *Sampson v. United States*, 724 F.3d 150, 163 (1st Cir. 2013); *Gibson v. Zant*, 705 F. 2d 1543, 1546 (11th Cir. 1983). Defendant specifically requests access to the following materials:

1. The Juror Selection Plan for the Eastern District of Michigan currently in effect, and if different in any respect, at the time the grand and trial jurors were and will be summoned in this case;
2. Any AO-12 or JS-12 form created which relates to the Master Jury Wheel that was used to summon the grand jurors who returned the indictment in this case and will be used to summon trial jurors as required by 28 U.S.C. § 1863(a);
3. Any other statistical or demographic analyses produced to ensure the quality and compliance of the Master Jury Wheel that was used to summon the grand jurors and will be used to summon trial jurors in this case with the Juror Selection Plan's Section (a), the Jury Selection and Service Act ("JSSA"), and constitutional requirements;
4. Any other statistical or demographic analyses produced with respect to the Juror Selection Plan's Sections (g)(1)(G) and (u)(1);
5. The date when the Master Jury Wheel that was used to summon grand jurors and will be used to summon trial jurors in this case was refilled as described in the Juror Selection Plan's Section (h)(3);

6. The calculation of proportional representation for each county as described in the Juror Selection Plan's Section (h)(2);
7. The dates the Supplemental Draw was or is in effect as described in the Juror Selection Plan's Section (k)(2);
8. The items described in the Juror Selection Plan's Section (t)(5)(B);
9. The items described in the Juror Selection Plan's Section (t)(5)(C);
10. The dates when grand jurors were summoned and trial jurors will be summoned in this case;
11. The number of persons that will be summoned from the Master Jury Wheel to be considered as grand and trial jurors in this case;
12. Master Jury Wheel data in electronic and accessible form that includes juror number, race, gender, Hispanic ethnicity, birth year, zip code, and county;
13. Status Codes for potential jurors who were selected for qualification but either had their qualification form returned by the postal service, did not respond, or were disqualified or exempted from jury service. The data should be in electronic and accessible form that includes juror number, whether the form was returned as undeliverable, whether the form was not returned, reason for disqualification, race, gender, Hispanic ethnicity, birth year, zip code, and county;
14. The juror number only (not name or address) for persons whose juror summons and qualification forms were returned as undeliverable by the United States Postal Service and the replacement person's juror number as described in the Juror Selection Plan's Section (k)(1);
15. The juror number only (not name or address) for persons that will be selected as potential trial jurors in this case;
16. The sources of data in electronic form for the Master Jury Wheel that was used to summon grand and trial jurors in this case as described in the Juror Selection Plan's Section (f). The data should include race, gender, Hispanic ethnicity, birth year, zip code, and county but not any personal information or information that could be used to identify any individual, such as name or address;
17. The juror qualification and summons forms for persons that will be summoned to potentially become grand and trial jurors in this case;
18. The disposition of each summoned potential grand and trial juror in this case as to excusal, deferment, disqualification, or selection.[5]

[5] Defendant notes that items 1, 2, 8, and 9 relating to the grand jury have been provided to counsel without a court order. (Dkt. 912, Pg. 4)

(Dkt. 912-4)

In order to determine if his claims regarding the District's alleged practices are discriminatory, Defendant has retained the services of statistician, Jeffrey Martin ("Martin"), to analyze the potential jury pools in this case and assess whether they represent a fair cross-section of the community. (Dkt. 912, Pg. 9) Defendant alleges that Martin has repeatedly qualified as an expert statistician in connection with jury procedures in capital cases at the state and federal levels across the country. (Dkt. 912, Pg. 9; Dkt. 912-2) Martin contends that after a review of the current Jury Plan, he has determined that he needs to access the nonpublic records in order to make an informed assessment of the impact that the Juror Plan has on Mills' case, and if warranted, assist with preparing a motion to challenge jury selection. (Dkt. 912, Pg. 9, 17)

## II. STANDARD OF REVIEW

"The Sixth Amendment guarantee of an 'impartial jury' has been construed as encompassing the right to a jury drawn from a fair cross section of the community." *United States v. Brown,* 128 F.Supp.2d 1034, 1038 (E.D.Mich.2001) (internal quotation marks and citations omitted). Likewise, the JSSA declares as a "policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross

section of the community in the district or division wherein the court convenes." 28 U.S.C. §1861.

Pursuant to Administrative Order No. 00-AO-060 of the Eastern District of Michigan (the "District"), when parties seek information that is beyond the normal scope of discovery with respect to information concerning jurors and potential jurors with the intent to challenge the composition of a grand and/or petit jury on the basis of race or ethnicity, they are normally limited to receiving materials pertaining to "juror number; race; and Hispanic ethnicity." To the extent that a party seeks additional or more detailed information and records bearing upon this District's process for juror selection, this Court has mandated that such requests will be reviewed by the Chief Judge on a "case-by-case basis," and will be granted upon a showing of "good cause." Administrative Order No. 00–AO–060. Since Defendant is requesting materials that are outside the normal scope of discovery,[6] his Motion has been referred to this Court in its role as Chief Judge of this District.

A party may establish the requisite "good cause" by showing that the requested information is necessary to prepare and present a motion challenging the jury selection process. *United States v. Montini,* No. 03–80228, 2003 WL

[6] The Court notes that the only information that Defendant requests that is outside of the normal scope of discovery relate to statistical or demographical analyses that have been prepared by the clerk. Above, that information is identified as numbers 3 and 4 on the list of materials that Defendant seeks.

22283892, at *3 (E.D.Mich. Sept. 3, 2002); *see also United States v. O'Reilly*, No. 05-CR-80025, 2008 WL 115537, at *1 (E.D. Mich. Jan. 10, 2008) (Friedman, C.J.). To establish his entitlement to the information sought through the present motion, Defendant must show that these materials will assist him in identifying and demonstrating a violation of either the Sixth Amendment or the JSSA. *United States v. Oldham*, 995 F. Supp. 2d 789, 795 (E.D. Mich. 2014).

Under the juror selection plan adopted by the Judges of this District in 2012 and subsequently approved by the Judicial Council of the Sixth Circuit in 2013, potential jurors are drawn from a "master jury wheel" in which "each county within a division is proportionally represented." *See* Administrative Order No. 00-AO-016, Juror Selection Plan § (h)(2). The exact percentages of this mandated "proportional representation," in turn, are determined by reference to the numbers of registered voters in each county within each division.[7] (*Id.*) In order to increase the probability that the names and addresses are as current as possible, the clerk is required to empty and refill the master jury wheels as frequently as practicable, but at least once every four years, in the year following general elections. *See* Administrative Order No. 00-AO-016, Juror Selection Plan § (h)(3).

## III. ANALYSIS

[7] As it pertains to the instant Motion, out of the minimum 340,000 names to be placed in each respective master jury wheel, 300,000 of them must come from the Detroit division. *Se* Administrative Order No. 00-AO-016, Juror Selection Plan § (h)(5).

Defendant's Motion is premised on his belief that the current jury selection methods have led to the systematic exclusion of African Americans and low-income individuals, and he seeks certain information pertaining to the jury selection process in order to demonstrate that his constitutional right to a fair and impartial jury drawn from sources reflecting a fair cross section of the community has been violated. (Dkt. 912, Pgs. 13-14.)

Defendant uses Detroit, the largest African American city in this jurisdiction, to prove that the District's Juror Selection Plan violates his constitutional rights and claims that "[s]ystematic exclusion or underrepresentation of the data sources used to gather African-American jurors in the largest African-American city in the jurisdiction pose Sixth Amendment concerns and must be analyzed." (*Id.* at 12.) Defendant's challenge derives from his contention that selecting jurors based on their status as registered voters and their possession of a valid driver's license[8] may

---

[8] In *United States v. Kilpatrick*, No. 10-CR-20403, 2012 WL 3133939, at *8 (E.D. Mich. Aug. 1, 2012), the court stated

> [w]hile this District's jury selection plan makes use of state-provided lists of licensed drivers and state ID holders as a supplement to the list of registered voters, it is important to note that this effort to augment the jury pool has been voluntarily implemented rather than legally compelled. The Sixth Circuit has recognized that "[v]oter registration lists are the presumptive statutory source for potential jurors," and that "[t]he circuit courts are in complete agreement that neither the [JSSA] nor the Constitution require that a supplemental source of names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population." *United States v. Odeneal,* 517 F.3d 406, 412 (6th Cir.2008) (internal quotation marks, alteration, and citations omitted). Indeed, so far as the Court is aware, this District's use of lists of licensed drivers and state ID holders is rare, if not unprecedented, among the federal district courts. Moreover, the plan used in this District prior to this supplementation was approved by the Judicial Council of

result in a statistical shortfall in the number of African American citizens on the jury wheels that are used to select jurors.[9] (*Id.* at 12-14.)[10]

Regarding registered voters, Defendant argues that African Americans are underrepresented because this method of selecting jurors for the jury pool is discriminatory. Defendant asserts that even though Detroit reports an estimated total of 470,000 registered voters, fewer than 200,000 people voted in 2018 and only 100,000 people voted for mayor in 2017, which he claims "certainly raises a question as to the validity of the estimated total [of voters]." (*Id.* at 13.) Defendant points out that given that the estimated current population is 675,000, the decision to use registered voters captures only either one-third or two-thirds, or just 15 percent of a city that is 83 percent African American. (*Id.*) Defendant concludes that using registered voters as the method to select potential jurors has undeniably excluded African Americans from the District's jury pool.

---

the Sixth Circuit, and the addition of licensed drivers and state ID holders was made at the recommendation of a jury analyst, rather than as a result of any perceived legal obligation to do so. *See United States v. Jones,* No. 01–80571, slip op. at 9, 13 (E.D.Mich. May 14, 2004) (Zatkoff, C.J.).

[9] Defendant makes no argument regarding the use of Michigan ID cards or state income tax records, if available, in Michigan, which are the other two sources that the District is authorized to use to select jurors at random for grand and petit juries. *See* Administrative Order No. 00-AO-016. (State income tax records are not available and have not been used for jury selection in this District.)

[10] Under the current jury selection plan, the default for duplicate voter registrations and driver's licenses is to use an individual's driver's license since the driver's license tends to be more accurate.

Next, Defendant asserts that gathering individuals for a jury pool who have valid driver's licenses (as opposed to all licenses) also discriminates against African Americans. Defendant claims that in 2018, an estimated 76,000 Detroit citizens did not have a driver's license due to unpaid driver's responsibility fees. (*Id.*) Allegedly, that number does not include those who were unable to pay fines from tickets or those who cannot drive due to Detroit's auto insurance rates. (*Id.*)

Further, Defendant contends that the current selection methods do not take into consideration the poverty rates in Detroit, and argues that those methods discriminate against all individuals on the basis of their economic status. Defendant alleges that it would behoove the District to consider using other avenues to invite jurors to serve on juries, such as, Detroit's identification records, food assistance recipients' records, or records of those receiving disability payments. (*Id.* at 14.) Defendant explains that pursuing jurors through those alternative avenues would create less likelihood that a jury summons would be deemed undeliverable because his proposed alternative methods use addresses associated with potential jurors that are connected with their monetary benefits. (*Id.*) Essentially, Defendant contends that potential jurors would be more likely to have current addresses on file if they are connected with programs that provide them with the monetary benefits that they regularly receive.

One additional concern of Defendant with the District's Juror Selection Plan is that it notably eliminates felons from the jury pools. (*Id.* at 15.) Defendant asserts that the clerk's office removes the names of disqualified jurors only *after* it tallies the completed questionnaires. Defendant argues that because the Jury Office creates the master wheel and proportionate number of jurors *before* felons are eliminated, fewer Wayne County residents, and consequently African Americans, are on the master wheel. (*Id.*)

Although Defendant seeks to receive the above-mentioned information in order to determine if his constitutional rights have been violated, the Government argues that the Court should not grant his request.

First, the Government claims that Defendant does not have an unqualified right to examine the Court's juror selection records. (Dkt. 922, Pg. 7) The Government's argument is that while there might be an unqualified right to inspect records used by the clerk in the jury selection process, the scope of this right is not unlimited with respect to the materials sought to be made available or inspected. (*Id.*) The Government cites to another case from this district, *O'Reilly*, where the Government claims that the court determined that a defendant did not have the unqualified right to *all* records or papers relating to the jury selection process. *O'Reilly*, 2008 WL 115537, at *1. The Government also cites to other cases in which courts did not grant expansive requests relating to juror materials. *See United States*

*v. Trumbo*, No. 18-20403, 2019 WL 652303, at *4 (E.D. Mich. Feb. 15, 2019); *Kilpatrick*, 2012 WL 3133939, at *1.

In response, Defendant contends that the Government erroneously claims that he is seeking "unfettered access" to "all jury papers." (Dkt. 924, Pg. 3) Defendant argues that he is not seeking to rummage through "all jury papers," but instead, is seeking access to specifically targeted materials. (*Id.*) Defendant argues that his request would not require the jury department to undertake a strenuous task to analyze the requested information, as Martin will be conducting the analysis of the information.

Second, the Government argues that there is no *good cause* that would warrant granting Defendant's request. The Government claims that good cause is lacking since most of the information Defendant requests is publicly available. (*Id.* at 14.) The Government alleges that it does not concede that the requested information relates to a distinctive group and claims that "Mills suggests there might be areas where impermissible systemic exclusion has taken place, but does not claim that it does and does not offer evidence that it has taken place." (*Id.*)

Defendant refutes the Government's argument. Defendant argues that his Motion seeks access to the requested information in order to protect two classes: (1) African Americans; and (2) citizens of low economic status. (Dkt. 924, Pg. 6)

Defendant asserts his claim of good cause rests in determining how the Jury Plan may discriminate against those two protected classes. (*Id.*) Defendant claims that without the requested information, he will be unable to determine whether he has a potential meritorious jury challenge. (*Id.*)

A claim that a jury selection process violates the "fair cross section" requirement of the Sixth Amendment and the JSSA, can be proven through either direct or indirect evidence. *See United States v. Ovalle,* 136 F.3d 1092, 1099 (6th Cir.1998); *see also Brown,* 128 F.Supp.2d at 1039. But, where, as here, there is no direct evidence that the jury selection process used in this District has led to the under-representation of African Americans and citizens of low economic status, Defendant must rely upon indirect evidence to sustain his claim. Defendant's initial burden is to establish the three elements of a *prima facie* showing of a "fair cross section" violation: "(1) that a 'distinctive group' is being excluded from the jury pool; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in comparison to the group's representation in the community at large; and (3) that this disparity is attributable to systematic exclusion of the group in the jury selection process." *Brown,* 128 F.Supp.2d at 1039 (citations omitted). At this stage, Defendant must only demonstrate that the additional information he seeks would aid him in establishing the elements of such a showing. *See Kilpatrick*, 2012 WL 3133939, at *7.

Regarding the first factor, the Court is satisfied that Defendant has identified two groups that are considered *distinctive*—African Americans and citizens of low economic status. As an initial matter, Section 1862 of the JSSA states that "[n]o citizen shall be excluded from service as a grand or petit juror in the district courts of the United States…on account of race, color, religion, sex, national origin, or economic status." 28 U.S.C. § 1862. Therefore, the two groups that Defendant claims have been excluded from the jury pool that he is challenging are *distinctive*.

The Court also finds that Defendant has demonstrated, for purposes of the first prong (and this Motion), that the two groups may have been excluded from the jury pool. As to African Americans, Defendant contends (without opposition from the Government) that the District's decision to select potential jurors from the group of individuals registered to vote in Michigan and who have a Michigan driver's license, significantly limits the pool of potential jurors. Defendant's argument is premised on how these methods have a discriminatory effect on Detroit, which in turn, discriminates against African Americans because Detroit is comprised of 83 percent African Americans. The statistics provided by Defendant regarding the number of potential jurors that are excluded from possible selection as grand and petit jurors are sufficient and further support Defendant's claim.

In regard to citizens of low economic status, the Court is similarly satisfied that Defendant has minimally demonstrated (for purposes of this Motion) that this

distinctive group may have been excluded from the jury pool. In the instant Motion, Defendant offers the Court ways that the District could ensure that members of the District who are low-income could more regularly be included in the jury pool. (Doc # 912, Pg. 14) The Court finds that because Defendant has shown that there are additional methods through which low-income individuals can be included in the jury pool, the logical inference to draw from such an argument is that these individuals have been excluded from the jury pool.

The Court now turns to the remaining second and third prongs. In order for Defendant to show that the second prong has been satisfied, he would have to establish that the representation of African Americans and low-income individuals in venires from which juries are selected in this District is not *fair and reasonable* in comparison to their representation in the community-at-large.[11] Here,

---

[11] *See Kilpatrick*, 2012 WL 3133939, at *8 ("Although Defendant has not shown good cause for his request to review this information, it bears emphasis that this Court has actively explored and implemented a number of measures over the years to ensure that its jury pools reflect a fair cross section of the community. *See Jones, supra,* No. 01–80571, 5/14/2004 slip op. at 18–20 (recounting various efforts which, while "not required ... under the Constitution," were pursued "with the intention of ensuring that the [District's] jury wheels are as fair of a cross-section of the community as possible, without violating the JSSA or the Constitution").

In fact, within the past two years, the Court has formed an *ad hoc* committee and commissioned an expert to once again review this District's jury selection plan and procedures. The "[k]ey [f]indings" of the expert's December 20, 2010 final report were as follows:

> The findings from this review suggest that the underrepresentation of African Americans in the Court's divisional jury pools results primarily from a combination of two factors: (1) undeliverable qualification questionnaires due to inaccurate or stale addresses on the master jury wheel; and (2) disproportionately high non-response rates in Wayne County, which has the largest concentration of African–

Defendant's argument is based on the fact that the current methods used to select potential juries decrease the jury pool *overall*, which also affects African Americans and those who are low-income—especially in Detroit. Defendant does not argue that the current juror selection procedures alter the jury pool so that the number of African Americans and low-income individuals in the jury pool is not representative of the percentage of African Americans and low-income individuals in the community. Defendant's burden at this stage is to prove that the additional information he seeks would aid him in establishing the elements necessary to show that his right to have a jury drawn from a fair cross section of the community has been violated. *See Kilpatrick*, 2012 WL 3133939, at *7. Defendant will receive the majority of the information that he has requested because it pertains to individuals' juror numbers, race, or Hispanic ethnicity, but the Court believes that the materials that he requests (numbers 3 and 4 from Defendant's above list), which do not relate to juror numbers, race, or Hispanic ethnicity, will not assist him in identifying and demonstrating a fair cross section violation.

---

> Americans within the Detroit, Ann Arbor, and Port Huron Divisions .... [A] substantial portion of the non-response rates since September 2009 may consist of undeliverable questionnaires that have not been returned by the U.S. Postal Service.

12/20/2010 Review of the Jury Selection Plan for the U.S. District Court, Eastern District of Michigan at i (report available on request from Eastern District Court Administrator's Office). As evidenced by this and other studies and initiatives over the years, while this Court has no constitutional or statutory mandate to rectify the underrepresentation of African–Americans in its jury pools, it nonetheless has made a steadfast commitment to address this concern within the confines of the law.").

Additionally, the Court notes that Defendant could only prove that the third prong has been satisfied by demonstrating that the disparity in the representation of African Americans and low-income individuals is "attributable to systematic exclusion of the group in the jury selection process." Since Defendant has not established that the second prong has been met, the Court will not assess whether the third prong has been satisfied.

## IV. CONCLUSION

Accordingly,

IT IS HEREBY ORDERED that Defendant Edwin Mills' Second Motion for Access to Jury Selection Records and Materials (Dkt. 912) is **GRANTED IN PART AND DENIED IN PART**.

IT IS FURTHER ORDERED that Defendant Edwin Mills is entitled to review any information regarding potential jurors' juror numbers, race, and Hispanic ethnicity for the 2015 jury wheel for grand jury information and the 2019 jury wheel for petit jury information.

IT IS FURTHER ORDERED that Defendant Edwin Mills is not entitled to review materials pertaining to statistical or demographic analyses produced by the clerk (to the extent they exist) under the Juror Selection Plan's Sections (g)(1)(G) and (u)(1) unless they relate to potential jurors' juror numbers, race, or Hispanic ethnicity, as Defendant Edwin Mills has not shown good cause for that information.

IT IS FURTHER ORDERED that Defendant Edwin Mills will only have access to the aforementioned information in the format that those materials are currently available in even though he asked for some information to be provided to him in electronic form.

IT IS FURTHER ORDERED that where jurors' personal information exists, it should be subject to an appropriate protective order; and some data may be subject to on-site review if redaction is laborious or not usually done by the jury department.

IT IS FURTHER ORDERED that Defendant Edwin Mills will be responsible for paying any costs associated with the Court producing the materials that he seeks.

IT IS FURTHER ORDERED that the Court's Order also applies to Defendants Carlo Wilson and Billy Arnold.

s/Denise Page Hood
DENISE PAGE HOOD
Chief Judge, U. S. District Court

DATED: July 16, 2019