UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

D-2 CARLO WILSON,

      Defendant.

Case No. 2:16-cr-20460

Hon. Mark A. Goldsmith

_____/

## WILSON'S MOTION TO ADJOURN THE COMPETENCY HEARING AND VACATE THE CASE SCHEDULE (DKT. 1281)

On April 7, 2020, the parties filed a Joint Memorandum Regarding Date for Competency Hearing Pursuant to Court's Directive in Text-Order dated April 2, 2020. Dkt. 1273. Thereafter, in part because of the pandemic, the Court Amended the Case Schedule. Dkt. 1281 at 3. As of this week, the Covid-19 pandemic has taken more than 160,000 lives in the United States, and more than 5 million people have been sickened.[1] The Detroit metro region was named by Dr. Deborah Birx, the White House coronavirus task force member, as one of the top ten areas at high

_____

[1] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html (Last visited August 7, 2020). As documented by the Centers for Disease Control (CDC), in just one day, from August 6, 2020 to August 7, 2020, there was an increase of 56,105 cases and 1,256 deaths in the U.S.

risk for a resurgence of the disease.[2]

Since March 25, 2020, the United States District Court for the Eastern District of Michigan (EDMI) closed its doors to the public. They remain closed. Some employees working at the Detroit courthouse tested positive for the virus.[3] In mid-June, Michigan appeared to have made it past the initial surge in cases by means of closing public offices, schools and gyms, restaurants and bars, and non-

---

[2] *See* https://publicintegrity.org/health/coronavirus-and-inequality/white-house-birx-call-warns-about-coronavirus-numbers. (Last visited August 7, 2020). The question remains whether in the near future Michigan will impose 14-day quarantine rules like the states of New Jersey, New York, and Connecticut upon a person's travel from certain states. *See* https://www.nj.gov/health/cd/documents/topics/NCOV/Travel_advisoryFAQs_6-25-2020.pdf (Restrictions placed on those persons who travel from Arizona, California, Florida, Illinois, Washington, and Texas. Mr. Wilson's counsel, investigators, and experts reside in these states.).

[3] On March 27, 2020, the webpage for the EDMI stated: "The U.S. District Court for the Eastern District of Michigan announced today that 10 court security officers (CSOs) have exhibited symptoms similar to COVID-19, four have been hospitalized and two have been diagnosed with the virus. The officers were in the building between March 12-21. The building was closed March 24 for disinfecting and the entire staff was sent home. The courthouse will remain closed indefinitely." *See also* Administrative Order 20-AO-039 dated July 21, 2020, excluding time under the Speedy Trial Act from July 2, 2020 until further order of the Court, http://www.mied.uscourts.gov/pdffiles/20AO039.pdf (Last visited August 7, 2020); and see, *Gould Electronics Inc. v. Livingston County Road Commission*, 17-11130 (E.D. Mich. 6/30/20)(Dkt. 223), opinion of this Court stating: "It remains uncertain when the courthouse will reopen to staff members, let alone resume public proceedings. In light of the grave an unprecedented public health concerns at issue, it is unlikely that an in-person bench trial could safely and realistically occur in a courtroom in the foreseeable future."

essential businesses, and prohibited travel slowing the spread of the virus. After various local and state governments eased some of these restrictions, many states—including those in which Mr. Wilson's experts and legal team reside—saw surges in Covid-19 cases. Additionally, July and early August have seen a rise in the Michigan case rate, with approximately 700 new cases per day on average.[4]

The rise in cases post re-opening has consequently resulted in new restrictions on gatherings, face covering and travel.[5] Across the U.S., millions of Americans are under "shelter-in-place" orders to reduce the pace and scope of spread of disease.[6] "Shelter-in-place" orders affect all of Mr. Wilson's counsel and experts.[7] In addition, many states have mandatory self-quarantine for those

---

[4] https://www.nytimes.com/interactive/2020/us/michigan-coronavirus-cases.html. (Last visited August 10, 2020).

[5] *See, e.g.*, https://covid19.ca.gov/stay-home-except-for-essential-needs/ (last visited August 7, 2020) for the state of California.

[6] The State of Michigan was among the states where the governor issued an executive order directing persons to stay home. *See* https://www.michigan.gov/Coronavirus. (Last visited August 7, 2020). Michigan's Governor extended the state of emergency and state of disaster related to the Covid-19 pandemic through September 4, 2020. *See* https://www.freep.com/story/news/local/michigan/detroit/2020/08/07/gov-whitmer-coronavirus-emergency-sept-4/3319245001/. (Last visited August 7, 2020).

[7] Michael Burt and Ashwin Cattamanchi, two of Mr. Wilson's counsel, reside in the State of California. Ms. Walsh resides in Seattle, Washington. These states are all known areas of wide-spread community transmission and where governors have issued stay-at-home executive orders. Furthermore, Mr. Wilson's experts also

traveling, with an expectation that those who arrive self-isolate for the 14 day period it takes, on average, to develop symptoms if a person has been exposed.

Of great concern now is that Covid-19 is on a collision course with flu season, which begins in September.[8] Thus, most disease projections, which assume no public health prevention measures will be maintained or re-imposed, still do not suggest that things will substantially improve by the current date of October 6, 2020, for the competency hearing, let alone in time for the substantial work on the ground required for that hearing.[9] Even the November 16, 2020 evidentiary hearing concerning Mr. Wilson's motion to suppress appears to pose a substantial risk to the health of the Court staff, Mr. Wilson, and defense and prosecution teams given the disease models.

---

reside in states that have been severely impacted by the lethal virus and cannot currently travel. Additionally, core members of Mr. Wilson's legal team reside in "hot-spots" for the virus (e.g., Florida, New Jersey, and New York). No member of the Wilson legal team resides in the state of Michigan, requiring all defense team members and experts to travel. Further complicating the dangers of travel is the fact that one defense counsel and experts are in at-risk categories because of age, other health concerns or both.

[8] *See* https://www.scientificamerican.com/article/coronavirus-and-the-flu-a-looming-double-threat/; https://bgr.com/2020/07/28/coronavirus-tips-flu-vaccine-who-advise-for-influenza-season/. (Last visited August 7, 2020).

[9] At this time, in person meetings with Mr. Wilson, as well as a number of people who may be called upon to testify at the competence hearing, both lay witnesses and experts, cannot be undertaken safely for the reasons set out above. Such work is a necessary pre-requisite in preparation for the hearing and will require adequate time once it is safe to travel and meet in person.

As such, Mr. Wilson, through counsel, requests that at a minimum this Court

adjourn the September 8, 2020 and September 22, 2020 deadlines related to

competency, and the competency hearing itself. Additionally, because all pre-trial

dates were set in accordance with a fall 2021 trial date, and because of the inability

to safely provide constitutionally safeguarded hearings in September, October and

November 2020, Defense requests that the case schedule be vacated in its

entirety.[10] Defense conferred with counsel for the Government and the

---

[10] *See United States v. Chavez*, et al., No. 15-0285 (N.D. Cal., June 9, 2020)(Dkt.
848), where Government stipulated in a complex federal capital case that "[t]he
COVID-19 pandemic has truly changed the landscape of our world. The parties
also have concerns about greater difficulties in the Fall if, as medical experts have
warned, there is an increase in the spread of COVID-19 when the weather cools,
schools reopen, and many more people return to their traditional work
environments. For all of these reasons, the defense requests, and the government
agrees, that it is appropriate to continue the July 9, 2020, trial date to May 2, 2022.
The parties also request that the Court vacate the Scheduling Order in its entirety."
The Court agreed. *Id.* at 5. *See also United States v. Saipov*, No. 17-cr-722
(S.D.N.Y. April 30, 2020, July 16, 2020)(Dkts. 326, 340)(Federal capital case
where Court concluded continuance was "necessary in light of the COVID-19
health crisis, and to allow the parties to continue their preparation for trial." Dkt.
326. The Court granted the parties' request to exclude time in the interests of
justice through August 17, 2020. No trial date has been set in light of the pandemic
and parties' need to prepare for trial. Dkt. 340); *United States v. Smith*, No. 16-cr-
00086-SLG-1 (D. Alaska, March 24, 2020)(Dkt. 806)(Court vacated the case
schedule in an authorized capital case "and continued to dates to be determined");
*United States v. Oscar Contreras Aguilar*, et al., No. 1:18-cr-00123 (RDA)(E.D.
Va. July 28, 2020) (Dkt. 647)(In a multi-defendant, complex RICO death penalty
case, upon motion of some of the defendants and without objection from the
government, the court vacates a August 24, 2020 trial date for the non-capital
defendants and declines to set a new date, in part because of "the challenges
inherent in preparing for and commencing with a multi-defendant criminal jury
trial involving many witnesses, some of which are out-of-state, during the

Government stated it had no position on adjournment at this time. Counsel for Mr.

Mills has no objection to Mr. Wilson's motion.

By: s/Michael Burt        s/ Jacqueline K. Walsh
     Michael Burt             Jacqueline K. Walsh
     California State Bar No. 83377    Washington State Bar #21651
     1000 Brannan St., Suite 400     705 2nd Ave., Suite 501
     San Francisco, CA 94103       Seattle, WA  98104
     (415) 522-1508             206-325-7900x5
     mb@michaelburtlaw.com       jackie@jamlegal.com

     s/ Ashwin Cattamanchi
     Ashwin Cattamanchi
     Illinois State Bar No. 6289199
     Federal Defenders of San Diego, Inc.
     225 Broadway, Suite 900
     San Diego, CA 92101
     (619) 234-8467
     ashwin_cattamanchi@fd.org

DATED: August 10, 2020

---

COVID19 pandemic.").

**MEMORANDUM IN SUPPORT OF DEFENSE MOTION TO ADJOURN THE DUE DATES RELATED TO THE COMPETENCY HEARING AND THE COMPETENCY HEARING ITSELF AND TO VACATE THE CASE SCHEDULE.**

**Issue Presented**

Should this Court grant Defense motion to adjourn the due dates related to competency and the competency hearing itself as well as vacate the case schedule because of the global health crisis, Mr. Wilson's inability to properly prepare for substantive hearings and trial, and the inability of the Court under current conditions to provide constitutionally safeguarded hearings and trial?

**Controlling Authority**

Fifth, Sixth and Eighth Amendments to the United States Constitution.

**ARGUMENT**

Death is different and seeking a death sentence requires heightened

reliability which is essential to all proceedings.[11] When the Government seeks to

extinguish human life, the guarantees of the Fifth, Sixth and Eighth Amendments,

in concert with other firmly established constitutional and statutory protections,

and the appearance of justice and fairness require at a minimum: heightened

reliability; the duty of counsel to investigate and prepare for substantive hearings

and trial, including thorough mitigation investigation, which necessarily includes

in-person interviews; in-person meetings with their client; and, the ability to

confront and cross-examine witnesses who testify against their client.

Due to factors beyond the control of defense counsel—namely the

---

[11] *See Monge v. California*, 524 U.S. 721 (1998); *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("the Eighth Amendment requires a greater degree of accuracy and factfinding than would be true in a noncapital case."); *United States v. Watson*, No. 05-80025, 2007 WL 4591860, at *2 (E.D. Mich. Dec. 28, 2007) ("Two fundamental, constitutional principles underlie death penalty jurisprudence. The first principle requires courts to assure heightened reliability in capital sentencing because capital punishment is qualitatively different from other punishments"); *United States v. Fell*, 360 F.3d 135, 143 (2d Cir. 2004) ("We fully agree with the district court that 'heightened reliability' is essential to the process of imposing a death sentence") (citations omitted).

uncontrolled and unmitigated spread of the deadly and devasting disease, Covid-19, a global pandemic which has severely affected the entire United States—the protections summarized above cannot be achieved. Such conditions are unlikely to improve until after the development and successful implementation of a Covid-19 vaccine. Efforts to mitigate the spread and scope of the virus have had mixed success across the U.S., but the resurgence of the disease in Michigan in mid July suggests that conditions have not substantially improved to the point where we can return to normal activity without further illness and death. At this point, there is simply too much that we do not know. *See, e.g.*, *United States v. Smith*, No. 2:19-cr-00213, 2020 WL 2541713, at *6 (E.D. Cal. May 19, 2020) ("[P]redicting the trajectory of this virus and its impact on the Court comes with a fair measure of speculation."); *Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL, 2020 WL 1808677, at *3 (D. Ariz. Apr. 9, 2020) ("It is folly for anyone to predict exactly how long the pandemic will last and how long the state and local responses to the pandemic will remain in effect."); *In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-08637, 2020 WL 3469166, at *8 (N.D. Ill. June 25, 2020) ("Recent statements by public health officials about the staying power of COVID-19 also belie Defendants' speculation that things may be so different in the Fall."). As such, the most prudent course is to vacate the current case schedule.

Below, Defense sets forth the specific impact the virus has had on the

preparation of this case justifying the need to vacate the case schedule.

## A. Effective Assistance of Counsel

In this case, because the pandemic's impact, counsel last visited Mr. Wilson in-person on March 13, 2020. Dkt. 1273 at 5. Counsel's lack of in-person meetings with a client who is a person with Intellectual Disability (ID) and where competency has been raised has directly impacted the progress of this case and counsel's ability to prepare for the currently scheduled competency hearing. While counsel has spoken with Mr. Wilson since March 13, 2020, there is no replacement for in-person contact. *See*, Exh. A Declaration of Elizabeth Vartkessian, PhD (citing ABA Supplementary Guideline 10.11.C stating "[t]eam members must conduct in-person, face-to-face, one-on-one interviews with the client.").[12]

The text of the Sixth Amendment guarantees the right to effective assistance of counsel. "The Amendment requires not merely the provision of counsel to the accused, but the 'Assistance,' which is to be 'for his defence.'" *United States v. Cronic*, 466 U.S. 648, 654 (1984). *See also Gideon v. Wainwright*, 372 U.S. 335,

---

[12] Notably, during counsel's March trip, she intended to meet with Mr. Wilson's family to discuss resolution of the case, but, this too had to be postponed because of the risk it posed to the family and their concern that Counsel is from a state that had a very high case-rate in March. *See also* Dkt. 1273 at 8, n.7. As of this writing, it is Defense's understanding that the USA's office has not yet submitted to the Attorney General for the United States Defense's request for de-authorization of the death penalty. Once it is safe to travel again, the Defense team will need time to meet with Mr. Wilson and witnesses, not just in an attempt to resolve this case, but also to prepare for pretrial hearings, including competency.

344 (1963). To prepare for the competence hearing, defense counsel must engage in myriad tasks including but not limited to: further investigation; meetings with her client, witnesses and experts; meetings with family members and prosecutors regarding possible resolution; potentially service of witness subpoenas; and presentation of the evidence at the hearing. This is because being counsel for any client, but especially a capitally charged client, means more than just seeing her client at the courthouse for a hearing or trial. The Supreme Court recognized this when it stated that "the assistance of counsel is not limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." *Maine v. Moulton,* 474 U.S. 159, 170 (1985). *See also Powell v. Alabama*, 287 U.S. 45, 69 (1932) (even an educated defendant "requires the guiding hand of counsel at every stage of the proceedings against him"); *Brewer v. Williams*, 430 U.S. 387, 398 (1977) (right to assistance of counsel is "vital need at pretrial stage"); Congress recognized the importance of in-person communications between capital counsel and their clients by mandating that counsel in capital cases "shall have free access to the accused at all reasonable hours." 18 U.S.C. § 3005; and, *United States v. Savage,* No. 07–550–03, 2010 WL 4236867, at *1 (E.D. Pa. 2010).

The ABA Guidelines and the Supplementary Guidelines, 31 Hofstra L. Rev. 913 (Spring 2003), 36 Hofstra L. Rev. 663 (Spring 2008), outline the *minimum*

practice standards for defense counsel in capital cases. The United States Supreme Court recognizes the importance of the guidelines. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366-67 (2010) ("We long have recognized that '[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . .'" (citing *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam)); *see also Wiggins v. Smith*, 539 U.S. 510, 535–38 (2003), and *Rompilla v. Beard,* 545 U.S. 374, 390–92 (2005).

Here, Defense adherence to the prevailing norms has been paused because of limitations imposed by the impact of the virus. For example, during the week of March 9, 2020, Defense planned to have two separate experts visit Mr. Wilson and other witnesses. However, because of the pandemic, and the fact that the experts were in high risk categories due to age and health concerns, they had to cancel their respective trips. After undersigned counsel and her mitigation specialist returned to their respective home states on March 13, 2020, shelter-in-place orders went into effect and thereafter the defense team suspended all case-related travel.

Defense's mitigation specialist Felicia Sullivan resides in Florida, a state that has seen an explosion of cases this summer.[13] She has not been able to travel and cannot conduct the necessary work for this case, including in-person witness

---

[13] As of August 8, 2020, 520,846 Floridians have tested positive for the virus and 8,109 have died. *See* https://floridahealthcovid19.gov (last visited August 8, 2020).

interviews, that must be done to prepare for upcoming substantive hearings including the competency hearing. In fact, given the ongoing pandemic, "it is neither responsible from a public health standpoint nor socially tolerable for a defense investigator to meet in-person with witnesses at this time. In-person outreach by an investigator is likely to be met with fear and anxiety by the witness, with good reason." *See* Exhibit B, Declaration of Casandra Stubbs, Director of the Capital Punishment Project of the American Civil Liberties Union (ACLU). As previously noted, with good reason, Defense witnesses in this case refused to meet in-person with counsel and investigators. *See* Dkt. 1273 at 5.

The Defense has not only been hamstrung in its ability to conduct in-person interviews, but also in its collection of necessary records to support expert opinions and corroborate witnesses' accounts. For example, on March 30, 2020, the state of Michigan cancelled the remainder of the school year, resulting in the unavailability of teachers, as well as administrators who process records request. Not only does Defense need access to Mr. Wilson's school records and employees, but he also needs the records of his extended family, many of whom also suffer from cognitive deficits.[14] In addition to difficulties with collecting records from schools, in July of

---

[14] The Defense experts have advised that although ID is not a genetic condition (i.e., a condition for which a genetic test exists), there are typically patterns of cognitive impairment within families that are important to document for purposes of demonstrating collateral support for their conclusions.

2020, Ms. Sullivan received an apology from an institution where records were requested indicating that the Covid-19 situation complicated matters because of limited staff and work hours to respond to requests. The records still have not been produced to the Defense.[15]

Previously, Defense had an investigative trip planned for the week of April 6, 2020, to further develop Mr. Wilson's competency and *Atkins* claims. That trip too was cancelled. Defense also had an investigative trip planned to interview witnesses outside the state of Michigan for the week of April 27, 2020, but this trip was canceled as well. Furthermore, some witnesses are located in prison facilities where legal visits have been suspended altogether. By the end of April, it was clear that no further trips could be undertaken until Covid-19 was contained.

Certainly, it was the hope of the parties that by mid-summer the virus might be contained and that work travel and case preparation for the substantive competency hearing in October could re-start. Unfortunately, that has not been possible both because of the continued, uncontrolled spread of the virus, and for reasons specific to the people involved. Two specific experts related to competency have not been able to meet as planned in-person with Mr. Wilson and

---

[15] Should this Court wish for more specific detail regarding the examples set forth by Defense, Defense would gladly do so, but would request the ability to do so in an *ex parte* and sealed pleading since such information necessarily includes confidential and work-product material.

his counsel or with other witnesses. The hope of resuming work travel in the
summer to finish necessary work related to preparation for the competency hearing
turned out to be grossly over-optimistic. Consequently, additional witness and
expert work, which both require travel into and out of Michigan, family homes,
jails and prisons, have not been completed on schedule.[16]

### B. Experts

Given the level of expertise and specialization required of mental health
experts in capital cases, and particularly in this case where competency and *Atkins*
claims have been raised, the Defense retained experts with extraordinary skill and
experience. In this case, those experts are not based in Michigan. It is not
uncommon in capital cases for experts to be employed from around the country as
they have been here. All but one of Defense experts are over the age of 65 and
some have additional health issues that place them at greater risk with regard to the
virus. Traveling to and entering the jail where Mr. Wilson is housed places at risk
the experts, Mr. Wilson, as well as other inmates and staff. The same is true for
experts conducting in-person witness interviews.

Experts, such as the experts in this case, conduct meetings with clients and

---

[16] In addition, Defense has identified a number of potential witnesses at MCC-
Chicago who will need to be interviewed and may be called as witnesses at the
competence hearing. As those interviews cannot take place under the current
Covid-19 conditions, it is not possible to determine whether they will be needed at
the hearing or not.

witnesses that typically last several hours. Meetings occur indoors and in close

proximity to one another, often times in small windowless rooms with poor

ventilation. Furthermore, the requirement of personal protective equipment (PPE),

such as a face mask or shield is likely to have a significant adverse impact on the

quality and reliability of the results of the evaluation and/or meeting. The medical

community recognizes this fact:

> Projecting a demeanor that is friendly and open, maintaining a
> respectful and nonjudgmental posture and demonstrating genuine
> interest in developing an empathic understanding of the patient's
> predicament are physician behaviors that build the type of rapport
> from which the doctor-patient relationship is formed. In the initial
> interview, successful development of a trusting relationship is what
> allows the patient to feel comfortable enough to share information that
> is often sensitive and quite private . . . In the clinical setting, rapport
> can be defined as the harmonious responsiveness of the physician and
> patient to one another. It is important that the patient experiences the
> evaluation as a joint effort and that the psychiatrist is truly interested
> in their story.

Rory P. Houghtalen and John S. McIntyre, *Psychiatric Interview, History, and*

*Mental Status Examination of the Adult Patient* in Benjamin James Sadock,

Virginia Alcott Sadock and Pedro Ruiz, *Kaplan & Sadock's Comprehensive*

*Textbook of Psychiatry*, 7.1 (10th ed. 2017). An expert's ability to communicate

with Mr. Wilson and witnesses in a manner conducive to establishing the necessary

rapport is likely to be severely impeded if the expert and/or the witness or Mr.

Wilson wears PPE, irrespective of whether the expert can even travel again for in-

person meetings. Furthermore, remote evaluations or video-conferencing when the

stakes in this case are so high is not acceptable, and we believe it falls well below

the medical community's standard of care:

> There are some challenges to assessing the mental status examination
> through videoconferencing. In particular, eye contact may be difficult
> to discern due to camera placement, which may make participants
> appear to be looking to the side or looking down or up.

Lidong Wang and Cheryl Ann Alexander, *Telepsychiatry: Technology Progress,*

*Challenges, and Language and Transcultural Issues*, 1 Journal of Translational

Medicine and Developmental Disorders, 1, 7-8 (2014).

> Eye gaze angle is the angle between the eye and the camera and the
> eye and the center of the display. A potential problem when using
> [video teleconferencing] technology is that users often make eye
> contact with the image of the person on the screen rather than with the
> camera – a phenomenon that gives the appearance that one person is
> looking down or away from the other person. Eye contact between a
> patient and a clinician is important because it provides visual cues to
> which participants can respond.

David D. Luxton, Larry D. Pruitt and Janyce E. Osenbach, *Best Practices for*

*Remote Psychological Assessment via Telehealth Technologies*, 45 Professional

Psychology: Research and Practice 27, 29 (2014).

> [T]he remote physical presence in [video teleconferencing] may create
> a barrier that reduces a patient's engagement in the assessment
> process, especially among members of cultures or groups that
> emphasize interpersonal connectedness or that rely heavily on
> nonverbal interactions . . . Also, patients that are less comfortable or
> have less experience with technology, such as elderly or severely
> impoverished populations, may display a more drastic discrepancy
> between in-person and [video conferencing] assessments.

Luxton et al. (2014), *supra*, at 30. While the American Psychological Association (APA) has made some adaptations because of the pandemic to treat patients, it explicitly recognizes that proceeding with video conferencing is not meant to supplant practices and guidelines under normal circumstances. That is, when it becomes safe and feasible to resume in-person services, these recommendations should not override typical and standardized practice.

### C. Procedures and Processes

Not only does the inability of counsel, investigators and experts to meet in-person with Mr. Wilson and witnesses, and the difficulty in obtaining records and documents, impede Defense's preparation for the competency hearing, but the Defense also does not yet know what procedures this Court will employ for the competency hearing. *See* Dkts. 1190 (Wilson's Motion for Certain Competency Procedures), 1207, 1279, 1287 (*ex parte* and sealed memorandum with declarations per court order Dkt. 1279).

Defense also cannot make decisions on which experts to call for the competency hearing because there is no ruling on the out-of-state licensure issue pertaining to whether experts not licensed in Michigan who testify in this case are in compliance with Michigan law. Dkts. 987, 1012, 1090, 1189, and 1199. Without an understanding of how the competency hearing might proceed and the ability to decide which experts will be called, Defense cannot make decisions about what

evidence to give which experts. Additionally, experts have not completed the necessary work for the hearing and cannot do so until it is safe to travel again. That includes completing work in order to prepare revised reports and opinions which are expected to be due in advance of the hearing itself. Finally, without knowing the procedures that the Court will use during the hearing (e.g., in camera *ex parte* sealed hearing to receive confidential work product material for purposes of assessing the 'ability to assist' prong of competency), experts cannot properly assess the parameters of their respective reports.

### D. Pending Sanctions

Further complicating matters is the pending request for sanctions before this Court for the Government's misconduct. Dkts. 1268, 1274, 1276, 1298, 1303, 1304, 1305, 1307, 1309, and 1311. As a sanction, Defense requested depositions of Government lawyers, an agent and expert. Dkt. 1307. Should this Court grant Defense's request, depositions would need to take place before any hearing to determine if the Government's misconduct impacted legal issues before this Court (e.g., competency and *Atkins*).

### E. Prior Objections to Video Conferencing

Previously, Defense filed its objections to any Government witness appearing by video conferencing. Dkt. 1246 at 3-7. Defense is aware that this Court recently conducted a bench trial of a civil matter by way of

videoconferencing. *Gould Electronics Inc. v. Livingston County Road Commission*, *supra*. As this Court recognized, there is a difference between civil and criminal matters and the rights of the accused: "Any argument that principles of due process require that testimony and cross-examination take place in-person is undercut by the Federal Rules of Civil Procedure." *Id.* at *5. Here, Mr. Wilson is facing capital punishment and he does have a due process right as well as a Sixth Amendment right to confront and cross-examine witnesses who testify against him. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). That literal face-to-face right to confront witnesses forms the core of the values furthered by the Confrontation Clause. *Cal. v. Green*, 399 U.S. 149, 157 (1970). *See also* 18 U.S. § 4247(d) (emphasis added) ("to *confront and cross-examine witnesses who appear at the hearing*.).

Of equal importance to Mr. Wilson's right to confront and cross-examine witnesses who testify against him is the ability for him to confer with his counsel during the hearing, which cannot happen with videoconferencing. Even allowing counsel and Mr. Wilson in close proximity to one another will not work, since all counsel are out of state and it is not safe to travel. Furthermore, the requirements of facial masks and social distancing further inhibit attorney-client communication

during an in-person hearing.

Some state courts have held in-person hearings during the pandemic, although most federal courts have remained closed for criminal cases. However, even those who take the recommended precautions have fallen ill. *See, e.g.*, Associated Press, *Texas Supreme Court justice tests positive for coronavirus*, May 21, 2020[17] (reporting that Texas Supreme Court justice and her husband tested positive for COVID-19 despite being "extremely careful" and "strictly adhering" to stay-at-home orders.). Without a vaccine, or one on the horizon, and given the limited effectiveness of social distancing, masks and self-diagnosis and monitoring, it is a painful reality that "[t]he best way to prevent illness is to avoid being exposed to this virus."[18] *See also Gomes v. US Dep't of Homeland Sec.*, No. 20-cv-453, 2020 WL 2514541, at *3 (D.N.H. 2020) ("There is currently no proven vaccine or treatment for the virus. Thus, the only way to protect ourselves and combat the spread of the virus is to prevent exposure to it").

Until the threats posed by the global pandemic are no longer with us, substantive pre-trial hearings, such as the competency, evidentiary and *Atkins*

---

[17] https://www.usnews.com/news/best-states/texas/articles/2020-05-21/texas-supreme-court-justice-tests-positive-for-coronavirus. (Last visited on August 8, 2020).

[18] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html. (Last visited on August 8, 2020).

hearings and the potential capital trial simply cannot be conducted in a manner which protects Mr. Wilson's health and his constitutional rights, counsel for all parties, jurors, court personnel, witnesses and the USMS. Those threats are likely to remain with us until such time as a vaccine is developed. *Criminal Court Reopening and Public Health in the COVID-19 Era, NACDL Statement of Principles and Report,* June, 2020, at 7 ("NACDL does not believe that it is possible to protect health and safety in the courtroom while protecting constitutional rights of accused."). The report of the Covid-19 Judicial Task Force of the United States Courts, while describing at length various measures that must be considered before it is possible and safe to resume jury trials, has not concluded that trials can be undertaken effectively and safely for all involved during this pandemic. The best that can be hoped for is to "minimize" risk. *Conducting Jury Trials and Convening Grand Juries During the Pandemic*, Report of the Jury Subgroup, COVID-19 Judicial Task Force, United States Courts, June 5, 2020.

On March 27, 2020, the Coronavirus Aid, Relief and Economic Security (CARES) Act was passed with overwhelming bipartisan support and signed into law. On March 30, 2020, dozens of federal Chief Judges entered Orders finding that due to COVID-19, court proceedings "cannot be conducted in person without seriously jeopardizing public health and safety." *See, e.g.*, *United States v. Jackson*, No. 1:19-cr-00492, 2020 WL 2759601, at *1(S.D.N.Y. May 26, 2020)

("On March 30, 2020, Chief Judge McMahon issued Standing Order M10-468,
finding that in-person proceedings would seriously jeopardize public health and
safety . . . ."); *United States v. Keosackdy*, No. 3:19-CR-061 JD (N.D. Ind. May 20,
2020)(Dkt. 57)("[P]ursuant to General Order 2020-08, the Chief Judge of the
district has concluded that in-person hearings cannot be conducted without
seriously jeopardizing public health and safety as a result of the current Covid-19
pandemic."); *United States v. Collazo*, No. 2:19-00120, 2020 WL 1905293, at
*1(S.D.W. Va. Apr. 17, 2020) ("On March 30, 2020, the Chief Judge of this
District, acting pursuant to the CARES Act and the authority granted by the
Judicial Conference of the United States, found that felony sentencings could not
be conducted in person without seriously jeopardizing public health and safety.");
*United States v. Emory*, No. 19-00109 JAO, 2020 WL 1856454, at *1(D. Haw.
Apr. 13, 2020) ("On March 30, 2020, the Chief Judge of this District, acting
pursuant to the CARES Act and the authority granted by the Judicial Conference of
the United States, found that felony sentencings could not be conducted in person
without seriously jeopardizing public health and safety …"); *United States v.
Rodriguez*, No. 2:19-CR-237-KJM, 2020 WL 3056437, at *1 (E.D. Cal. June 9,
2020) ("On March 30, 2020, the Chief Judge of this District, per General Order
614, [found that] felony pleas under Rule 11 of the Federal Rules of Criminal
Procedure and felony sentencings under Rule 32 of the Federal Rules of Criminal

Procedure cannot be conducted in person without seriously jeopardizing public health and safety."); and, *In re: Expanded Use of Elec. & Other Signatures Due to Exigent Circumstances Created by Covid-19*, No. ING ORDER MC 120-007, 2020 WL 1816469, at *1 (S.D. Ga. Apr. 9, 2020) ("[O]n March 30, 2020, the Chief Judge of this District, pursuant to Section 15002(b) (1) of the CARES Act and based on a finding that criminal proceedings cannot be conducted in person without seriously jeopardizing public health and safety, entered an Order-MC120-005 . . . .").

### F. The Government is Not Harmed by a Continuance

Although taking no position on this motion to adjourn certain dates and hearings and vacating the case schedule, the Government is not harmed by it. They face the same difficulties in safely preparing their case as the defense does, with out of state experts and travel restrictions also affecting them.

The impact of the pandemic has not diminished in any way since March of 2020; to the contrary, that impact has significantly worsened. Accordingly, there must be significantly changed circumstances before substantive hearings requiring testimony and the trial can take place if the health and safety of court staff, transportation staff, witnesses and experts, Messrs. Mills and Wilson, as well as Defense and Government teams are to be minimally protected. As such, Defense requests that this Court vacate the current case schedule and set a status conference

after November 2020, when this Court anticipates the possibility of in-person

criminal hearings and trials, so that the parties may reassess scheduling in this

matter.

By: s/Michael Burt                    s/ Jacqueline K. Walsh
    Michael Burt                      Jacqueline K. Walsh
    California State Bar No. 83377     Washington State Bar #21651
    1000 Brannan St., Suite 400       705 2nd Ave., Suite 501
    San Francisco, CA 94103           Seattle, WA  98104
    (415) 522-1508                    206-325-7900x5
    mb@michaelburtlaw.com             jackie@jamlegal.com

    s/ Ashwin Cattamanchi
    Ashwin Cattamanchi
    Illinois State Bar No. 6289199
    Federal Defenders of San Diego, Inc.
    225 Broadway, Suite 900
    San Diego, CA 92101
    (619) 234-8467
    ashwin_cattamanchi@fd.org

DATED: August 10, 2020

## CERTIFICATE OF SERVICE

    I, Jacqueline K. Walsh, hereby certify that on August 10, 2020, I
electronically served the forgoing document with the Clerk of the Court using the
ECF system, which will send notification to all parties.

                   s/ Jacqueline K. Walsh
                   Jacqueline K. Walsh