UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

D-2 CARLO WILSON,

        Defendant.

_____/

Criminal Action No.
16-20460

HON. MARK A. GOLDSMITH

**OPINION & ORDER**
**(1) FINDING DEFENDANT CARLO WILSON COMPETENT TO STAND TRIAL; (2)**
**DENYING WILSON'S MOTION RELATED TO THE COMPETENCY HEARING (Dkt.**
**1644); AND (3) DENYING WILSON'S MOTION TO LIMIT CONSIDERATION OF DR.**
**DENNEY'S TESTIMONY (Dkt. 1646)**

Defendant Carlo Wilson is currently awaiting trial for murder, violating the Racketeering

Influenced and Corrupt Organizations Act, and related crimes.  2d Superseding Indictment (Dkt.

292).  Wilson filed a motion for a hearing to determine his mental competency, 6/25/19 Def. Mot.

(Dkt. 965), asserting that he is incompetent to stand trial because he is intellectually disabled.[1]  The

Court granted this motion (Dkt. 976), Wilson was evaluated at the Metropolitan Correctional

Center-Chicago (MCC Chicago), and the Court held a 12-day competency hearing that began on

March 21, 2022.[2]  After the hearing, the parties filed proposed findings of fact and conclusions of

_____

[1] A person has an intellectual disability (previously referred to as mental retardation) if (i) he or she has significant deficits in intellectual functioning, (ii) he or she has significant deficits in adaptive functioning, and (iii) the deficits occurred during the individual's developmental period. See Hr'g Trans. Vol 2 at 62–63 (Dkt. 1625); United States v. Pervis, 937 F.3d 546, 554 (5th Cir. 2019).

[2] The competency hearing was delayed, in large part, by the COVID-19 pandemic, which began a series of lockdowns in our nation in early 2020.

law.  Def. Br. (Dkt. 1644);[3] Gov't Br. (Dkt. 1645).  Wilson also filed a motion to limit the Court's consideration of the testimony of the Government's rebuttal expert, Dr. Robert Denney, 6/24/22 Def. Mot. (Dkt. 1646).[4]  For the following reasons, the Court finds Wilson competent to stand trial, and it denies his motion to limit consideration of Dr. Denney's testimony.

## I.  BACKGROUND

During the competency hearing, the Court heard testimony from various experts and lay witnesses.  The Government called one witness in its case-in-chief, Dr. Robin Watkins, and one witness in rebuttal, Dr. Denney.  The defense called the following witnesses: Tammora Green, Bridget Horton, Kevin Bullock, Aqua Raven Murray, Dr. Bhushan Agharkar, Dr. James Patton, Dr. Kathleen Fahey, Dr. Scott Hunter, and John Philipsborn.  The Court describes the testimony of each witness in turn.

### A.  Dr. Watkins

Dr. Watkins is the Bureau of Prisons (BOP) forensic psychologist appointed by the Court to evaluate Wilson at MCC Chicago.  She evaluated Wilson over a two-month period, from August 5 to October 9, 2019.  During this period, Dr. Watkins met with Wilson 11 times for a total of over 11 hours.  Outside of these meetings, Dr. Watkins observed Wilson's behaviors in prison.

During her meetings with Wilson, Dr. Watkins administered various tests, including the Revised Competency Assessment Instrument (RCAI).  Dr. Watkins described the RCAI as "a semi-structured interview that's used to organize the collection of information about competency."

---

[3] Wilson filed his proposed findings of fact and conclusions of law as a motion.  He requests that the Court (i) adopt his proposed findings and conclusions and (ii) find that he is incompetent to stand trial.  Because the Court finds Wilson competent to stand trial, his motion (Dkt. 1644) is denied.

[4] The Government filed a response, Gov't Resp. (Dkt. 1651), and Wilson filed a reply, Def. Reply (Dkt. 1656).

Hr'g Trans. Vol. 1 at 23 (Dkt. 1624).  Prior to Dr. Watkins's administration of the RCAI, she observed that during their interactions, Wilson was "sort of flat," was "[not] very expressive," and gave her "concrete, simplistic answers" to her questions.  Id. at 84.  She observed that his demeanor changed dramatically during the RCAI, when she told Wilson that she thought he could put forth better effort in the interview and that it seemed like he was feigning competency-related deficits.  Id. at 84–85.  According to Dr. Watkins, Wilson "became upset by that pretty quickly and then appeared to immediately grasp what that would mean for him and his case."  Id. at 85.  Wilson "came back to [her] . . . with a lot of unsolicited information about how he doesn't in fact know this stuff, he's not good at school, he wasn't able to play basketball because his grades were too low, you know, just giving many examples . . . to illustrate how impaired he was without necessarily being asked by [Dr. Watkins]."  Id.  Her discussion with Wilson "became a very rapid . . . discussion which was different for him."  Id.

Dr. Watkins attempted to teach Wilson certain concepts throughout the RCAI to test his abilities to learn information, but Wilson "typically asserted that he didn't remember" or did not know the answer, "giving the presentation that perhaps he couldn't or didn't learn the information."  Hr'g Trans. Vol. 2 at 34.  But, according to Dr. Watkins, there were times during the interview that Wilson "did recall things and not only recall, but think about them, think about the implications and bring them back up during the evaluation."  Id.  Examples included Wilson's understanding of the accusation that he might be thought to be malingering—that is, feigning a mental deficit in order to gain a legal advantage—and his repeated, unsolicited attempts to convince Dr. Watkins of his incompetence.  Id.  To Dr. Watkins, this suggested Wilson's "lack of demonstrated retention and recollection of things that [she] . . . taught him during the competency

interview" was "not . . . representative of his ability to recall and demonstrate the knowledge" and, rather, suggested that Wilson was malingering.  Id. at 35.

In addition to their one-on-one meetings at MCC Chicago, Dr. Watkins had the opportunity to observe Wilson on a day-to-day basis, while he was unaware that he was being watched.  Hr'g Trans.  Vol. 1 at 20–21.[5]  Dr. Watkins observed Wilson interact and socialize with other inmates, including those who were well-respected at MCC Chicago.  Id. at 81.  Dr. Watkins testified that, in her experience, intellectually disabled inmates are often taken advantage of or ostracized by their fellow inmates.  Id. at 81–82.  But Dr. Watkins "didn't see any of those behaviors with Mr. Wilson"; to the contrary, she "saw him being treated with apparent respect by others."  Id. at 82. On several occasions, Dr. Watkins saw Wilson engaged in a "pretty active conversation" with other inmates, but upon spotting Dr. Watkins watching him, Wilson would "stop[] the conversation and adopt[] this blank stare that he had in meetings with [her]."  Id. at 83.

Dr. Watkins also had the opportunity to review 21 recorded phone calls made by Wilson at MCC Chicago.  Id. at 26–27, 89–90.  Dr. Watkins explained that recorded calls can be a value tool to assess someone's competency, particularly "when there's [a] question about . . . the genuineness of someone's presentation."  Id. at 90.  "[I]n cases of feigning or malingering, we often see a stark contrast between presentation on the phone and during interviews."  Id.  In Wilson's recorded calls, his speech was "much more rapid" than it was in his meetings with Dr. Watkins.  Id.  Wilson was also "much more quick thinking and verbally fluid" in the calls than he was with Dr. Watkins.  Id.  As an example, Dr. Watkins pointed to a call where Wilson "made quick calculations" to try to convince someone that it would be more cost-efficient to get a

---

[5] Dr. Watkins's office at MCC Chicago has a large window overlooking an inmate housing unit. Hr'g Trans. Vol. 1 at 20.  In addition to watching the unit from her office, Dr. Watkins would, from time to time, walk through the unit.  Id. at 21.

Chicago-based phone number.  Id. at 91.  Dr. Watkins also observed that the people Wilson spoke

to did not seem to voice any concern about his ability to function in prison or whether others were

taking advantage of him, which is something that she commonly hears in calls to inmates with

mental deficits.  Id.  In several calls, Wilson reminded the person with whom he is speaking that

the calls are recorded and monitored.  Id. at 99–100.

Dr. Watkins administered an IQ test to Wilson, and he obtained a composite score of 65.

Id. at 111.  Dr. Watkins explained that a score of 65 "falls in the lower extreme to below average

range."  Id.  "It has a confidence interval of 60 to 73 which means basically if he was displaying

full effort, there would be a 90 percent chance that his true abilities fell within that range . . . ."  Id.

Ultimately, Dr. Watkins diagnosed Wilson as malingering.  Id. at 120.  She opined that

Wilson is not intellectually disabled and he does not have a mental disorder that would impair his

ability to understand the nature and consequences of the proceedings against him, or to assist

properly in his defense.  Hr'g Trans. Vol. 2 at 45; Gov't Ex. 1 at 32.  Rather, in Dr. Watkins's

opinion, Wilson is competent to stand trial.  Hr'g Trans. Vol. 2 at 43.[6]

Although Dr. Watkins had not seen Wilson since October 2019, she testified that the mere

passage of time would not change her opinion of his intellectual ability.  Id. at 44.  She explained

that intellectual disability "tends to be pretty stable" absent "some significant event" like "a

traumatic brain injury"; nothing in the record suggested that Wilson had experienced such a

significant event during that time that elapsed between his evaluation by Dr. Watkins and the

March 2022 competency hearing.  Id. at 45.

---

[6] Dr. Watkins also diagnosed Wilson with antisocial personality disorder.  Hr'g Trans. Vol. 1 at
116.  The criteria for this diagnosis include "a failure to conform to social norms," which Wilson
displayed "based on his history of repeated arrests and the behavior leading to that arrest."  Id.
The criteria also include "[d]eceitfulness, irritability and aggressiveness," which Wilson "showed
fairly often and he talked about also during [his and Dr. Watkins's] . . . evaluation."  Id.

**B. Green**

Green, who is employed by Detroit Public Schools (DPS), began her career as a special education teacher and is now an Individualized Education Plan (IEP) compliance supervisor. Hr'g Trans. Vol. 1 at 61, 69. According to Green, an IEP is designed to address the needs of students who require special education services and is required to be in place before such services can be provided by the school. Id. at 66. She testified that she was unable to locate any evidence that Wilson had an IEP—or that he received any specialized services based on an IEP—when he attended DPS. Id. at 76. She did not offer any opinion on Wilson's competency.[7]

**C. Horton**

Before retiring, Horton was a teacher employed by DPS. Hr'g Trans. Vol. 3 at 6–7 (Dkt. 1626). She testified that in the eighth grade, Wilson was a "resource student" who "struggled." Id. at 10. Another teacher would occasionally pull Wilson out of Horton's science class to teach him. Id. More often, the resources teacher would pull Wilson out of reading or language class. Id. at 10–11. Horton did not provide an opinion on Wilson's competency.

**D. Bullock**

Bullock, who attended middle school and high school with Wilson, id. at 31, testified that he recalled Wilson being taken out of class "[a] few times," id. at 33. Bullock also testified that he would, on occasion, help Wilson with his homework. Id. at 34. As adults, Bullock and Wilson did some roofing work together; Bullock stated that Wilson's performance was "adequate." Id. Bullock did not provide an opinion on Wilson's competency.

---

[7] According to Wilson, Green's testimony was relevant to undercut Dr. Denney's statements that (i) Green told him resource students were not special education students, and (ii) it was possible to tell whether a student had an IEP in place by looking at the student's transcript. Def. Br. at 17.

### E.  Murray

Murray, a DPS teacher, taught English and reading to Wilson in seventh and eighth grade. Hr'g Trans. Vol. 4 at 6–7 (Dkt. 1627).  She testified that when she was teaching Wilson, he would be pulled from her class two or three times a week to be taught in the resource room.  Id. at 9.  She stated that Wilson was "not a good speller, not a good reader," and "not necessarily mentally present in class."  Id. at 10–11.  Wilson received "mainly Ds" in Murray's classes.  Id. at 20. Murray did not provide an opinion on Wilson's competency.

### F.  Dr. Agharkar

Dr. Agharkar, a psychiatrist, met with Wilson once on October 18, 2021 for approximately two hours.  Hr'g Trans Vol. 6 at 6, 26, 59 (Dkt. 1629).  Specifically, Dr. Agharkar observed Wilson interacting with his counsel for an hour.  Id. at 59.  For the second hour, Dr. Agharkar interviewed Wilson; Wilson's counsel remained in the room but did not otherwise participate in the interview. Id.  Dr. Agharkar did not administer any tests to assess Wilson's cognitive abilities.  Id.  Much of Wilson and Dr. Agharkar's conversation focused on Wilson's understanding of the justice system and his particular case.

According to Dr. Agharkar, Wilson could identify the evidence or witnesses that are "bad" for him, and he would insist that the evidence or testimony could be "arguable," but he could not provide an analysis of ways to counter bad evidence or witnesses.  Id. at 34–37.  Although Wilson understood the concept of pleading guilty or pleading not guilty, Dr. Agharkar did not believe that Wilson understood the concept of pleading guilty by reason of insanity, even though Dr. Watkins had previously discussed this concept with him.  Id. at 36.  In terms of possible defenses, Dr. Agharkar noted that Wilson suggested that his team argue that Wilson was not a member of a gang but, rather, "just a group of people that hang out."  Id. at 100.  Wilson also raised the possibility of

7

a defense of misidentification.  Id. at 101.  Dr. Agharkar stated that Wilson understood the roles of the judge, attorneys, witnesses, defense attorney, prosecutor, and jury.  Id. at 38.  But Dr. Agharkar appeared to doubt Wilson's knowledge of the jury; Dr. Agharkar emphasized that when he asked Wilson about the number of people in a jury (12)—another concept that Dr. Watkins had previously discussed with him—Wilson said, "it's 11 or 12 or 13."  Id.  When Dr. Agharkar asked Wilson about the sentence that he was facing, Wilson answered "life or death."  Id. at 89.[8]  Wilson also told Dr. Agharkar that he had authorized defense counsel to accept a plea of 15 to 20 years' imprisonment.  Id. at 90.  When Dr. Agharkar asked Wilson why he believed that the Government would accept such a plea offer, Wilson answered that his co-defendant, who had similar charges, received a 15-year term of imprisonment.  Id. at 90–91.  Wilson told Dr. Agharkar that, if his case went to sentencing, Wilson's attorney should emphasize Wilson's minimal criminal history.  Id. at 91.

Dr. Agharkar testified that it is possible for someone with an intellectual disability to be competent.  Id. at 88.  Nevertheless, Dr. Agharkar ultimately opined that Wilson is intellectually disabled and that his intellectual disability renders him incompetent to stand trial.  Id. at 52, 55–56.  Dr. Agharkar did not believe that Wilson was malingering.  Id. at 30.

### G.  Dr. Patton

Dr. Patton holds a doctorate degree in special education.  Hr'g Trans. Vol. 7 at 20.  He previously worked as a special education teacher, and, more recently, he has worked as a professor, preparing teachers to work with special education students.  Id. at 20–21.  Dr. Patton was hired by

---

[8] At the time that Dr. Agharkar interviewed Wilson, the Government was seeking the death penalty.

the defense to render an opinion as to whether Wilson meets the adaptive functioning criterion for intellectual disability.  Def. Ex. 3 at 1.[9]

Dr. Patton interviewed several individuals who knew Wilson as a child, including his friend Patrick Johnson, his stepmother Delores Kimbrough, and his classmate Robert Irby.  Hr'g Trans. Vol. 7 at 57–62.[10]  Johnson told Dr. Patton that "with Carlo you had to be careful with the words that you used."  Id. at 57.  Kimbrough told Dr. Patton that Wilson "was reluctant to kind of talk with other folks."  Id. at 59.  Irby told Dr. Patton that Wilson had "a very difficult time" memorizing a poem for English class and that Wilson had difficulty comprehending things he read.  Id. at 62–63.

Dr. Patton also administered the Adaptive Behavior Diagnostic Scale (ABDS) to Wilson's former teacher Murray as well as the mother of his child, SheVont'e Griffin.   Id. at 63, 68.  The ABDS contains a series of questions that are administered to persons who have had interactions with the subject individual; it is designed to identify whether the subject individual has adaptive functioning deficits.  Id. at 47.  Dr. Patton conceded that, according to the manual for the ABDS, the primary purpose of the test is to identify individuals who are significantly behind their peers in adaptive behavior development and determine if they may be eligible for special services.  Id.

---

[9] Adaptive functioning is comprised of three sets of skills: (i) conceptual, (ii) social, and (iii) practical.  Def. Ex. 3 at 9.  Conceptual skills involve "competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others."  Id. at 10.  Social skills involve "awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others."  Id.  Practical skills involve "learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others."  Id.

[10] Dr. Patton also interviewed Wilson's grandmother Yvonne Wilson, his mother Carla Wilson, his classmate Chardonnay Humphry, and several of his former teachers—Horton, Sylvia Maisano, and Emily Smith.  Def. Ex. 3 at 8.

at 108.  Obviously, this was not Dr. Patton's purpose in administering the ABDS in this case.  Dr. Patton also conceded that there is no empirical data to validate or reject a retrospective use of the ABDS, which is how Dr. Patton used the tests.  Id. at 137.  Specifically, Dr. Patton had Murray answer questions about how she perceived Wilson's behavior back when he was 13 years old, and Dr. Patton had Griffin answer questions about how she perceived Wilson's behavior back when he was 20 years old.  Def. Ex. 3 at 23.  In both cases, the scores reflected that Wilson's social skills in the adaptive functioning domain were "extremely low."  Hr'g Trans. Vol. 7 at 75–76.  Murray admitted that she had guessed on the answers for several of the questions, id. at 116–117, but Dr. Patton believed that Murray's guessed answers were still valid because he believed that Murray likely reached these answers by "reasonably apply[ing]" her knowledge, id. at 117.

While Dr. Patton declined to offer an opinion as to whether Wilson is overall intellectually disabled, he opined that Wilson "clearly has deficits in the conceptual area" of adaptive functioning, and he likely "has deficits in [the] social and practical" areas of adaptive functioning as well.  Id. at 91.[11]  Dr. Patton did not offer an opinion on Wilson's competency.

One other portion of Dr. Patton's testimony bears highlighting.  Dr. Patton stated that individuals with a moderate to severe intellectual disability would not be able to drive a car.  Id. at 98.  However, video evidence presented during the competency hearing showed Wilson operating a vehicle on several instances.  These videos are discussed in further detail below.

---

[11] Dr. Patton never personally met Wilson, but he stated that it was not necessary to meet Wilson to offer an opinion on Wilson's adaptive functioning.  Hr'g Trans. Vol. 7 at 91.  In fact, Dr. Patton went so far as to suggest that it could have been detrimental for assessment of Wilson's adaptive functioning if he had personally interviewed Wilson, who is incarcerated.  Specifically, Dr. Patton stated that self-reports "run the risk of individuals telling you that they are better at something than they really are."  Id. at 92.  Additionally, Dr. Patton stated that jail—i.e., Wilson's present location—is "not . . . an appropriate location to do a comprehensive assessment" of adaptive functioning because "in an incarcerated setting, there are many adaptive behaviors that one will not have an opportunity to do."  Id. at 86–88.

### H.  Dr. Fahey

Dr. Fahey is a speech and language pathologist.  Hr'g Trans. Vol. 8 at 5 (Dkt. 1635).  She was hired by the defense to assess Wilson's speaking, listening, reading, and writing abilities, as part of the assessment of Wilson's adaptive functioning.  Id. at 7–10.  To conduct this assessment, on April 29, 2019, Dr. Fahey administered several tests and obtained both an oral language sample as well as a writing sample.  Def. Ex. 7 at 1.

Dr. Fahey opined that Wilson's scores from the assessment "are in the severely-impaired range across the board."  Hr'g Trans. Vol. 8 at 43.  Further, she stated that Wilson has a language disorder that arose during his developmental period, id. at 54, and that his language abilities plateaued at the third grade level, id. at 60.  Wilson's language disorder, Dr. Fahey testified, affects his "ability to think and to reason and to problem solve."  Id. at 56.  Wilson, Dr. Fahey stated, is a "a very concrete thinker and so language that is abstract is going to be exceedingly difficult [for him]."  Id. at 58.  As a result of Wilson's language disorder, Dr. Fahey opined, he has a significant deficit in adaptive functioning.  Id. at 60.  She also testified that these deficits are consistent with intellectual disability.  Id.

Although Dr. Fahey did not offer an opinion as to Wilson's competency, she opined that "his language deficits in the severe range will make it exceedingly difficult and probably impossible for him to be able to assist [his counsel]."  Id. at 59.  However, on cross-examination, Dr. Fahey conceded that she formed this opinion without any awareness of the facts, witnesses, or evidence of this particular case.  Id. at 63.  She also conceded that she has never been present during a criminal trial, and agreed that she "do[es] not have an understanding of what goes on between a defendant and their attorney during a trial."  Id. at 64.

11

**I. Dr. Hunter**

Dr. Hunter is a neuropsychologist.  Hr'g Trans. Vol. 9 at 17 (Dkt. 1630).  However, he is not board-certified in neuropsychology.  Id. at 105.  Dr. Hunter was hired by the defense to evaluate whether Wilson meets the criteria for a diagnosis of intellectual disability.  Def. Ex. 4 at 1.  Dr. Hunter met with Wilson over a two-day period in October 2018 and administered a series of tests.  Id. at 6; Hr'g Trans Vol. 9 at 41.[12]

Dr. Hunter testified that test results revealed that Wilson has an IQ of 53, Hr'g Trans Vol. 9 at 66, which places Wilson in the "the mildly to moderately impaired range," Def. Ex. 4 at 9.  However, Dr. Hunter stated, adjusting this score for the Flynn effect[13] results in an IQ of 43.  Hr'g Trans. Vol. 9 at 66.  An IQ of 43 "still fall[s] within the range of moderate performance."  Id.  Ultimately, Dr. Hunter concluded that Wilson has mild intellectual disability.  Id. at 96.

Dr. Hunter reached this opinion despite the fact that Wilson failed the malingering test (the TOMM) that Dr. Hunter had administered to him.  Id. at 135.  Specifically, Wilson obtained an overall score between 26 and 27, and a passing score is "41 to 47 depending on what group you're

---

[12] These tests included: (i) Boston Naming Test, Second Edition (BNT-2); (ii) California Verbal Learning Test, Third Edition (CVLT-3); (iii) a clinical interview; (iv) Delis-Kaplan Executive Function System (D-KEFS); (v) Grooved Pegboard; (vi) Repeatable Battery for the Assessment of Neuropsychological Status, Updated (RBANS); (vii) Rey 15 Item Test; (viii) Rey Complex Figure Task (RCFT); (ix) Sensory Perceptual Exam (SPE); (x) Test of Memory and Malingering (TOMM); (xi) Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-4); (xii) Wechsler Memory Scale, Fourth Edition (WMS-4); and (xiii) Woodcock-Johnson Tests of Achievement, Fourth Edition (WJ-4).  Def. Ex. 4 at 6.

[13] According to Dr. Hunter, the Flynn effect describes the observed phenomenon that, over time, the average IQ score increases.  See Hr'g Trans. Vol. 9 at 33–34.  Thus, as Dr. Agharkar clarified, to adjust for the Flynn effect, "for every year the [IQ] test has been out, you subtract 0.3 points per year to the test score in order to bring it to . . . the real score."  Hr'g Trans. Vol. 6 at 71.  Dr. Hunter noted that it is not "standard practice" to apply an adjustment for the Flynn effect in all contexts, such as determining an individual's "eligibility for things like special education."  Hr'g Trans. Vol. 9 at 34.  Rather, according to Dr. Hunter, it is "most appropriate" to apply the adjustment in "high stakes" contexts, which he described as criminal cases where there are questions "of competence" or criminal cases that involve "the death penalty."  Id. at 34–35, 124–125.

looking at." Id. Dr. Hunter stated that the TOMM is a reliable test that is appropriate to give to someone who may have a mild to moderate intellectual disability. Id. However, Dr. Hunter asserted that test results are just one component in the evaluation of whether someone is malingering; a psychologist must also use his or her own clinical judgment. Id. at 134. Dr. Hunter believed that during the testing, Wilson was "trying to meet the demands as they were presented to him," but that he easily became frustrated and overwhelmed. Id. at 47, 50–51.

Further, when asked whether someone with Wilson's level of intellectual disability could operate a car, Dr. Hunter stated that it would be "unusual" for someone like Wilson to be able to drive a car, and suggested that such a person would be able to successfully drive a car only "in an environment where that is something that is going to be safe for them." Id. at 121. When asked whether someone with an IQ score in Wilson's range could "drive a car in a metropolitan area while operating a cell phone," Dr. Hunter stated that he had never seen something like that, and agreed that he would be surprised to see such a person able to drive in that environment. Id. at 121–122. As discussed further below, the Government submitted evidence of video that Wilson took on his cellphone showing himself being pulled over by police while driving a car in Detroit.

Dr. Hunter did not offer an opinion as to Wilson's competence. However, in December 2018, Dr. Hunter met with Wilson about his findings and discussed with Wilson "what that might mean in terms of ways that he can be more effective in terms of his learning and also in his communication." Id. at 102. Dr. Hunter also met with Wilson's lawyer and defense team and explained how to, "in interacting with . . . [Wilson,] break [] down communication in a way that actually could be more effectively processed by him, more effectively sequenced and remembered," so that "ultimately . . . [Wilson] could actually show that he is understanding what is taking place with this case and . . . can work with his attorneys." Id.

13

### J. Philipsborn

Philipsborn is an attorney licensed to practice in California.  Hr'g Trans. Vol 5 at 5 (Dkt. 1628).  The defense hired Philipsborn "as an attorney-expert on competency with regard to the ability to assist prong of <u>Dusky</u>." Def. Br. at 24.[14],[15]  To prepare his report, Philipsborn interviewed Wilson's lawyer, Jacqueline Walsh, as well as other members of Wilson's defense team.  Hr'g Trans. Vol. 5 at 13.  He also met with Wilson on March 3, 2020 and again on August 18, 2021. <u>Id.</u> at 21, 45.

Philipsborn observed Walsh discussing the strengths and weaknesses of the evidence in this case with Wilson.  <u>Id.</u> at 59.  Regarding the testimony of one purported eyewitness, Curtis Grimes, Wilson observed that Grimes is not present in the security footage that captured the shooting at issue, so there is a lack of evidence to corroborate that Grimes was an eyewitness.  <u>Id.</u> at 59–60.  Wilson also told Walsh that he had a call with Grimes a week after the shooting, and Wilson told legal team member Collin Byrne that the team should obtain phone records to discredit Grimes.  <u>Id.</u> at 59, 63–64.

---

[14] <u>Dusky</u> refers to <u>Dusky v. United States</u>, 362 U.S. 402, 402 (1960).  <u>Dusky</u>'s two-prong test for competency is described below.

[15] Before Philipsborn testified at the competency hearing, the Government sought to exclude or limit his testimony (Dkt. 1584).  The Court granted in part and denied in part the Government's motion (Dkt. 1588).  Specifically, the Court excluded Philipsborn's opinion testimony regarding "whether or not [Wilson's lawyer,] Ms. Walsh and her legal team met the standards of practice applicable to the investigation assessment of a client's possible incompetence," as this issue was not one before the Court. Hr'g Trans. Vol. 4 at 62–63.  The Court also prevented Philipsborn from testifying about the law pertinent to competency, which "is not the province of an expert witness on the subject of whether or not a criminal defendant can assist in his own defense."  <u>Id.</u> at 63. However, the Court permitted Philipsborn to offer his opinion as to whether Wilson can assist his counsel.  <u>Id.</u> at 64.  The Court noted the possibility that Philipsborn's testimony would turn out to be wholly unhelpful, but ultimately decided to allow his limited testimony "given the stakes involved in this case."  <u>Id.</u> at 65.

Philipsborn also discussed Wilson's assessment of the evidence with other legal team members. For instance, defense investigator Mary Pisula-Stewart recounted viewing the video footage of the shooting with Wilson. Id. at 65. She told Wilson that the footage showed a car purportedly belonging to him. Id. Wilson stated that he did not believe the car belonged to him and suggested that Pisula-Stewart look for similar cars in the area where the video was taken, to see if any cars with a similar make and model were in the area. Id.

Additionally, Philipsborn and Walsh discussed with Wilson legal concepts and strategies for Wilson's case. Wilson explained his understanding that he is the one who ultimately decides whether to plead guilty or go to trial. Id. at 60. Wilson stated that he did not know how he could present an alibi defense in his case. Id. at 57. Philipsborn explained that one reason a defendant might have difficulty presenting an alibi defense is if he were present at the crime scene. Id. When asked about self-defense, Wilson stated that he did not believe that was a defense for his case; instead, he suggested that his defense should be that "they got the wrong person." Id. at 57–58. Regarding possible arguments he could make at sentencing, Wilson stated that "he doesn't want to blame drugs or blame something else." Hr'g Trans. Vol 7 at 9 (Dkt. 1633).

Philipsborn suggested that Wilson's abilities to communicate with counsel had improved between their March 2020 meeting and their August 2021 meeting. Philipsborn noticed that Wilson was using "adult phrases." Hr'g Trans. Vol 5 at 46. In other words, Wilson "did not appear to be as simple in his communication as he had been when [Philipsborn] . . . first met him." Id. For instance, Wilson used and defined the words "enlighten" and "elaborate." Id. at 46–47.

When asked about his ultimate opinion regarding Wilson's ability to assist his counsel, Philipsborn stated that "on certain subjects or in certain ways, [Wilson] . . . does have the ability to assist counsel and specifically [Walsh] . . . in communicating and at least being willing to

communicate about the subject matter of [Walsh's] . . . representation." Id. at 52.  But as for

certain other subjects, Philipsborn "had very serious questions about the extent to which [Wilson]

. . . could assist [Walsh] . . . ." Id.[16]

**K.  Dr. Denney**

Dr. Denney is a psychologist and is board certified in both neuropsychology and forensic

psychology.  Hr'g Trans. Vol. 9 at 154–155.  He was hired by the Government to evaluate Wilson

for intellectual disability.  Gov't Ex. 41.  Dr. Denney met with Wilson over a two-day period in

June 2019 and administered a series of tests.[17,18]  Dr. Denney was present for the entirety of

---

[16] As stated above, Philipsborn was permitted to testify only as an expert regarding Wilson's ability to assist counsel.  Further, the defense did not establish that Philipsborn, an attorney who does not represent Wilson, is qualified to offer an expert opinion on Wilson's cognitive abilities.  However, at defense counsel's prompting, Philipsborn offered an opinion "as to Mr. Wilson's reasoning, appreciating and decision-making capacity," stating: "I think there are questions about the extent to which he has a functional ability to understand the language that's used in the criminal court system."  Hr'g Trans. Vol. 4 at 52–53.

[17] The tests included the following: (i) Conners Continuous Performance Test-3 (CPT-3); (ii) Green's Medical Symptom Validity Test (MSVT); (iii) Trail Making Test, Parts A & B 4; (iv) WAIS-4; (v) Reynolds Intellectual Assessment Scales-2 (RIAS-2); (vi) Nonverbal Medical Symptom Validity Test; (vii) Neuropsychological Assessment Battery (NAB); (viii) Green's Word Memory Test (WMT); (ix) Finger Tapping Test; (x) Grooved Pegboard Test; (xi) Wisconsin Card Sorting Test (WCST); (xii) Woodcock-Johnson Tests of Achievement, 4th edition, Form B; and (xiii) Minnesota Multiphasic Personality Inventory, 2nd edition, Restructured Form (MMPI-2-RF) Auditory Disk Administration.  Gov't Ex. 41 at 2.

[18] In addition to the tests that he administered to Wilson, Dr. Denney administered an adaptive assessment instrument to Kimbrough, asking Kimbrough to answer questions about Wilson when Wilson was 12 years old.  Gov't Ex. 41 at 18–20.  However, during the competency hearing, Dr. Denney testified that his opinion regarding the use of such retrospective analyses had changed since he administered the instrument to Kimbrough.  Hr'g Trans. Vol. 10 at 41–42, 45–48.  Dr. Denney explained that based on an article he read, he now believes that "[b]ecause people have to rate behaviors from . . . years ago," retrospective analyses "are less reliable" when it comes to specific information like whether someone "carr[ied] scissors safely" when the person was 12 years old.  Id. at 47.

Wilson's competency hearing. After the defense's case-in-chief, the Government called Dr. Denney as a rebuttal witness.

Three of the tests that Dr. Denney administered to Wilson were validity tests—i.e., tests designed to assess whether Wilson was malingering. On the first test, the WMT, Wilson's results were inconsistent with the standard results for "bona fide low IQ and intellectual disabilities." Hr'g Trans. Vol. 10 at 89 (Dkt. 1631). Dr. Denney testified that Wilson's performance on the WMT was, therefore, "more reflective of someone who is simulating impairment than having actual intellectual disability." Id. at 89–90. On the second tests the NV-MSVT, Wilson "performed better on more difficult portions of the test than he did on easy portions." Id. at 93. Dr. Denney explained that it is "rare" that someone would validly perform that way on the NV-MSVT and, therefore, Wilson's performance on the NV-MSVT "indicate[s] that he was feigning severe cognitive problems on his test." Id. at 93, 95. On the third test, the MSVT, Wilson's results were "not as striking" as his results on the WMT and the NV-MSVT. Id. at 98. Nevertheless, according to Dr. Denney, Wilson's results for the MSVT "were not consistent with what [Dr. Denney] . . . would expect from people . . . who had bona fide intellectual disability and were trying their best on this measure." Id. at 99. This led Dr. Denney to conclude that Wilson "was feigning on [the MSVT] . . . as well." Id.

Dr. Denney also reviewed videos that Wilson uploaded to his Facebook account before being arrested on the charges in this case. These videos—taken by Wilson from the driver seat of a car—depict his interactions with police officers during several traffic stops. The videos were played during the competency hearing. Dr. Denney's impressions of the videos can be summarized by his observations of the second video that was played during the hearing:

> [W]hat really struck me as important is how quickly [Wilson's] . . . mental
> processing speed was [when he was interacting with the police officer]. He [was]

> responding to questions rapidly, justifying himself rapidly, quick thinking on his feet regarding his interactions with the officer.  He's clearly not gullible and not a pushover from the officer.  He appeared to have quick thinking and tended to negotiate and try to, try to justify himself.  It was a lot faster processing of mental skills than what was reflected in testing that I've seen on the record [by other witnesses] or in my own testing.

Id. at 60–61.  Dr. Denney observed that Wilson was often successful in negotiating with and persuading the officers; on one occasion, he successfully argued his way out of his car being impounded.  Id. at 63.  The videos also show Wilson controlling the actions of others by, for instance, commanding the passengers in his car to not say anything during the traffic stop.

Dr. Denney discussed his administration of the WAIS-4 to Wilson, stating that Wilson obtained a full scale IQ score of 80, which falls in the low average range of intellectual functioning.  Id. at 103; Gov't Ex. 41 at 25.  As Dr. Denney acknowledged, this IQ score varies drastically from the score of 43 that Wilson obtained when Dr. Hunter administered the test approximately eight months earlier.  Dr. Hunter suggested two reasons for the differences in the scores: the practice effect (also known as "retest effect")[19] and the Flynn effect.  However, Dr. Denney testified that he adjusted the score that he obtained based on practice effect.  Hr'g Trans. Vol. 12 at 56 (Dkt. 1620).  Moreover, Dr. Denney stated, the practice effect could not explain the dramatic difference between Wilson's two scores, as "you would expect retest effect to increase [Wilson's first score] . . . by two points and that's all."  Hr'g Trans. Vol. 9 at 103.[20]  Dr. Denney concluded that "the

---

[19] According to Dr. Hunter, practice effects occur "once a person [has] . . . done . . . the [WAIS-4] . . . [and then the test is] administered [again within] . . . less than a year"; the individual's IQ score will increase "from the experience of taking and then the learning that take[s] place" from the first administration of the test.  Hr'g Trans. Vol. 9 at 95.

[20] Dr. Hunter suggested that, to account for practice effect, seven to twelve points should be subtracted from the IQ score that Dr. Denney obtained.  Hr'g Trans. Vol. 9 at 126–127.  Dr. Hunter stated that seven to twelve points would be a "standard" deduction; however, he was not able to point to a specific piece of literature to support his position.  Id.

difference between [the two IQ scores] . . . is not due to retest effects." Id.  Rather, the large difference reflects that Dr. Hunter's "testing is not a valid reflection of [Wilson's] . . . ability." Id. As for the Flynn effect, Dr. Denney stated that he "considered" it.  Hr'g Trans. Vol. at 57. However, because the Flynn effect is an estimation of how the average IQ test is affected—and it is impossible to know how the Flynn effect affects an individual—Dr. Denney declined to change Wilson's IQ score based on the Flynn effect, as Dr. Denney "would not know what to change it to." Id. at 57–58.

Dr. Denney also critiqued Dr. Hunter's decision to disregard Wilson's scores on the TOMM, which indicated that Wilson was malingering.  Dr. Denney agreed with Dr. Hunter that the TOMM is a valid measure, citing to various studies.  Hr'g Trans. Vol. 10 at 73–75.  Dr. Denney opined that these studies establish that "we can have great confidence that the positive results [of the TOMM administered by Dr. Hunter] are accurate." Id. at 75.

Ultimately, "[a]fter reviewing all of the information available to [him] . . ., the test data, [Dr. Denney's] . . . own interactions,  [and his] . . . own test data," Dr. Denney concluded that "Wilson was malingering; that is, trying to appear much more impaired than he is." Id. at 115.  In light of his finding of malingering, Dr. Denney further concluded that "the neurocognitive test data including the IQ test are not a valid reflection of Mr. Wilson's genuine abilities" because "[t]hey grossly underestimate his abilities." Id. at 105.  Dr. Denney also "found[] [an] indication . . . of anti-social personality disorder" and stated that Wilson's "history suggested a . . . probable language-based learning disability, likely reading." Id. at 115.[21]  Dr. Denney did not offer an opinion as to whether Wilson is competent to stand trial.

---

[21] When asked about whether he agrees with Dr. Denney's opinion that Wilson is more likely learning disabled as opposed to intellectually disabled, Dr. Hunter stated: "I do believe that there is actually a reflection that for Mr. Wilson . . . [his abilities are] actually indicative of a learning

## II. ANALYSIS

### A. Dr. Denney

The Court first takes up the issue of whether to limit its consideration of Dr. Denney's testimony "to only those opinions which were offered in rebuttal to the [d]efense expert testimony and which were offered in his report." 6/24/22 Def. Mot. at 1. Specifically, Wilson asks the Court to disregard Dr. Denney's "new" opinions offered at the competency hearing such as his opinion regarding the reliability of retrospective assessments like the one he administered to Kimbrough. Id. at 10. Wilson also asks the Court to disregard Dr. Denney's opinions regarding Wilson's malingering and antisocial personality disorder, stating that these opinions are not proper rebuttal opinions because "[n]either of those conditions rules out [intellectual disability] . . . nor do they make a person competent to stand trial." Id. at 15.[22]

The Government argues that Dr. Denney's opinions should be considered in full because "[t]he rules of evidence should not strictly apply to a competency hearing." Gov't Resp. at 7 (referencing Fed. R. Evid. 1101 (stating that the Rules of Evidence do not apply to proceedings to determine the admissibility of evidence of other "miscellaneous proceedings"); United States v. Stepp, 680 F.3d 651, 669 (6th Cir. 2012) (stating, in a case regarding a suppression hearing, that "we would expect the district court to err on the side of considering more, not less, information

---

disability[,] so I don't fully disagree." Hr'g Trans. Vol. 9 at 103. Dr. Hunter further clarified that he believes Wilson has "co-occurring and comorbid intellectual disability . . . ." Id.

[22] Further, Wilson asks the Court to disregard certain factual "mis-state[ments]" of his educational and employment history. See 6/24/22 Def. Mot. at 18–20 (asserting that the PowerPoint that accompanied Dr. Denney's testimony misstated, among other things, Wilson's educational history and employment history). The Court need not completely disregard Dr. Denney's testimony to obtain an accurate view of Wilson's educational and employment history. Rather, it can cross-reference facts set forth by Dr. Denney with facts established by other evidence, and resolve any differences by weighing the trustworthiness and persuasive value of each source of information.

particularly on an issue for which the other offered competing expert testimony")).    The Government also argues that Dr. Denney's testimony was properly "offered to rebut the testimony and claims of the defense experts . . . that Wilson suffers from intellectual disability."  Id. at 4. Finally, the Government points out that the Court gave Wilson "wide latitude" in responding to Dr. Denney's testimony, permitting Wilson to—in addition to cross-examining Dr. Denney— present additional witnesses or file additional expert witness declarations to address Dr. Denney's testimony.  Id. at 9. However, "Wilson chose not to take advantage of this option."  Id.

"[I]t is not clear that the rules of evidence are applicable to competency hearings . . . ." United States v. Mahan, No. 05-50070, 2008 WL 1766664, at *2 n.3 (E.D. Mich. Apr. 17, 2008). Ultimately, the Court need not determine whether the rules apply to a competency hearing because Dr. Denney's testimony was clearly proper rebuttal testimony.  The proper function of rebuttal evidence is "to rebut new evidence or new theories proffered in the defendant's case-in-chief." Benedict v. United States, 822 F.2d 1426, 1428 (6th Cir. 1987) (punctuation modified, citation omitted).[23]  Dr. Watkins, who was appointed to assess Wilson's competency (not his asserted intellectual disability), testified in the Government's case-in-chief.  In Wilson's case-in-chief, the defense raised the theory that Wilson's incompetency is "predicate[d]" on his intellectual disability.  Def. Br. at 9.  To prove his intellectual disability, the defense hired various witnesses to assess Wilson and offer opinions about his IQ and adaptive functioning.  Dr. Denny testified about the validity and reliability of IQ and adaptive functioning tests administered to Wilson, evidence of Wilson's malingering, and alternative diagnoses—like a reading disability or anti-social personality disorder—that could explain his behaviors.  Because this testimony contradicts

---

[23] A plaintiff has no duty to anticipate or negate a defense theory in the plaintiff's case-in-chief. Benedict, 822 F.2d at 1428.  Thus, the fact that real rebuttal evidence could have been offered in chief does not preclude its admission in rebuttal.  Id.

and defuses the impact of the theory of intellectual disability raised by Wilson in his case-in-chief, it is proper rebuttal testimony.  See Benedict, 822 F.2d at 1428.

 To the extent that Wilson suggests he did not have a fair opportunity to respond to opinions that Dr. Denney did not include in his report and, rather, identified for the first time at the competency hearing, Wilson is mistaken.  During the competency hearing, the Court stated that, once the Government finished its examination of Dr. Denney, the Court would entertain what relief, if any, the defense should have to address Dr. Denney's opinions based on materials that had, as of that time, only recently been provided to the defense.  Hr'g Trans. Vol. 10 at 16.  The Court contemplated allowing the defense to present another witness or expert declaration to respond to Dr. Denney's new opinions.  Id.  At the end of the Government's examination on April 4, 2022, defense counsel asked the Court for time before beginning cross-examination "to review this new data and [Dr. Denney's] . . . new opinions" and "consult with experts regarding the opinions and the information."  Id. at 123.  The Court gave the defense three additional weeks to prepare to address Dr. Denney, starting cross-examination on April 25, 2022.  Id. at 124.  The defense ultimately did not present any witnesses or expert declarations to address Dr. Denney's testimony.  But Wilson was clearly given a fair opportunity to prepare for and address Dr. Denney's newer opinions.

 Wilson's motion to limit consideration of Dr. Denney's testimony is, therefore, denied. Further, as demonstrated by the analysis below, there is significant evidence upon which the Court relies quite aside from Dr. Denney's rebuttal testimony.

### B. Competency

 If there is reasonable cause to believe that the defendant may "presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to

understand the nature and consequences of the proceedings against him or to assist properly in his defense," the court must order a competency hearing.  18 U.S.C. § 4241(a).  The test for competency is whether the defendant has (i) "the sufficient present ability to consult with his counsel with a reasonable degree of rational understanding" and (ii) "a rational as well as factual understanding of the criminal proceedings against him." Drope v. Missouri, 420 U.S. 162, 172 (1975) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)).  If the court finds "by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense," the defendant must be committed to the custody of the Attorney General, who will "hospitalize the defendant for treatment in a suitable facility."  18 U.S.C. § 4241(d).  As this Court previously determined, the Government bears the burden of proving the defendant's competency to stand trial. 10/27/21 Op. at 5 (Dkt. 1513).

"[T]he bar for incompetency is high." United States v. Miller, 531 F.3d 340, 350 (6th Cir. 2008).  District courts may consider a variety of factors in determining whether a defendant is competent to stand trial, including the defendant's behavior and medical opinions on the defendant's competence to stand trial.  See United States v. Miller, 531 F.3d 340, 349 (6th Cir. 2008).  Ultimately, there are no factors or thresholds that, if met, will automatically determine competency.  Cowans v. Bagley, 639 F.3d 241, 247 (6th Cir. 2011) ("'There are, of course, no fixed or immutable signs' of incompetence, the standard is a high one, and the relevant factors— 'evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence'—are difficult to evaluate'") (quoting Drope, 420 U.S. at 180).  "In short, any evidence that is probative of a defendant's ability to understand the proceedings against him and

to assist in his defense is relevant to the Court's competency determination." United States v. Stafford, No. 1:12 CR 238, 2013 WL 1694033, at *2 (N.D. Ohio Apr. 18, 2013).

Here, Wilson asserts that he is incompetent to stand trial because he is intellectually disabled. See 6/25/19 Def. Mot. at 8–9. Intellectual disability and incompetency are not coterminous. "[C]ompetency can be lost or regained over time," while intellectual disability requires "the onset of . . . deficits" during the developmental period. Davis v. Kelley, 854 F.3d 967 (8th Cir. 2017). Significantly, as Dr. Agharkar testified, the fact that a defendant has an intellectual disability does not per se mean that the defendant lacks a rational understanding of the proceedings against him or lacks a sufficient present ability to consult with his counsel. Thus, not all individuals who have an intellectual disability are incompetent to stand trial. See United States v. Pruitt, 429 F. App'x 155, 158 (3d Cir. 2011) (affirming district court's determination that defendant's intellectual disabilities did not create reasonable cause to question a defendant's competency to enter a guilty plea). In other words, even if a defendant has an intellectual disability, the competency determination is still governed by the test set forth in Drope. See 420 U.S. at 172.

As described above, the defense presented testimony from several experts who administered a series of tests. Regarding intellectual functioning, Dr. Hunter testified that Wilson obtained a full scale IQ score of 43, which is an extremely low IQ. Drs. Patton and Fahey both opined that Wilson had severe deficits in adaptive functioning. Drs. Agharkar and Hunter both opined that Wilson met the criteria for intellectual disability. And Dr. Agharkar opined that as a result of his intellectual disability, Wilson is incompetent to stand trial.

The defense experts' assessments of Wilson would be more compelling if their test results were trustworthy. Wilson obtained three different IQ scores: he obtained a 43 on the test administered by Dr. Hunter, a 65 on the test administered by Dr. Watkins, and an 80 on the test

administered by Dr. Denney.  The stark difference in the scores obtained by Drs. Hunter and Denney cannot be completely accounted for by the practice effect or Dr. Hunter's application of the Flynn effect.

Moreover, Dr. Hunter administered a test—the TOMM—that indicated Wilson was malingering.  Despite these results, Dr. Hunter and several other defense experts opined that Wilson's deficits were not feigned.  But the defense experts formed their opinions after relatively brief observations of Wilson, during which time Wilson knew that he was being evaluated.  Dr. Agharkar evaluated Wilson for two hours; Dr. Patton did not meet with Wilson; Dr. Hunter evaluated Wilson over the course of two days; and Dr. Fahey evaluated Wilson on one day.

By contrast, Dr. Watkins, who opined that Wilson was malingering, reached this opinion after observing Wilson over a two-month period.  Dr. Watkins's opinion is supported by her observations of Wilson both when he was and was not aware of her observation.  When Wilson was not aware that Dr. Watkins was watching him, he engaged in active conversations with other inmates, and did not display the flat, slow affect that he displayed with Dr. Watkins.  When Dr. Watkins confronted Wilson with the suggestion that he was malingering, his speech became very rapid and he was able to quickly give several examples of his purported deficits.[24]  Dr. Watkins's

---

[24] The defense urges the Court to discount Dr. Watkins's observations because she has not observed Wilson since October 2019.  However, considerable time has likewise passed since the defense experts' evaluations of Wilson: Dr. Agharkar evaluated Wilson in October 2021, Dr. Hunter evaluated Wilson in October 2018, and Dr. Fahey evaluated Wilson in April 2019.  This means that the defense experts' observations of Wilson's behaviors are not more reliable than Dr. Watkins's due to temporal proximity to the competency hearing.  Further, the passage of time between the experts' evaluations and the competency hearing is largely the product of the COVID-19 pandemic, which led the courthouse to close to the public in March 2020.  The courthouse did not reopen to the public until September 2021, and even then, the pandemic continued to affect the Court's ability to schedule lengthy in-person proceedings like Wilson's competency hearing.

malingering opinion is further bolstered by Dr. Denney's testing that revealed a strong likelihood of malingering.

Evidence that Wilson intentionally did not put forth full effort reduces the reliability of the results of the various tests administered to assess his functioning and competency. It also makes evidence of the behavior that Wilson displayed while he was not being observed by experts—or did not know that he was being observed—the most reliable evidence of his competency. See Pervis, 937 F.3d at 557 (affirming district court finding of competency and noting that (i) the district court found the observations and recordings of the defendant's behavior in prison to be the "most reliable" evidence of competency, and (ii) the defendant's "intentionally poor effort" on formal tests "left the district court little better material with which to evaluate" the defendant's functioning).[25]

Evidence of Wilson's behavior when he was not being watched (or did not know that he was being watched) includes  Dr. Watkins's observations of Wilson's interactions with other inmates. Dr. Watkins observed Wilson engaged in active conversation with others. She also saw him socializing with well-respected inmates and observed others treating him with respect. She did not see anyone trying to take advantage of or ostracize Wilson, which often happens to intellectually disabled inmates. This evidence also includes the recorded jail calls, which showed Wilson exercising caution—such as when he reminded the conversation participants that the calls were being recorded—and engaging in quick arithmetic. Additionally, this evidence includes the

---

[25] The Court acknowledges that the Supreme Court has cast doubt on the informational value of behavior observed in the correctional setting and on analysis emphasizing adaptive strengths to the exclusion of adaptive deficits. See Moore v. Texas, 137 S. Ct. 1039, 1050 (2017). But Wilson's "intentionally poor effort" on formal tests leaves the Court with "little better material with which to evaluate [Wilson's] . . . adaptive functioning." See Pervis, 937 F.3d at 557. Moreover, the Court does not exclusively rely on observations in the correctional setting; it also relies on videos taken prior to Wilson's incarceration.

videos that Wilson took during the traffic stops.  The fact that Wilson thought to record these videos reveals that he was cognizant that filming his interactions with the police might be a persuasive tool.  The content of the videos shows Wilson engaged in quick conversation with officers and successfully negotiating his way out of punishment.  The videos also establish that Wilson was able to drive a car in Detroit, which, according to Drs. Patton and Hunter, is not a skill that someone with a moderate or severe intellectual disability would possess.  Collectively, the evidence of Wilson's behavior displayed during moments when he was not being observed by experts strongly supports that he is able to understand consequences of his actions, advocate for himself, and communicate effectively with others.[26]

The Court also finds notable the fact that several of the defense experts' observations of Wilson support the view that Wilson is able to understand the proceedings against him and sufficiently communicate with his counsel.  For instance, Dr. Agharkar testified that Wilson could identify the evidence or witnesses that are "bad" for him; Wilson understood the concept of pleading guilty or pleading not guilty; Wilson was capable of assisting in his defense by suggesting defenses to his legal team, like misidentification or arguing that Wilson was not a member of a gang; Wilson understood the roles of the judge, attorneys, witnesses, defense attorney, prosecutor, and jury; Wilson recalled the approximate number of jurors; Wilson knew that he was facing the

---

[26] The Government suggests that the Court should also take into consideration its interactions with Wilson during the competency hearing. Gov't Br. at 31. Specifically, the Government refers to the instance where the Court proposed holding part of the competency hearing over Zoom due to a health issue that arose partway through the proceedings. Id.  Initially, when asked whether he would consent to proceed via Zoom, Wilson stated that he did not feel like he had a choice because he did not want to anger the undersigned. Id.  The Court explained that it would not be angry at Wilson if he did not agree to proceed by Zoom, and that the choice was Wilson's to make. Id. Wilson then consented to proceed via Zoom. Id.  While this interaction is not as reliable as evidence of the instances where Wilson was not—or did not believe—that his behaviors were being observed as part of the competency hearing, the interaction lends at least minor support to the Court's conclusion that Wilson is competent to stand trial.

death penalty; Wilson communicated a valid a reason for authorizing his counsel to accept a plea of 15 years (this was the length of the sentence received by one of his co-defendants); and Wilson was able to participate in strategizing for sentencing, instructing his legal team to emphasize his minimal criminal history at sentencing. Dr. Philipsborn observed that Wilson was able to assist in his defense by proposing ways to impeach a purported eyewitness; Wilson suggested ways that his defense team could bolster a defense of misidentification, like looking for cars that matched the description of the one captured in the video footage of the shooting; Wilson understood that he is the one who ultimately decides whether to plead guilty or go to trial; and Wilson was able to strategize for sentencing, telling his legal team that he did not want to blame drugs or others for his actions.[27]

In light of this evidence, the Court concludes that the Government has carried its burden of establishing by a preponderance that Wilson can reasonably understand the proceedings against him and can sufficiently assist counsel in his defense.[28]

### III. CONCLUSION

For the foregoing reasons, the Court finds Wilson competent to stand trial. Wilson's motion related to the competency hearing (Dkt. 1644) is denied. Wilson's motion to limit consideration of Dr. Denney's testimony (Dkt. 1646) is also denied.

SO ORDERED.

---

[27] The Court also notes that Dr. Hunter opined that, with training, Wilson and his legal team could communicate with each other even more effectively. There is at least some record evidence to suggest that these attempts to improve communication paid off. Specifically, Philipsborn testified that during his August 2021 meeting with Wilson, he observed that Wilson's communication abilities had greatly improved since their March 2020 meeting.

[28] The Court, therefore, need not decide whether Wilson meets the criteria for intellectual disability.

Dated: August 2, 2022                    s/Mark A. Goldsmith_____
      Detroit, Michigan                    MARK A. GOLDSMITH
                                    United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 2, 2022.

                                        s/J. McCoy for Karri Sandusky
                                        Case Manager