UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

        Plaintiff,

v.

D-2 CARLO WILSON,

        Defendant.

Case No. 2:16-cr-20460

Hon. Mark A. Goldsmith

---

## CARLO WILSON'S SENTENCING MEMORANDUM

I.    <u>Relevant Procedural History</u>

On August 24, 2022, Mr. Wilson entered into a plea agreement pursuant to Federal Rule of Criminal Procedure (Fed.R.Cr.P) 11. ECF No.1670. Under Fed.R.Cr.P 11(c)(1)(C), the parties agree Mr. Wilson's sentence of imprisonment may not exceed 300 months (or 25 years) and any sentence of imprisonment may not fall below 264 months (or 22 years). *Id*. at PageId.19915. The parties also stipulated to facts that support underlying acts of Murder in the Second Degree, not Murder in the First Degree. *Ibid*. at 19908-10.

Sentencing is scheduled for March 9, 2023. Defense submits this sentencing memorandum for the Court's consideration when imposing sentencing. Defense requests that this Court consider the factors set forth below and impose a sentence at

the low end of the agreed upon range of 264 months (or 22 years). A sentence of 22 years reflects the seriousness of the offense, promotes respect for the law and provides just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A).

II.    Credit for Time Served and Time Well Served

Mr. Wilson was arrested on June 29, 2016, and has been incarcerated ever since. He has served more than 6 years and 8 months in custody. He is entitled to credit for all the time he has served since being detained. *See* 18 U.S.C. § 3585(b).

As noted by probation, Mr. Wilson has been compliant in custody. This Court also had the opportunity to observe Mr. Wilson while in court and for extended periods of time during the competency hearing, where he always acted respectfully towards others.

Mr. Wilson has made good use of his time while incarcerated. He completed the Life Skills Transitions Sessions, attended and completed Bible studies, as well as other classes. Exhibit A. Additionally, while at the Federal Detention Center in Milan, Michigan, he has been working as a trustee. The Court may receive and consider all this information for purposes of imposing an appropriate sentence. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

III.    Guideline Range

Probation calculated Mr. Wilson's guideline range to be 360 months to life with a total offense level of 41 and a criminal history category of II. Sealed ECF No.1698, PageId.20098-20101. However, that calculation is based upon the underlying act of First-Degree Murder. *Id*. at 20098.

In the Government's sentencing memorandum, it correctly wrote: "Wilson's position is that the Second Degree Murder is the appropriate underlying offense, consistent with how Probation scored the murder of A.T., who was killed in the same course of action, (PSR ¶40), and consistent with the elements of the count of conviction and factual basis laid out in the Rule 11 Plea agreement (ECF No.1670, PageId.19907-10 at Section 4.6, 5)." ECF No.1706, PageId.20138-9. As expressly stated in a written objection to Probation, the Government has no objection for sentencing guideline purposes to hold Mr. Wilson accountable for two acts of Second-Degree Murder, as opposed to one act of First-Degree Murder and one act of Second-Degree Murder. Importantly, the agreed upon facts for purposes of the plea do not support premeditation, a necessary element under Michigan Law for First-Degree Murder.

Defense contends (and the Government agrees) the guideline range calculated using Second-Degree Murder as the underlying offense produces a guideline range of 262-327 months. ECF No.1706, PageId.20142. This range is in keeping with the

Rule 11(c)(1)(C) agreement reached by the parties that Mr. Wilson's sentence of imprisonment may not exceed 300 months (25 years) and may not fall below 264 months (22 years).

IV.     Sentencing Factors Pursuant to 18 U.S.C. § 3553 (a)

In *United States v. Booker,* 543 U.S. 220; 125 S. Ct. 757 (2005), the United States Supreme Court ruled that the "guidelines [were] effectively advisory," and "requires a sentencing court to tailor the sentence in light of other statutory concerns…see § 3553(a) (Supp. 2004)". After *Booker*, the Guidelines are to be "respectfully considered", but no one factor is to be given more or less weight than any other § 3553(a) factor in arriving at an appropriate sentence. *Kimbrough v. U.S.,* 128 S. Ct. 553 (2007); *Gall v. U.S.,* 128 S. Ct. 586 (2007); *Rita v. U.S.,* 127 S. Ct. 2456 (2007).

Previously disapproved or disfavored departure factors such as physical condition (U.S.S.G. § 5H1.4) employment record (U.S.S.G. § 5H1.5); family ties and responsibilities (U.S.S.G. § 5H1.6); socio-economic status (U.S.S.G. § 5H1.10); and substance abuse (U.S.S.G. § 5H1.4) may now be considered. Post *Booker,* there is no limitation on the information concerning the background, character and conduct of a defendant which a court may receive and consider for the purposes of imposing an appropriate sentence. 18 U.S.C. § 3661.

The United States Code is explicit about the role of 18 U.S.C. § 3553(a) in

sentencing determinations.  18 U.S.C. § 3582 specifically states:

> The court, in determining whether to impose a term of imprisonment and, if a term of imprisonment is to be imposed in determining the length of this term, *shall consider* the factors set forth in section 3553(a) to the extent they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

(Emphasis added).

The district court can also make independent assessments to justify an individualized sentence determination. In *Rita v. United* States, 127 S. Ct. 2456, 2458 (2007), the Supreme Court held that the district courts can conclude that the guideline sentence fails to reflect 18 U.S.C. §3553(a) considerations, reflects an unsound judgment, does not treat defendant characteristics in the proper way, or that a different sentence is appropriate "regardless." As stated by the 6th Circuit:

> *Booker* breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the § 3553(a) factors to the criminal defendants that come before them. If there is a pattern that emerges from *Rita, Gall* and *Kimbrough*, it is that the district court judges were vindicated in all three cases, and a court of appeals was affirmed just once and that of course was when it deferred to the on-the-scene judgment of the district court.

*United States v. Vonner*, 516 F.3d 382, 392 (6th Cir.) (en banc), *cert. denied*, 129 S. Ct. 67 (2008).

Variances are an important part of the sentencing process because they offer the opportunity to ameliorate, at least in some aspects, the rigidity of the

Guidelines themselves. Many courts have held that district judges need not shrink from utilizing variances when the opportunity presents itself and when the circumstances require such action to bring about a fair and reasonable sentence. Sentencing should be an act of reason by the Judge looking at a particular person and the circumstances of the crime this person has committed and then making a judgment. *United States v. Dominquez*, 296 F.3d 192, 196 n.7 (3rd Cir. 2002) ("The Guidelines do not require a judge to leave compassion and common sense at the door to a courtroom".); *United States v. Meyers*, 353 F. Supp. 2d 1026, 2017 (S.D. Iowa 2005) ("[i]f the 600-plus pages of the most recent set of sentencing guidelines have taught us anything, it is that punishment cannot be reduced to an algorithm."); *United States v. Biheiri*, 356 F. Supp. 2d 589 (E.D. Va. 2005) ("fashioning a just sentence cannot be reduced to a mere arithmetical exercise and that reliance solely on numbers, quantities, offense levels, criminal history categories, and matrices produce an illusory precision that obscures the fact *that sentencing in the end, must involve the exercise of judgment*".) (Emphasis added).

In this case, the Court has had the benefit expert reports and testimony from experts and lay witnesses who have described Mr. Wilson and his disability. This information, along with the argument below, supports a sentence at the low end of the range, or 22 years, which is at the low end of the agreed upon guideline range of 262-327 months.

A. <u>Nature and Circumstances of the Offense 18 U.S.C. § 3553 (a)(1)</u>

Based on the Government's evidence as presented in discovery by way of lab reports, ballistics reports, video footage, medical examiner report, recorded jail calls, and the police interrogation of Mr. Wilson, Edwin Mills was the principal actor. As acknowledged by the Government in Mr. Wilson's plea agreement he was not the first person to fire a weapon:

> "on December 1, 2015, S.H. was in a car at the Troester Market in Detroit. Victim A.T. was in the car with S.H. and victims M.A. and T.M. were riding on the hood of the car. When Carlo Wilson and another member of 6 mile saw S.H., *the other 6 Mile member fired his weapon first*, and then Wilson intentionally fired his firearm at the vehicle that S.H. and A.T. occupied."

ECF No.1670, PageID.19909-10 (emphasis added). *See also* Government's Exh.1 (ECF No.1706-1) at 5:17 of 6:00 minute pole camera video. At the time the "other 6 Mile member fired his weapon first" at the passenger side of S.H.'s vehicle, Mr. Wilson had not yet fully retrieved his weapon from his waistband. The "other 6 Mile" member, after firing at the passenger side of the vehicle, continued to shoot out the back window of the vehicle before Mr. Wilson fired a single shot.

The Government's evidence supported that 14 cartridge casings, which were associated with two different handguns (a .45 and a .40), were found at the crime scene. Two .45 caliber cartridge cases and twelve .40 caliber cartridge cases were recovered by police. *See* Bates 099687-099688 (Lab Report – 12/3/2015). The

Government's discovery also shows that the two .45 caliber casings were fired from a gun associated with Mr. Wilson. *See* Bates 099689-099690 (Lab Report - 5/16/2016). The Government's position was that the .40 caliber cartridge cases were associated with the gun fired by Mr. Mills, and thus demonstrates that Mr. Mills not only shot first but fired 12 shots at the victims.

The Government's evidence as seen in the video footage from the scene shows that Mr. Mills fired the majority of his 12 shots from the rear of the vehicle, which is consistent with the path of the bullets that killed the victims. Mr. Mills begins firing before the second shooter and continued firing after the second shooter fired 2 shots.

The police, when interrogating Mr. Wilson, knew that Mr. Wilson was not the principal actor and that he didn't "really want to be there":

> Police Officer: <u>01:00:31</u> So I'm watching this video, right? And I'm looking at these pictures. And... do you know who this is?
>
> …
>
> Police Officer: <u>01:01:01</u> And this is Edwin. This is Edwin, right here. Alright? What I see in this picture, lets pause [crosstalk 01:01:07] for a second. Listen to me for a second.
> …
>
> Police Officer: <u>01:01:11</u> I see this person who is hurt the most about B's [sic] murder and trying to kill someone he knows killed him. Right? And I see a person here [pointing at Mr. Wilson in the photograph], sitting back, not really proud of wanting to be a part of this. Trying to distance himself, or- or take the least

amount of action in this murder. Because they know there's kids sitting on that hood. They know there's kids in that car.

Police Officer: <u>01:01:40</u> I think that this person-
…

Police Officer: <u>01:01:42</u> ... has regrets about being there, and not really wanting to be there.
…

Police Officer: <u>01:01:56</u> ... this is- this is what I feel is going on in this picture, alright? This person [meaning Mr. Wilson] doesn't really want to be there.

Even the Government's evidence demonstrates that Mr. Wilson is a follower, not a leader.[1] Other evidence supports that Mr. Mills is the main actor. For example, after Vincent Johnson was killed on November 19, 2015, Dejuvon Carter ("White boi") placed a call from prison to Mr. Mills on November 20, 2015, and told Mr. Mills "you already know what time it is", initiating the action against S.H. Mr. Wilson is not mentioned in this phone call, was not present when Mr. Mills received the call, and no evidence supports that Mr. Wilson was even told about the call.

In the Government's sentencing memorandum, it stretched the interpretation of the evidence when it wrote: "[a]t least one of the bullets from Wilson's .45 caliber *reached the intended target* and was found inside the car." ECF No.1706, Page.Id.20142 (emphasis added). While true that Mr. Wilson fired his gun, and a

---

[1]    Mr. Wilson has always been described as a follower not a leader, which is consistent with his deficits in adaptive functioning. *See* ECF.No.930-2, PageID.8983 (As described by his grandmother and stepmother to Dr. Patton).

bullet and a bullet jacket fragment from the .45 was found in S.H.'s vehicle, the Government's evidence does not support that any bullets from Mr. Wilson's gun killed either S.H. or A.T. The .45 bullet was recovered on the driver side front floor of the vehicle and the .45 caliber bullet jacket fragment was recovered from the driver door of the vehicle. *See* Bates stamp 00127-00131. According to the Government's medical examiner the bullet which killed A.T. travelled from the rear right to the front left. *See* Bates 00117-00119 (Wayne County Medical Examiner Postmortem Report – 12/8/2015). This trajectory is inconsistent with the .45 bullet and bullet fragment found in the driver side door and floor of the vehicle, as well as from the relative position of Mr. Wilson when the shots were fired. It is also inconsistent with having killed S.H.

The Government's plea agreement with Mr. Mills does not contain a range (ECF No.1685, PageId.19967), and Mr. Wilson's agreement does (ECF No.1670,19915). This fact, and the Government's evidence, supports that Mr. Mills is the principal actor and should be treated differently for sentencing purposes than Mr. Wilson.

B. <u>History and Characteristics of Mr. Wilson. 18 U.S.C. § 3553 (a)(1)</u>

Mr. Wilson's family history evidences exposure to numerous risks for Intellectual Disability (ID). Mr. Wilson was born in 1993, the middle of three sons born to his mother by three fathers. He also has two younger half siblings on his

father's side. At the time of Mr. Wilson's birth and throughout nearly all his up-bringing, Mr. Wilson lived in housing in the Detroit area, which has among the highest lead content in the region, was racially segregated and was marked by high rates of poverty. In 1998, when Mr. Wilson was 5 years old, more than 40% of children in Detroit had lead levels at or above the 5 micrograms/deciliter. J. Maqsood et al., *2016 Data Report on Childhood Lead Testing and Elevated Blood Lead Levels: Michigan*, MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES. In 2000, when Mr. Wilson was 7 years old, his neighborhood was 85% African American and 50% of female headed families with children under 5 years old lived below the poverty line. *See*, www.factfinder.census.gov.

School records for several of Mr. Wilson's immediate and extended family demonstrate multi-generational struggles with academic success. His mother obtained failing grades in many classes, repeating 10th grade twice. She failed 10th grade a second time and dropped out of school at the age of 19, having given birth to Mr. Wilson's older brother. Mr. Wilson's father also dropped out of school after the 10th grade. His older brother repeated 9th grade, before eventually failing out after 10th grade; and his younger brother was expelled from school without finishing, with a class rank of 72 out of 73 students in 10th grade. Mr. Wilson's cousin dropped out of school in the 7th grade due to a severe learning disability, subsequently receiving disability support from social security. Mr. Wilson's paternal

family includes an aunt with severe cognitive impairments (who repeated 4th grade twice, 9th grade, and 10th grade), a great uncle receiving disability support, as well as a number of cousins who have serious cognitive impairment and were unable to graduate from high school. Additionally, many members of the maternal and paternal family have been diagnosed with serious mental illness.

Mr. Wilson was exposed to extraordinarily high levels of violence during his developmental years, including the murder of his father when he was 11 years old, which he learned about on the television news. The Government, without a basis, claims in its sentencing memorandum that after Mr. Wilson's father was murdered, Mr. Wilson failed to "take advantage of the opportunities presented to him by positive influences in his life…" ECF No.1706, PageId.20142. Such an unsupported claim begs the question, what were the opportunities presented to him? His step-mother Delores Kimbrough reported that "his father's death was a significant emotionally troubling event for him and that his mother did nothing to help him deal with the issue. She said it was terrible for him when his father died." *See* Government's expert's report, ECF No.971-1, PageId.9839.

Mr. Wilson witnessed domestic violence as well as community violence as a child and adolescent. In 2010, emergency service response times in Detroit averaged 18 to 22 minutes when the nationally accepted response time was within 5 minutes to insure the best likelihood of survival. A. Turner et al., *Emergency Medical*

*Services in Detroit: Progress and Potential*, Altrium Institute Research Brief, Center for Sustainable Health Spending (May 2017).

Further, Mr. Wilson's family was unable to provide him with necessities. His mother was unable to provide adequate food, clothing, or safety for her children. Mr. Wilson's step-mother described developmental delays she observed in Mr. Wilson during childhood. ECF No.930-2, PageId.8980-3. She also described that he would arrive at her home dirty and hungry, having not been cared for. Concerned that Mr. Wilson was not adequately clothed and fed, she offered to adopt Mr. Wilson but was rebuffed by Mr. Wilson's mother.

Each of these genetic and environmental risks may have contributed to Mr. Wilson's intellectual disability.

1. Mr. Wilson is a person with ID.

Mr. Wilson's bio-psychosocial history provides substantial evidence of the early manifestation and persistence into the present day of his cognitive and functional impairments; his substantial deficits in learning, adapting, and incorporating new information; his need for constant support and guidance; his gullibility; and his substantial difficulty in making decisions, understanding and weighing options, and frustration when faced with making decisions or trying to understand information. In support of Mr. Wilson being a person with ID, the Defense previously submitted reports of experts who have extensive years of clinical

experience in assessing ID. *See* ECF No.930-2 (Patton); 930-3 (Hunter), 930-4 (Fahey); 930-5 (Woods); 930-6 (Bigler); Exhibit A from Competency Hearing (Report of Dr. Bhushan Agharkar).

Finding Mr. Wilson competent to stand trial, the Court wrote "not all individuals who have an intellectual disability are incompetent to stand trial." ECF No.1661, PageId.19879 (internal citations omitted). The Court did not find that Mr. Wilson was not ID or that he did not suffer from a serious learning disability as described by the Government's experts. Whether this Court concludes that Mr. Wilson is intellectually disabled or learning disabled, both constitute mitigating evidence and is relevant to sentencing. *See* 18 U.S.C.§3553 (a)(1).

The testing results, historical information about Mr. Wilson, descriptions of Mr. Wilson throughout the developmental period, and the testimony during the competency hearing support that Mr. Wilson is a person with ID. Both of his prior schoolteachers Ms. Horton and Ms. Murray testified that Mr. Wilson was pulled out of their respective classes by the special education teacher Ms. Jensen to receive services. 1626, PageId.18390-91; 1627, PageId.18519. A classmate, Mr. Bullock, corroborated their account that Mr. Wilson was pulled out of class to receive services. ECF No.1626, PageId.18413. Both teachers testified that he had to have had an IEP to have received special education services. ECF 1627, PageId.18519; 1626, PageID.18408-09. Their testimony was not refuted.

Government and Defense experts testified the evidence supported that Mr. Wilson suffered from significant deficits in adaptive behavior, specifically in the conceptual domain. Conceptual skills include communication, planning and problem solving, thinking abstractly, self-direction, abstract thinking, and anticipating cause and effect. AAIDD User's Guide at 56-57. Dr. Fahey testified that Mr. Wilson's significant deficits in the conceptual domain, specifically his language disorder, had onset during the developmental period. ECF No.1635, PageId.19298. She further testified that Mr. Wilson's profile "shows a marked depression in scores across every area and all in the severe range, all two and-a-half to three standard deviations below the mean", which is more closely related to intellectual disability than a learning disorder. *Id*. at PageId.19300.

Based upon his clinical judgement and years of experience working with persons with ID[2], Dr. Hunter, a neuropsychologist with expertise in neurodevelopmental disorders, opined that Mr. Wilson is a person with mild ID. ECF No.1630, PageId.18879, 18885-86. He also testified that his impairments in learning and memory functioning are consistent with a mild form of ID and "the variability seen are very reflective of what [he] is used to in [his] work with individuals with intellectual disability syndromes, particularly the mild level in their

---

[2]     ECF No.1630, PageId.18795-96; 18797-98.

presentations." *Id*. at PageId.18875. This is significant mitigating evidence that the Court should consider when sentencing Mr. Wilson.

2. <u>Mr. Wilson's youth at the time of the offense</u>

At the time of the incident, Mr. Wilson was barely 22 years of age. He had turned 22 less than a month before the crime. He is now 29 years of age and the father of a 10-year-old son whom he cherishes. Defense requests that this Court consider Mr. Wilson's youth as a mitigating factor for purposes of sentencing.

In January of 2016, the Department of Justice (DOJ) issued a report that acknowledged there is "evidence of a national scientific consensus" that the developmental period extends into one's twenties. *See* U.S. Department of Justice Report and Recommendations Concerning the Use of Restrictive Housing, January 2016 ("While most jurisdictions use the age of 18 as the cutoff between juvenile and adult criminal court adjudication, developmental research shows this is a somewhat arbitrary demarcation. …[defining] young adults… as… between the age of 18 and 24.").

The following year, in a May 2017, the Sentencing Guideline Commission issued a report, Youthful Offenders in the Federal System ("Youthful Offenders") whereby it extended the developmental period to age 25. The Commission begins by defining a youthful offender as a person "age 25 or younger at the time they are sentenced in the federal system." Youthful Offenders at *1,

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf (last visited March 3, 2023). The Report explains the "inclusion of young adults is informed by recent case law and neuroscience research in which there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average." Youthful Offenders at *5. The Report further explains the emerging research "has focused on the prefrontal cortex of the brain, which is located at the front of the frontal lobe and is the last part of the brain to fully develop." Youthful Offenders at *6. It notes: "The prefrontal cortex is utilized in impulse control, emotional reactions, executive function and decision making." *Id*.

The Report summarizes the scientific consensus concerning brain maturation as follows:

> First, researchers agree that the prefrontal cortex is not complete by the age of 18 . . . . Second, researchers agree that development continues into the 20s. Third, most researchers reference 25 as the average age at which full development has taken place . .

Youthful Offenders at *7. *See also* Alexandra Cohen et al., *When Does a Juvenile Become and Adult? Implications for Law and Policy*, 88 Temp. L. Rev. 769, 783 (2016) (summarizing scientific research on brain maturation and noting that "noninvasive brain imaging and postmortem studies have shown continued regional development of the prefrontal cortex, implicated in judgment and self-control beyond the teen years and into the twenties.").

One of the most prominent researchers on brain development, Dr. Jay Giedd, explained the physiology this way:

> The most recent studies indicate that the riskiest behaviors (among adolescents) arise from a mismatch between the maturation of networks in the limbic system, which drives emotions and becomes turbo-boosted in puberty, and the maturation of networks in the prefrontal cortex, which occurs later and promotes sound judgment and the control of impulses. Indeed, we now know that the prefrontal cortex continues to change prominently until well into a person's 20s.

Jay N. Giedd, *The Amazing Teen Brain*, 312 Scientific American 33, 34 (2015).

The full development of crucial executive functioning—the decision-making and moral aspect of a person's brain that renders them fully culpable—does not occur until a person's 20s. The full development of gray matter "peaks latest in the prefrontal cortex, crucial to executive functioning, a term that encompasses a broad array of abilities, including organization, decision making and planning, along with the regulation of emotion." *Id*. at 35. Similarly, Dr. Laurence Steinberg, whose research was relied upon by the Supreme Court in *Roper v. Simmons*, 543 U.S. 551, 569 (2005) and in *Miller v. Alabama,* 567 U.S. 460, 471 (2012), and whose testimony was determinative in *Cruz v. United States,* No. No. 11-CV-787, 2018 WL 1541898 at *21 (D. Conn. Mar. 29, 2018), details findings that "the development of self-regulatory capacities [] occurs over the course of adolescence and during the 20s." Laurence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*, 28 Developmental Review 78, 93 (2008).

Mr. Wilson, at the time of the crime, possessed the distinctive attributes of youth within the current medically-recognized late adolescence category and submitted evidence of his brain's underdevelopment and his neurodevelopmental disability. Simply put, his individual characteristics and risk factors delayed his brain development even further.

The science is clear: people in their early twenties are not yet adults and should not be punished as such. Defense requests this Court to take into consideration why the Supreme Court moved to protect juveniles and the science of brain development which prompted *Roper* and *Miller* in considering the appropriate sentence for Mr. Wilson. Defense asserts that when taking into account Mr. Wilson's youth, underdeveloped brain, and disability a sentence of 22 years is appropriate.

   3.  The need to avoid unwanted sentencing disparities pursuant to

"The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" is a factor to be considered when sentencing Mr. Wilson. 18 U.S.C. 3553 (a)(6). Of the eleven indicted defendants, nine plead guilty and have been sentenced. All the sentences imposed by this Court to date have been either below or at the bottom of the agreed upon guideline range. *See* Sealed ECF No.1698, PageId.20090 (PSIR at p.5). No sentences have been at the high end of the range. *Id.* Of the eleven indicted defendants, four defendants faced capital murder charges. Two of those 4 defendants

are Messrs. Donnell Thompson and Lomnil Jackson. Mr. Thompson and Mr. Jackson, both of whom have far more extensive criminal records than Mr. Wilson, received sentences of 180 (15 years) and 150 (12.5 years) months respectively. To sentence Mr. Wilson to more than the low end of the agreed upon range would result in a sentence disparity among the indicted defendants.

4. <u>Mr. Wilson has family and friends that love and support him</u>

While Mr. Wilson had a traumatic upbring filled with neglect and one which lacked the support that every child needs for a healthy development. His upbringing and his current social circle is not without love, however. As demonstrated by the attached letters of support, Mr. Wilson finds himself with family and friends who love him. He is described as "respectful", "honest", filled with "human kindness", "supportive and dependable", having a "loving heart", a "responsible father", and "optimistic". *See* attached letters of support (Exh. B). He has grown in immeasurable ways over the last six years. With the support of family and friends he can and will continue to grow into the man he was always meant to be. Probation places him at low risk for negative behavior, which is certainly a reflection of his maturation over the last several years. Sealed ECF No.1698, PageId.20104.

## CONCLUSION

Mr. Wilson has accepted responsibility for his conduct and has expressed genuine remorse. For the reasons submitted in this memorandum and for the

anticipated statements at the sentencing hearing, Defense requests that this Court impose a sentence of 22 years.

Respectfully submitted,

By: s/ Jacqueline K. Walsh
Jacqueline K. Walsh
Washington State Bar #21651
140 Lakeside Ave., #A-338
Seattle, WA 98122
206-325-7900x5
Jackie@jamlegal.com
Attorney for Mr. Wilson

Dated: March 3, 2023

## CERTIFICATE OF SERVICE

I, Jacqueline Walsh, hereby certify that on March 3, 2023. I electronically served the forgoing document with the Clerk of the Court using the ECF system which will send notification to all parties.

s/ Jacqueline Walsh
Jacqueline Walsh